Receipt number AUSFCC-11166297

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SUBLIME SYSTEMS, INC.,

*Plaintiff,*

v.

UNITED STATES OF AMERICA,

*Defendant.*

Case No. 26-458 C

## COMPLAINT

1. This case concerns the Department of Energy's unlawful, unilateral termination of a cooperative agreement with Sublime Systems, a technology company pioneering a zero-carbon emissions method of manufacturing cement.

2. In 2022, Congress enacted legislation that provided hundreds of millions of dollars to DOE to fund industrial technology projects that would reduce greenhouse gas emissions. Carrying out that mandate, in November 2024, DOE awarded Sublime $86.9 million to build a first-of-a-kind manufacturing facility in Holyoke, Massachusetts. The facility would enable Sublime to bring its proprietary cement technology to commercial scale, producing enormous benefits for American manufacturing, energy independence, and jobs. DOE legally obligated the full $86.9 million to Sublime via a cooperative agreement.

3. In reliance on DOE's award, Sublime invested millions of dollars in the project and entered into final agreements and term sheets with some of the nation's largest corporations to purchase cement that would be produced at the facility funded by DOE. These agreements were set to provide Sublime hundreds of millions of dollars in future revenues. Sublime also

received nearly $150 million in tax credit allocations and funding commitments from investors, the receipt of which depended upon the funds that DOE had obligated to Sublime.

4.    In the months following the award, Sublime did everything it was required to do under the cooperative agreement. It continued its preparations of design plans, hired staff, and met all of the deliverables required under the cooperative agreement. Up until the date of termination, DOE never questioned Sublime's performance and had been paying Sublime's invoices for work performed under the agreement. Sublime was right on schedule—just months away from beginning to construct the facility and, soon after, manufacturing and selling cement to customers around the world.

5.    In May 2025, however, DOE abruptly terminated the award. DOE did so without providing notice to Sublime or suggesting that Sublime had failed to comply with the terms of the agreement in any way. Instead, DOE cited a patently false factual basis for the termination: that Sublime had not considered emissions generation of electricity to power the project in its application. Sublime had, in fact, expressly considered these emissions in its DOE application.

6.    DOE also claimed it was terminating because the award no longer effectuated program goals or agency priorities. However, the agreement permitted DOE to terminate on this basis only "to the extent authorized by law," and the termination was unlawful for a host of reasons, including because it violated federal law prohibiting arbitrary and capricious agency action. DOE similarly abused its discretion and violated the implied duty of good faith and fair dealing by terminating Sublime's award—as part of a mass termination of awards issued under the same statutory program—without any individualized consideration or explanation for why the project purportedly no longer effectuated the agency's goals or priorities.

2

7.      DOE's unlawful termination has caused Sublime billions of dollars in damages in the form of lost income, lost funding, reliance damages, and lost company value. To remedy these harms, Sublime seeks money damages for breach of contract, breach of the implied covenant of good faith and fair dealing, abuse of discretion, and bad faith.

### JURISDICTION

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1491(a).

### PARTIES

9.      Plaintiff Sublime Systems is a technology company with its principal place of business in Somerville, Massachusetts.

10.     The United States of America is a defendant pursuant to 28 U.S.C. § 1491.

### FACTUAL ALLEGATIONS

**A.      DOE Announces Funding for Clean Energy Projects**

11.     In 2022, Congress appropriated $5.8 billion to DOE's Office of Clean Energy Demonstrations to provide financial assistance to projects that would deploy "advanced industrial technology" to reduce greenhouse gas emissions. Pub. L. 117-169 § 50161, 136 Stat. 1818, 2049 (Aug. 16, 2022). For this Advanced Industrial Facilities Deployment Program, Congress directed that the Secretary of Energy "shall" use the appropriated funds to provide funding to eligible entities in the form of grants, loans, or cooperative agreements. *Id.* §§ 50161(a), (g).

12.     In accordance with Congress's direction, in 2023, DOE issued a funding opportunity announcement for companies to apply for awards from DOE's Office of Clean Energy Demonstrations (OCED) under the advanced industrial technology deployment program. The announcement stated that the awards would be funded by appropriations from § 50161 of

the IRA as well as related appropriations from the Infrastructure Investment and Jobs Act (IIJA), Public Law No: 117-58. The announcement explained that the "purpose" of the program was to make available "approximately $6 billion in federal funds for projects that will validate low-[greenhouse gas] emitting industrial facilities capable of manufacturing products and materials with low-carbon footprints." When combined with private sector cost share, the announcement "represent[ed] a more than $12 billion opportunity to catalyze high-impact, large-scale transformational advanced industrial facilities to significantly reduce greenhouse gas . . . emissions in energy-intensive industrial subsectors."

13.    The announcement explained that DOE was looking particularly for "first- or early-of-a-kind commercial-scale projects," which could include "new technologies that have been proven at a pilot scale but have yet to be deployed commercially." Projects selected for the program would proceed in four phases, with the first phase encompassing initial planning and analysis activities to ensure that the concept is technologically and financially viable. The final phase would involve ramping up to full operations and analyzing the plant's operations, performance and financial viability.

14.    The funding announcement noted that cement and concrete were particular "areas of interest" to the agency. As "vital components of the nation's infrastructure," DOE explained, few construction materials have the "resilience, versatility, low cost, ease of production, and resistance to severe weather events." The traditional method of producing cement, however, contributes significantly to U.S. industrial greenhouse gas emissions, presenting an opportunity for new technologies to decarbonize the production of cement and concrete.

15.    DOE anticipated awarding 10-30 awards in total for facility-level large installation projects, with an anticipated award duration of 3-7 years and anticipated federal funding of $75-$500 million per award.

16.    In March 2024, DOE announced it had selected 33 projects for award negotiations, including Sublime's as described below.

**B.    Sublime Systems**

17.    Sublime Systems is a Massachusetts-based technology company founded by Dr. Leah Ellis and Dr. Yet-Ming Chiang in 2020. Dr. Ellis, who holds a PhD in chemistry, co-invented Sublime's technology with Dr. Chiang at MIT, where Dr. Ellis worked as a postdoctoral fellow. Dr. Chiang is a Professor of Materials Sciences and Engineering at MIT, a world-renowned pioneer of electrochemistry and advanced materials, and an entrepreneur who previously co-founded several companies that are collectively worth billions of dollars. These companies include American Superconductor ($1.86 billion peak valuation), A123 Systems ($2.6 billion), 24M technologies ($1.3 billion), Desktop Metal ($8 billion), and Form Energy ($3.37 billion). Sublime's current Chief Executive Officer is Rob Davies, who has 30 years of industrial and manufacturing experience, including two decades in the cement industry with companies including Blue Circle Industries, Lafarge, and Holcim.

18.    Sublime's process for manufacturing cement avoids the extreme heat and rigid requirements involved in the traditional manufacturing process for what is known as ordinary "portland cement." Under the traditional process, a specific set of raw materials such as limestone, silica, alumina, and iron (known as "feedstock") are heated in a rotary kiln to approximately 900 degrees Celsius to decompose the limestone—releasing 50% of its weight as $CO_2$. The mixture is then heated to 1,450 degrees Celsius, at which point the portland cement

5

forms. This semi-molten mix is then quenched with cool air and ground with gypsum to form a fine cement powder.

19.    While this process for manufacturing cement has been in place for decades, it wastes approximately 40% of raw materials and produces 1 ton of greenhouse gas emissions for each ton of cement. Given that the cement industry is the third largest consumer of industrial energy globally (representing 7% of global industrial energy use), the traditional process is thus a significant contributor to global greenhouse gas emissions.

20.    Sublime's process transforms electrical energy into chemical energy to break feedstocks down into their constituent minerals. It then reassembles these pure ingredients into an ideal cement composition. The minerals that are not used for cement can then be sold into commodity markets to support the production of steel and lightweight metals needed for manufacturing, as well as other industrial sectors. This process transforms nearly all of the feedstock to products, creating near-zero waste and a path for recycling industrial byproducts into valuable construction materials.



21.    Sublime Cement is validated by third parties to meet ASTM C1157, the performance-based specification for hydraulic cement, approved by concrete industry

specifications and the International Building Code. Sublime Cement also outperforms typical portland cements in many key durability tests such as alkali-silica reaction, chloride attack and sulfate attack, meaning concrete can last longer in tough environmental conditions.  In addition, Sublime Cement is significantly whiter in color than portland cement, which is highly desirable for increased visual appeal of architectural concrete or reducing heat island effects, increasing its value.

**C.      Sublime Applies for Federal Funding**

22.      In August 2023, Sublime applied for federal assistance under DOE's advanced industrial technology deployment program. The application explained that Sublime intended to reduce the global warming potential of cement by more than 75% through electrochemical manufacturing. Sublime sought funding to build a new, ultra-low carbon cement manufacturing facility in Holyoke Massachusetts with capacity of 30,000 tonnes per year, known as the "Kiloton Project."

23.      The Kiloton Project would implement Sublime's proprietary first-generation electrochemically assisted process to produce cement from a variety of abundant feedstocks. The project was intended to demonstrate the technology that could be scaled up into what would eventually be numerous Megaton-scale Sublime plants within the United States, and the facility would help Sublime demonstrate the production of its cement and validate its performance in real-world applications.

24.      Sublime's application explained that DOE funding would be critical for Sublime to bridge the final demonstration "valley of death" for its cement production technology, before full-scale commercial production facilities can be built and funded with traditional project financing.

7

25.     Sublime noted that a cooperative agreement would unlock private follow-on investment for the significant capital demands necessary to execute such a scale-up. Sublime further noted that it was in "advanced discussions with multiple offtake partners" and expected that the Holyoke plant would be "significantly oversubscribed for allocations." Sublime's project management plan made clear that Sublime would have capacity reservation agreements comprising 30% of the Holyoke plant's capacity by the end of phase 1 of the project (*i.e.*, by October 2025). Sublime also regularly kept DOE apprised of the progress it was making in negotiations with partners, and notified DOE that it signed a binding offtake agreement with a major technology company worth, at a minimum, many tens of millions of dollars.

26.     Sublime's application shared that the company's "schedule for achieving long-term financial viability beyond DOE and other federal funding" would "be accomplished primarily through sales of materials produced by the plant."

27.     Sublime's business development and management plan informed DOE that the "cooperative agreement will unlock significant private-sector follow-on investment through a Series B fundraise," which would reduce the project's capital flow risk.

28.     Sublime also noted in its application that, in addition to greenhouse gas reductions, the Holyoke plant would help to reshore manufacturing in the United States and reduce the nation's reliance on foreign imports.

29.     Sublime sought $86.9 million total in federal funding in connection with its application.

**D.      DOE Selects Sublime for Award and Enters Into Cooperative Agreement**

30.      In March 2024, Sublime received notice that its demonstration project for its Kiloton Plant had been selected for federal financial assistance. Sublime then entered into negotiations with DOE and became "under award" in November 2024.

31.      Under the award, DOE agreed to provide total government assistance of $86,907,197. Sublime for its part agreed to invest $132,562,589 in the project, for a total investment of $219,469,786 for the project.

32.      In November 2024, DOE "obligated" $12,792,364 of the funds to Sublime, meaning the agency incurred a "legal liability" to "disburse funds immediately or later based on a series of actions." 50 C.F.R. § 80.91. In December 2024, DOE legally obligated the remaining award balance of $74,114,833 to Sublime.

33.      In connection with the award, DOE and Sublime also entered into a cooperative agreement.

34.      The principal project objective under the cooperative agreement was to "[c]onstruct and commence commercial operations of an industrial scale Sublime Cement plant" that would "demonstrate the feasibility of implementing an electrochemically assisted Sublime process to produce 20,000-30,000 tonnes per year of cement with similar strength to" ordinary portland cement.

35.      The agreement authorized four budget periods and allocated a maximum DOE funding amount for each period. The agreement likewise set forth the project activities that Sublime would need to complete in phase 1 of the project, as well as a series of objective "go/no-go review criteria" that Sublime would have to meet to advance to phase 2. Phase 1 project activities included updating the project's Life Cycle Analysis, addressing technology

9

development through a Technology Maturation Plan, and assessing market demand and developing offtake agreements for potential customers.

36. The period of performance for the agreement was November 2, 2024, to April 1, 2028.

37. The cooperative agreement also specified the circumstances under which a party may terminate the agreement. The agreement does not provide for termination for convenience. Rather, DOE could terminate the agreement only in two circumstances: (i) if Sublime "fails to comply with the terms and conditions of this Award" or (ii) "to the greatest extent authorized by law, if the Award no longer effectuates the program goals or agency priorities."

**E.**    **Sublime Receives Significant Financing and Offtake Agreements Based on the DOE Agreement, and Performs Under the Agreement**

38. Sublime immediately set to work on the Kiloton Project, hiring staff and securing commitments from customers and investors. Sublime submitted all of its deliverables required under the agreement on schedule, including design packages, environmental information, and a project management plan. The company was on track to proceed to phase 2 of the project on schedule.

39. As a result of the DOE funding, Sublime demonstrated to future customers and investors that it had a feasible path to building the facility and begin producing cement by 2028.

40. Sublime secured enormous financial commitments from customers and investors, based on DOE's entry into the agreement.

41. Three leading cement companies pre-paid for over one-third of the Kiloton Plant's capacity as part of an enormous financial investment in Sublime's technology. As part of the deal, the companies were actively planning multiple Megaton-scale cement plants with Sublime.

42. Subsequent to entering into the DOE agreement, Sublime received a $46.7 million allocation for a federal tax credit known as the Qualifying Advanced Energy Project Credit. Sublime's receipt of this allocation is conditioned on hitting certain milestones by January 2027 and January 2029. Sublime cannot hit these milestones without the Kiloton Plant being operational.

43. Sublime also secured a Massachusetts tax credit worth $1,050,000, and a local tax credit worth $350,000, both of which are dependent on the operation of the Kiloton Plant.

44. Sublime further received a letter of intent from a major energy investment company to provide tens of millions of dollars in funding.

45. In addition to these capital commitments and tax credits, some of the largest corporations in the nation jumped at the opportunity to enter offtake agreements for the cement that Sublime would produce at the Kiloton Plant.

46. For example, one major technology company, hereinafter referred to as "Hyperscaler 1," signed a binding offtake agreement to purchase hundreds of thousands of tonnes of Sublime's cement products, worth a minimum of many tens of millions of dollars. Another technology company, "Hyperscaler 2," approved a term sheet for binding offtake worth tens of millions of dollars. Another company, "Hyperscaler 3" also sent term sheets projecting binding offtake agreements worth up to hundreds of millions of Sublime's cement products.

47. Sublime also entered negotiations with a range of other potential offtake partners, including some that were at advanced stages of negotiations at the time of the award termination.

48. As of termination of the award, the Kiloton Project was significantly oversubscribed, with 205% of the plant's projected production allocated.

49.    Sublime has also completed multiple successful commercial demonstrations of its product, including at a facility of a Fortune 10 company and a data center of a large property developer and manager. For the latter, Sublime successfully completed a concrete pour using Sublime cement in a new state-of-the-art office building.



50.    Sublime updated DOE on this significant commercial progress through numerous deliverables, including its market assessment report, letters of commitment, and capacity reservations deliverables.

**F.    DOE Abruptly Terminates the Cooperative Agreement Without Basis**

51.    In May 2025, Secretary of Energy Chris Wright announced that DOE would conduct a "review" of financial assistance awards issued under the prior administration. A press release stated that Secretary Wright had "concern[s]" about certain awards issued by the prior administration, but did not specify the awards or further explain his concerns.

52. DOE announced that a committee would conduct a "review process" for certain awards "on a case-by-case basis." During the next two weeks, Sublime heard nothing from DOE. Although the press release contemplated that DOE may request information from award recipients to help inform DOE's decision-making, and although DOE did reach out to other companies requesting such information, DOE never contacted Sublime to request information or even notify Sublime that its award was under review.

53. Instead, on May 29, 2025, just two weeks after announcing its intended review of awards, DOE sent Sublime a termination notice, purporting to unilaterally terminate the cooperative agreement "effective immediately." The termination letter was not sent to Sublime's designated points of contact for the award, but rather to a junior accountant at Sublime.

54. The termination notice did not allege that Sublime failed to comply with the terms and conditions of the award or cooperative agreement, or that Sublime was deficient in its performance under the agreement in any manner. Instead, the termination notice stated that DOE was terminating the award for three reasons: (i) Sublime allegedly "only considered the emissions reduction at the facility and did not consider emissions generation of electricity to power the project," (ii) the award "fails to meet the goals or priorities of DOE and the Administration," and (iii) the project "no longer effectuates the program/agency priorities." The letter did not provide any individualized explanation as to why Sublime's award failed to meet or no longer effectuated DOE's goals or priorities.

55. The first reason given for termination is demonstrably false, and Sublime would have shown that it is false had it been given any opportunity to be heard prior to termination. Sublime's application for the award accounted for greenhouse gas emissions from the electricity consumed in making Sublime's cement. The life cycle assessment that Sublime submitted upon

applying described that the electricity for the Holyoke plant would have emissions of 15.0 kg of carbon dioxide per megawatt hour. Further, Sublime's industry value proposition submitted with the application package acknowledged that Sublime's cement process would consume energy, with the benefit being that there would be lower emissions since Sublime's process could run on renewable energy. Indeed, Sublime submitted an updated life cycle assessment in April 2025 as part of a Phase 1 deliverable, which confirmed that the electricity for the Holyoke plant would have emissions of 15.0 kg of carbon dioxide per megawatt hour.

56.    The second reason given for termination is not a valid basis for termination under the cooperative agreement. Nowhere does the cooperative agreement authorize DOE to terminate Sublime's award on the ground that it "fails to meet the goals or priorities of DOE and the Administration," without regard to whether the termination is otherwise "authorized by law" or whether the award ever effectuated program goals or agency priorities.

57.    The final reason cited by DOE is in reference to the provision of the cooperative agreement permitting the agency to terminate the award—to the extent authorized by law—if the award no longer effectuates programs goals or agency priorities. But DOE never explained *how* Sublime's project no longer effectuated program and agency priorities. Moreover, the cooperative agreement authorizes DOE to terminate on this basis only as "authorized by law," and this termination was not authorized by law in multiple different ways.

58.    DOE's termination of Sublime's award was part of a broader, mass termination of DOE awards funded by the IRA and IIJA. DOE announced 24 award terminations on the same day, May 30, 2025, comprising $3.7 billion in total funding. Secretary of Energy Christopher Wright announced all the award terminations in a single press release, stating that the terminated projects purportedly all "failed to advance the energy needs of the American people, were not

14

economically viable and would not generate a positive return on investment of taxpayer dollars."[1] Like the termination letters, the Secretary`s announcement did not explain how any particular award, including Sublime's, was not economically viable or would not generate a positive return on investment. And that characterization was plainly untrue for Sublime's award, where Sublime had already received massive commitment from major corporations to acquire the cement that would be produced using the federal award.

**G.      DOE's Unlawful Termination Causes Massive Damages to Sublime**

59.      DOE's unlawful termination of the cooperative agreement has caused and will cause Sublime to incur substantial damages in the form of lost income, lost funding, reliance damages, delay costs, and a diminution in value of the company.

*Lost Income*

60.      Before the termination, Sublime had executed binding offtake agreements and negotiated term sheets with three major "hyperscalers" and one leading construction company. These included a binding offtake agreement with Hyperscaler 1, approval of a term sheet for binding offtake from Hyperscaler 2, and negotiation of a term sheet projecting binding offtake agreements with Hyperscaler 3. Sublime had also secured a significant financial commitment from four major construction companies.

61.      The unlawful termination of Sublime's award will directly cause Sublime to lose this income. DOE knew or should have known that Sublime would lose out on such income because Sublime explained its commercial objectives in detail in its application. For instance, Sublime submitted an industry value proposition that explained that there was an unmet,

---

[1] Secretary Wright Announces Termination of 24 Projects, Generating Over $3 Billion in Taxpayer Savings, DOE.gov, https://www.energy.gov/articles/secretary-wright-announces-termination-24-projects-generating-over-3-billion-taxpayer.

domestic market demand for cement and that Sublime expected its Holyoke plant to be significantly oversubscribed for allocations of Sublime cement. Similarly, Sublime submitted a workplan that listed commercial goals and expected outcomes, including that Sublime would generate offtake agreements.

62.    In addition, Sublime was in the process of negotiating and finalizing offtake commitments from at least ten other companies when DOE abruptly terminated the award. At the time of the termination, it was reasonably certain that Sublime would reach agreement with some or all of these companies.

### Lost Funding

63.    DOE's unlawful termination has also caused Sublime to lose out on tens of millions of dollars in investment from DOE and other sources.

64.    The termination directly resulted in a loss of more than $80M in financial assistance that DOE had obligated to Sublime.

65.    The termination also has resulted or will result in the loss of tens of millions of dollars of other secured funding in the form of investments and tax credits, including $46,700,000 federal tax credit that Sublime was due under the Qualifying Advanced Energy Project Credit, and Massachusetts and local tax credits of $1,050,000 and $350,000 respectively.

66.    Due to the termination, Sublime has already lost a commitment it had received of tens of millions of dollars from an energy investment company.

### Reliance Damages and Delay Costs

67.    Sublime also incurred significant expenses in reliance on the cooperative agreement. Sublime has already invested millions in the Kiloton Project, in reliance on the DOE award. The termination of the award has also caused an ongoing delay in Sublime's ability to

16

continue developing the Holyoke plant, leading to substantial expenses each month. Sublime has also had to terminate a significant number of employees and contractors, resulting in significant costs including but not limited to severance and legal fees.

### *Loss of Company Value*

68.    Finally, because of the termination, Sublime has had to suspend operations at the Holyoke Plant site. If that remains the case, Sublime is entitled to receive the lost value of the company, which was eminently foreseeable to DOE because DOE was aware that the OCED award was necessary for Sublime to build a kiloton plant to demonstrate that its cement is commercially scalable. Indeed, Sublime's business development plan informed DOE that the company's "long-term financial viability beyond DOE and other federal funding" "will be accomplished primarily through sales of materials produced by the plant."

## CAUSES OF ACTION

### Count One
### (Breach of Contract)

69.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

70.    Sublime's cooperative agreement with DOE is a valid and enforceable contract.

71.    The cooperative agreement authorized DOE to terminate the agreement unilaterally only in two circumstances: (a) if Sublime failed to comply with the terms and conditions of the award; or (b) to the greatest extent authorized by law, if the award no longer effectuates the program goals or agency priorities.

72.    Sublime complied fully with all the terms and conditions of the cooperative agreement, and DOE never asserted otherwise.

73.    DOE instead cited three reasons for terminating the agreement: (i) Sublime allegedly "only considered the emissions reduction at the facility and did not consider emissions generation of electricity to power the project," (ii) the award "fails to meet the goals or priorities of DOE and the Administration," and (iii) the project "no longer effectuates the program/agency priorities."

74.    The first stated reason, that Sublime "only considered the emissions reduction at the facility and did not consider emissions generation of electricity to power the project," is not a valid basis for termination under the contract. And in any event, it is false. Sublime's application expressly accounted for emissions generation of electricity to power the project.

75.    The second stated reason, that the award "fails to meet the goals or priorities of DOE and the Administration," is also not a valid basis for termination under the contract. The contract permits termination based on "goals or priorities" only "to the extent authorized by law," and only if the award "no longer effectuates" the agency's goals or priorities that existed at the time that DOE issued the award.

76.    The third stated reason, that "the project no longer effectuates the program/agency priorities," is not a valid basis for termination both as a legal and factual matter.

77.    The contract permits termination based on program goals or agency priorities only "to the extent authorized by law." DOE's termination of Sublime's award was not legally authorized—and thus constitutes a breach of the terms and conditions of the contracts—for at least two reasons.

a.  First, the termination violated the requirements of the Administrative Procedure Act (APA) and DOE regulations that DOE not engage in arbitrary and capricious action. 5 U.S.C. § 706(2)(A); 10 C.F.R. § 1003.17. DOE's false factual basis for

the termination—that Sublime did not consider emissions generation of electricity to power the project—alone renders the termination arbitrary and capricious. The termination was also arbitrary and capricious for many additional reasons, including that DOE: (i) did not provide a reasoned explanation for the termination, including because DOE did not examine the relevant data and articulate a satisfactory explanation for the termination based on the relevant data, (ii) considered factors that Congress did not permit DOE to consider in the Inflation Reduction Act, and ignored the factors that Congress required DOE to consider in the Inflation Reduction Act, (iii) did not even acknowledge, let alone address, the serious reliance interests of Sublime and other communities and entities impacted by the termination, (iv) carried out the termination without providing Sublime the dialogue and process that DOE afforded other awardees; and (v) did not consider alternatives, such as modifying the project as needed to align with the agency's purportedly different priorities.

b.  Second, DOE's termination was not legally authorized because DOE terminated the award for the express purpose of not carrying out Congress' directive in § 50161 of the IRA to spend appropriated funds for advanced industrial technology to reduce greenhouse gas emissions, in violation of the Inflation Reduction Act and the Impoundment Control Act.

78.   DOE's termination based on program goals and agency priorities also constitutes a breach as a matter of law because the contract permits termination only if the award "no longer effectuates" the agency's goals or priorities that existed at the time that DOE issued the award. This contractual ground for termination is based on the Uniform Grants Guidance issued by the

19

Office of Management and Budget (OMB) in 2020. OMB was clear that the intent of the provision is to protect the government in two circumstances: if post-award evidence reveals that an award "is ineffective at achieving program goals," or if later evidence leads to a significant question about "the feasibility of the intended objective of the award." *See* 85 Fed. Reg. 49506, 49507-08 (Aug. 13, 2020). DOE did not claim—and could not have credibly claimed—in its termination letter that Sublime's award no longer effectuated the program goals and agency priorities that existed when DOE issued the award. The termination therefore violates the contract.

79.    Even if the relevant contractual provision did permit DOE to terminate based on changed program goals or agency priorities, the termination of Sublime's award still violated the contract.

80.    Contractual provisions must be interpreted as the parties would have reasonably expected at the time of entering the award. *See Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) ("This court adheres to the principle that 'the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" (quoting *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 351 F.2d 972, 975 (1965))); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998) ("[A] proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents.").

81.    Here, the parties would have reasonably understood the relevant provision—that DOE could terminate "if the Award no longer effectuates the program goals or agency priorities"—to require the agency make an individualized determination that Sublime's

individual award "no longer effectuates the program goals or agency priorities." The provision did not permit DOE to make a mass determination to terminate all or nearly all awards effectuating § 50161 of the IRA. This understanding follows from the plain text of the contractual provision, which allows for termination, to the extent authorized by law, " if *the Award* no longer effectuates the program goals or agency priorities." *Id.* Agency practice supports this reading as well, as DOE had never carried out a mass termination of awards in reliance on this provision prior to the mass termination that swept in Sublime's award.

82. In addition, the contract cannot be read to permit DOE to terminate based on changed goals and priorities that directly conflict with Congress's goals and priorities in requiring the agency to spend the relevant funds. Otherwise, the contract and the underlying regulation upon which it is based would be unlawful. DOE in this case did terminate based on goals and priorities that directly conflict with those of Congress in appropriating the relevant funds to carry out the Advanced Industrial Facilities Deployment Program under the IRA.

83. In all events, DOE breached the contract because Sublime's award does effectuate the government's goals and priorities. DOE's termination letter did not explain why this is not so, and it is readily apparent that Sublime's award furthers the current Administration's priorities. For instance, in June 2025, the federal Office of Science and Technology Policy published a request for information seeking public input about strategies to "advance United States manufacturing competitiveness, including advanced manufacturing research and development that will create jobs, grow the economy across multiple industrial sectors, strengthen national security, and improve healthcare." 90 Fed. Reg. 26335 (June 20, 2025). Sublime's project would have effectuated those goals and priorities. Sublime's Kiloton Project would have increased domestic production and exports of cement, decreased reliance on imports,

21

reshored American manufacturing jobs, expanded critical minerals manufacturing, and overall bolstered American energy dominance through advanced American technologies.

84.     For all of these reasons, DOE's unilateral termination of the cooperative agreement constituted a breach of contract.

85.     As a result of DOE's breach of contract, Sublime has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

**Count Two**
**(Breach of The Implied Covenant of Good Faith and Fair Dealing)**

86.     Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

87.     "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 205 (1981)). Courts have "long applied those principles to contracts with the federal government." *Id.*

88.     The covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1238, 1304 (Fed. Cir. 2005)).

89.     Where a contract confers discretion on a party, the implied covenant of good faith and fair dealing "limits the manner in which [the] party . . . may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 705–06 (1996) (citation omitted); *see also Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 638 (2020) (plaintiff's "allegations of arbitrary and

22

capricious agency conduct" supported its "claim for breach of the implied duty of good faith and fair dealing"). This requires that an exercise of discretion "be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of such power." *Orange Cove Irr. Dist. v. United States*, 28 Fed. Cl. 790, 800–01 (1993).

90.     Here, DOE acted to destroy Sublime's reasonable expectations when entering into the cooperative agreement. Sublime could not have reasonably expected that DOE would unilaterally terminate the award just months after approval—as part of a mass termination of DOE awards—on the ground that the award no longer effectuates the program goals or agency priorities. Sublime especially could not have reasonably expected such a termination given the significant cost-sharing requirements that DOE required under the cooperative agreement, the agency goals and priorities at the time the contract was entered, and the current Administration's support for advanced manufacturing research and development.

91.     DOE also acted arbitrarily and capriciously in terminating the cooperative agreement for all of the reasons explained above. DOE did not provide a reasoned explanation for the termination, did not cite a valid legal basis to terminate the award, did not consider the factors that Congress required it to consider, did not address the serious reliance interests at stake with the termination, and did not consider reasonable alternatives. DOE's false factual basis for the termination—that Sublime did not consider emissions generation of electricity to power the project—alone renders the termination arbitrary, capricious, and inconsistent with good faith and fair dealing. The hurried manner in which DOE terminated the award, without affording Sublime the opportunity to engage with the agency that the agency afforded other awardees, further underscores the capricious nature of the termination.

92.     Accordingly, DOE breached the implied covenant of good faith and fair dealing.

93.     As a result of such breach, Sublime has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

**Count Three**
**(Abuse of Discretion)**

94.     Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

95.     "The cases are legion establishing that where a contract affords discretion to the government, exercise of that discretion must be fair and reasonable, not arbitrary and capricious." *Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 637 (2020). Thus, even where a contract gives an agency wide discretion in terminating a contract, the government breaches a contract where it abuses its discretion in carrying out a termination. *JKB Sols. & Servs., LLC v. United States*, 18 F.4th 704, 709 (Fed. Cir. 2021). And the government abuses its discretion where "the contracting officer's decision to terminate was arbitrary and capricious." *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 361 (2013).

96.     DOE abused its discretion and acted arbitrarily and capriciously in terminating the cooperative agreement. DOE terminated the award without any genuine individualized consideration, and instead as part of a mass termination of dozens of DOE awards undertaken for impermissible and irrational reasons, such as a desire to nullify a congressionally mandated program, the mere timing of when the award was issued, and purported concerns over the award's economic viability, the latter of which was contrary to the evidence as to Sublime's award. The contract gave DOE discretion to terminate if "the Award" no longer effectuated agency priorities, based on individualized consideration and analysis of the project underlying the specific award being terminated. DOE abused that discretion in terminating Sublime's award with no meaningful individualized consideration at all.

24

97.    The termination was also arbitrary and capricious because DOE did not provide a reasoned explanation for the termination, did not cite a valid legal basis to terminate the award, did not consider the factors that Congress required it to consider, did not address the serious reliance interests at stake with the termination, and did not consider reasonable alternatives. DOE's false factual basis for the termination—that Sublime did not consider emissions generation of electricity to power the project—alone renders the termination arbitrary, capricious, and an abuse of discretion.

98.    DOE further abused its discretion in terminating Sublime's award without providing it any process to explain why the award should not be terminated and was consistent with the agency's goals and priorities. The termination further was an abuse of discretion between DOE terminated the awards based on its new purported goals and priorities, rather than assessing whether the project was meeting the goals and priorities of the agency at the time of the award was issued.

99.    Accordingly, DOE breached the contract in abusing its discretion in terminating the award.

100.    As a result of such breach, Sublime has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

**Count Four**
**(Termination in Bad Faith)**

101.    Plaintiff re-alleges each and every allegation set forth above as if set out fully herein.

102.    "It is an established principle that the government is not permitted to terminate a contract in bad faith." *Irwin Cnty. v. United States*, 170 Fed. Cl. 355, 370 (2024). "Bad faith" includes "any conduct that evinces a 'specific intent to injure' and 'animus' toward the opposing

25

party in terminating the contract." *Id.*; *see also Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118 (2016) (bad faith includes "specific intent to injure" or "animus").

103.    The administration has made it a priority to terminate thousands of awards issued by the prior administration *en masse*, including specifically because they were issued under the prior administration. *See, e.g.*, *Am. Council of Learned Societies v. McDonald*, No. 25 CIV. 3657 (CM) (BCM), 2025 WL 2097738, at *30 (S.D.N.Y. July 25, 2025). The administration has also specifically targeted and sought to injure companies seeking to reduce greenhouse gas emissions. *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 103 (D.D.C. 2025); *City of Saint Paul, Minnesota v. Wright*, No. 25-CV-03899 (APM), 2026 WL 88193, at *2 (D.D.C. Jan. 12, 2026).

104.    DOE abruptly terminated Sublime's award just weeks after announcing a purported "review" of awards issued under the prior administration. DOE provided Sublime with no opportunity to participate in that review. It did not provide Sublime with any particularized reasons for terminating the award, other than a demonstrably false allegation that Sublime did not consider emissions generation of electricity to power the project. The other reasons that DOE provided were generalized assertions that the project "no longer effectuates the program/agency priorities," which, on information and belief, DOE asserted for all of the other projects it terminated.

105.    DOE has never come forward with any evidence or specific reasons why Sublime's project no longer effectuates the agency's priorities. In the absence of any explanation, the most plausible inference is that DOE terminated the award to injure beneficiaries of awards issued by the prior administration and specifically beneficiaries focused on technologies that would reduce greenhouse gas emissions. That is consistent with the

Secretary's referring to the money that funded awards like Sublime's as "Green New Scam" funding.[2] Because DOE acted with such an intent to injure and animus, it acted in bad faith.

106.   As a result of Defendant's conduct, Sublime has incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of Sublime and against the United States in the amount of Sublime's damages, or such other amount as to be proven at trial, as well as costs, fees, interest, and such further and other relief as the Court deems just and proper.

Dated: March 23, 2026                    Respectfully submitted,

/s/ *Daniel F. Jacobson*
Daniel F. Jacobson
John Robinson
Brian C. Rosen-Shaud
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiff*

---

[2] Energy Department Returns $13 Billion in Unobligated Wasteful Spending to American Taxpayers, Sept. 24, 2025, https://www.energy.gov/articles/energy-department-returns-13-billion-unobligated-wasteful-spending-american-taxpayers