**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SUBLIME SYSTEMS, INC., | |
| *Plaintiff*, | |
| v. | No. 26-458<br>Judge Kaplan |
| THE UNITED STATES, | |
| *Defendant*. | |

**DEFENDANT'S MOTION TO DISMISS**
**AND IN THE ALTERNATIVE MOTION TO STRIKE**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CORINNE A. NIOSI
Assistant Director

MATTHEW D. LEWIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

BRIGHTON SPRINGER
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

**Table of Authorities**

**Cases**                                                                                    **Page(s)**

*Acceptance Ins. Cos., Inc. v. United States*,
    583 F.3d 849 (Fed. Cir. 2009) ................................................................. 8

*Am-Pro Protective Agency, Inc. v. United States*,
    281 F.3d 1234 (Fed. Cir. 2002) ....................................................... 37, 38

*Am. Council of Learned Societies v. McDonald*,
    2025 WL 2097738 (S.D.N.Y. July 25, 2025) ......................................... 35

*Aries Const. Corp. v. United States*,
    164 Fed. Cl. 290 (2023) ....................................................................... 30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................ 8, 9, 32, 38

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................... 8

*BGT Holdings LLC v. United States*,
    984 F.3d 1003 (Fed. Cir. 2020) ............................................................ 31

*Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    146 F.4th 1144 (D.C. Cir. 2025) .......................................................... 24

*Bradley v. Chiron Corp.*,
    136 F.3d 1317 (Fed. Cir. 1998) ............................................................ 32

*Buckeye Cablevision, Inc. v. United States*,
    438 F.2d 948 (6th Cir. 1971) ............................................................... 25

*Cheatham v. ADT Corp.*,
    161 F. Supp. 3d 815 (D. Ariz. 2016) ..................................................... 9

*City of Saint Paul, Minnesota v. Wright*,
    2026 WL 88193 (D.D.C. Jan. 12, 2026) ............................................... 35

*Clean Team Janitorial Serv., Inc. v. United States*,
    171 Fed. Cl. 1 (2024) ...................................................................... 8, 31

*Climate United Fund v. Citibank, N.A.*,
    778 F. Supp. 3d 90 (D.D.C. 2025) ....................................................... 35

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    698 F. Supp. 3d 39 (D.D.C. 2023) ....................................................... 24

*Dekatron Corp. v. United States*,
    128 Fed. Cl. 115 (2016) ...................................................................... 33

i

*Dep't of Educ. V. California*,
604 U.S. 650 (2025) ........................................................................................... 11

*Dobyns v. United States*,
915 F.3d 733 (Fed. Cir. 2019) ........................................................................... 30

*Doe v. Indyke*,
457 F. Supp. 3d 278 (S.D.N.Y. 2020) ............................................................ 9, 10

*Farm Credit Bank of Spokane v. Parsons*,
758 F. Supp. 1368 (D. Mont. 1990) ..................................................................... 9

*Furlong v. Shalala*,
156 F.3d 384 (2d Cir 1998) ............................................................................... 25

*Galen Med. Assocs., Inc. v. United States*,
369 F.3d 1324 (Fed. Cir. 2004) ............................................................... 33-34, 36

*Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*,
114 Fed. Cl. 258 (2013) .............................................................................. *passim*

*Hi-Shear Tech. Corp. v. United States*,
356 F.3d 1372 (Fed. Cir. 2004) ................................................................... 16, 17

*Immigration Review*,
959 F.2d 742 (9th Cir. 1991) ............................................................................. 25

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
97 F.4th 634 (9th Cir. 2024) ............................................................................... 9

*Irwin County v. United States*,
170 Fed. Cl. 355 (2024) ................................................................. 30, 33, 34, 37

*Kalvar Corp. v. United States*,
543 F.2d 1298 (Ct. Cl. 1976) ............................................................................ 37

*Krygoski Constr. Co. v. United States*,
94 F.3d 1537 (Fed. Cir. 1996) .......................................................................... 37

*LaSalle Partners v. United States*,
48 Fed. Cl. 797 (2001) ..................................................................................... 16

*Libertatia Assocs., Inc. v. United States*,
46 Fed. Cl. 702 (2000) ..................................................................................... 34

*Librach v. United States*,
147 Ct. Cl. 605 (1959) ..................................................................................... 34

*Metcalf Constr. Co. v. United States*,
742 F.3d 984 (Fed. Cir. 2014) .......................................................................... 30

*Mktg. & Mgmt. Info., Inc. v. United States*,
62 Fed. Cl. 126 (2004) ................................................................................ 15, 16

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................ 27

*Navab-Safavi v. Broad. Bd. of Governors*,
650 F. Supp. 2d 40 (D.D.C ............................................................................ 24

*Navab-Safavi v. Glassman*,
637 F.3d 311 (D.C. Cir. 2011) ................................................................... 24, 25

*Northrop Grumman Computing Sys., Inc. v. United States*,
120 Fed. Cl. 460 (2015) ................................................................................. 13

*Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*,
2024 WL 815553 (N.D. Tex. Feb. 27, 2024) .................................................... 9

*Portland Mint v. United States*,
102 F.4th 1371 (Fed. Cir. 2024) ..................................................................... 31

*Precision Pine & Timber, Inc. v. United States*,
596 F.3d 817 (Fed. Cir. 2010) ........................................................................ 30

*Road and Highway Builders, LLC v. United States*,
702 F.3d 1365 (Fed. Cir. 2012) ...................................................................... 37

*S. Cal. Edison v. United States*,
58 Fed. Cl. 313 (2003) ................................................................................... 21

*Salsbury Indus. v. United States*,
905 F.2d 1518 (Fed. Cir. 1990) ...................................................................... 29

*Sanchez v. United States, No. 25-565C*,
2026 WL 248141 (Fed. Cl. Jan. 29, 2026) ..................................................... 8-9

*Shaw v. Restoration Hardware, Inc.*,
93 F.4th 284 (5th Cir. 2024) ............................................................................ 9

*Shell Oil Co. v. United States*,
148 Fed. Cl. 781 (2020) ................................................................................. 31

*Sommers Oil Co. v. United States*,
241 F.3d 1375 (Fed. Cir. 2001) ........................................................................ 8

*Stockman v. Fed. Election Comm'n*,
138 F.3d 144 (5th Cir. 1998) .......................................................................... 25

*T & M Distributors, Inc. v. United States*,
185 F.3d 1279 (Fed. Cir. 1999) ...................................................................... 29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ................................................................. 8

*Torncello v. United States*,
  231 Ct. Cl. 20, 681 F.2d 756 (1982) ...................................... 34

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C. Cir. 2006) ................................................ 24

*Perales v. Casillas*,
  903 F.2d 1043 (5th Cir. 1990) ................................................ 25

*XP Vehicles, Inc. v. Dep't of Energy*,
  118 F. Supp. 3d 38 (D.D.C. 2015) .......................................... 24

**Statutes**

5 U.S.C. § 706 ........................................................................... 25

**Rules**

Rule 12 of the Rules of the Court of Federal Claims...........1, 3, 4, 9

**Other**

2 C.F.R. part 200 .......................................................... *passim*
2 C.F.R. § 200.340 ....................................................... *passim*
2 C.F.R. § 200.341 ................................................................. 28
2 C.F.R. § 200.343 ................................................................... 5
2 C.F.R. § 200.344 .............................................................. 5, 11
2 CFR Part 200 ............................................................. 4, 13, 31
48 C.F.R. § 52.217-5 ............................................................. 15
48 C.F.R. § 17.207 ................................................................ 15
85 Fed. Reg. 49,506, 49,507 (2020) ................................. 25, 26
C. Wright & A. Miller,
  *Federal Practice and Procedure* § 1216 (3d ed. 2004) ..... 9, 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

SUBLIME SYSTEMS, INC.,

    *Plaintiff*,

    v.

THE UNITED STATES,

    *Defendant*.

No. 26-458
Judge Kaplan

**DEFENDANT'S MOTION TO DISMISS
AND IN THE ALTERNATIVE MOTION TO STRIKE**

Pursuant to Rules 12(b)(6) and12(f) of the Rules of the Court of Federal Claims (RCFC),

defendant, the United States, seeks dismissal of the allegations in the complaint filed by Sublime

Systems, Inc. (Sublime), which challenges the discretionary decision of the Department of

Energy (DOE) to terminate a cooperative agreement (the "Cooperative Agreement"), in which

the DOE contracted to partially fund only the initial design development phase of a proposed

cement manufacturing facility.  Rather than seeking standard termination closeout costs, Sublime

seeks an unprecedented $2 billion windfall in expectation and consequential damages that are

unrecoverable as a matter of law because they are entirely dependent on three optional, future

budget periods that DOE never authorized and expressly disclaimed any obligation to fund.

Additionally, the Court should dismiss Sublime's Counts I-IV for failure to state a claim upon

which relief may be granted under RCFC 12(b)(6).  First, Sublime's breach of contract claims,

Counts I and III, must be dismissed based upon the termination authority in the Cooperative

Agreement and because Sublime cannot impose requirements that exceed the contract language

and DOE regulation rights.  Second, Sublime's claim for breach of the duty of good faith and fair dealing, Count II, should be dismissed where Sublime fails to identify a specific promise that was violated and otherwise merely repeats its breach of contract claims.  Finally, Sublime's fourth claim for termination in bad faith fails to plead animus or specific intent to injure as required to sustain a bad faith claim.

## QUESTIONS PRESENTED

1.     Whether Sublime can recover $2 billion in windfall expectation and consequential damages associated with the completion of three unexercised and optional budget periods, where the express terms of the Cooperative Agreement disclaimed any entitlement to future funding and limited DOE's commitment solely to the initial design phase.

2.     Whether Sublime's Claims I and III, alleging breach of contract, should be dismissed under RCFC 12(b)(6) where Sublime argues breach of contract based upon heightened decision-making standards that are not DOE obligations under the Cooperative Agreement.

3.     Whether Sublime's Claim II, breach of the duty of good faith and fair dealing, should be dismissed where Sublime fails to identify a specific contractual promise that was breached, instead seeking to create an implied covenant to override the contract's express termination provisions, and otherwise improperly duplicates Sublime's breach of contract arguments.

4.     Whether Sublime's Claim IV alleging termination in bad faith should be dismissed where Sublime fails to plead specific intent to injure Sublime or targeted animus towards Sublime.

I.      BACKGROUND

   a.  DOE and Sublime Entered into a Cooperative Agreement to Fund the First Budget Period
       of Design Work

On November 4, 2025, Sublime and DOE entered into the Cooperative Agreement for the construction of a cement manufacturing facility employing Sublime's emerging cement manufacturing technology, which Sublime represented would reduce emissions in the cement manufacturing process.  Compl. ¶ 22.  This cement manufacturing facility would be the first of its kind using Sublime's technology and would help Sublime demonstrate that its technology could be scaled to real-world applications.  *Id.* at ¶ 23.

The period of performance for the Cooperative Agreement included four distinct budget periods, for a maximum Federal share of $86,907,197, not to exceed 39.6% of the total project costs.  Appx32.  In the Cooperative Agreement, DOE *only* agreed to fund the first budget period through a cost share relationship, which represented a small share of the total project costs.  *Id.* Similar to the general structure of the Cooperative Agreement, DOE only partially funded this initial period, with Sublime to fund the remaining amounts on its own or through third-party funding.  *See id.* at Table 1-1 (documenting the larger minimum recipient share of costs).

In Attachment 4 to the Cooperative Agreement—the Award-Specific Terms and Conditions[1]—the "Critical Project Activities for the Current Budget Period" are described. Appx33-34.  In this first budget period DOE agreed to partially fund 7 topics of critical project activities: Design and Engineering, Siting, Construction Planning, Operational Planning, Financial and Commercial Planning, Organizational Planning, and Community Benefits.  *Id.*  In

---

[1] DOE and Sublime modified Attachment 4 to the Cooperative Agreement, the Award-Specific Terms and Conditions, in Modification No. 0001.  Citations are provided to the modified Award-Specific Terms and Conditions.

short, the initial budget period addressed design and planning stages for the project.

On May 29, 2026, DOE terminated Sublime's Cooperative Agreement following roughly six months of performance pursuant to 2 C.F.R. § 200.340.  *See Compl.* ¶ 5.  Accepting Sublime's allegations as true for the purposes of this RCFC 12(b)(6) motion to dismiss, DOE terminated Sublime following a multiple-week "review process" for Cooperative Agreements "on a case-by-case basis."  Compl. ¶¶ 51-53.  The termination indicated that, among other reasons, the Cooperative Agreement no longer met DOE program priorities.  *Id.* at ¶ 54.

b.   The Termination Provisions in the Cooperative Agreement and Regulations Provide DOE Broad Termination Rights

Sublime's Cooperative Agreement incorporated the Government's right to terminate the Cooperative Agreement both by reference and through directly included contract language.   In Attachment 3 to the Cooperative Agreement, the Standard Terms and Conditions, Sublime is immediately advised in Term 2 that the "Financial Assistance Regulations: Title 2 Subtitle A OMB Guidance for Federal Financial Assistance of the CFR, including Chapter 2 2 CFR Part 200 (effective October 1, 2024)," are incorporated by reference.  In relevant part, 2 C.F.R. part 200 authorizes terminations of awards by the awarding agency in the following circumstances:

(a) The Federal award may be terminated in part or its entirety as follows:

(1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

. . . or

(4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

. . .

(d) When the Federal award is terminated in part or its entirety, the Federal agency or pass-through entity and recipient or subrecipient remain responsible for compliance with the requirements in §§ 200.344 and 200.345.

4

2 C.F.R. § 200.340.

The regulations provide a mechanism for terminated awardees to pursue costs incurred in performance of the terminated award. They require for a closeout process for terminated contracts that includes a requirement that the Federal agencies pay authorized costs, *id*. § 200.344, and that terminated grantees must refund the balance of any unobligated funds paid in advance or that are not authorized to be retained for use in other projects, *id*. § 200.344(d). "Costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient . . . after the termination of a Federal award" are not allowable unless expressly authorized. 2 C.F.R. § 200.343.

In addition to the incorporated regulations above, Sublime's agreed-upon Cooperative Agreement transcribes DOE's ability to terminate the award directly into the award. This language, at Term 30 to the Standard Terms and Conditions, largely parallels the termination regulations in 2 C.F.R. § 200.340. Referencing 2 C.F.R. § 200.340, the parties agreed that the Cooperative Agreement could be terminated "[b]y DOE, to the greatest extent authorized by law, if the Award no longer effectuates the program goals or agency priorities[.]"

  c.  <u>Provisions Relating to Future Budget Periods in the Cooperative Agreement</u>

Each of the three additional budget periods of the project was further subject to future funding determinations by DOE under the agreed-upon terms of the Cooperative Agreement. Term 19 of the Award-Specific Terms and Conditions of the Cooperative Agreement required DOE to perform "Go/No-Go Reviews and Continuation Decisions" before any subsequent period of the Cooperative Agreement could proceed. Under the process set out in the Award-Specific Terms and Conditions, roughly 180 days before the end of the current budget period Sublime was to submit a detailed "Continuing Application" demonstrating why the project

should continue, including a report on the progress made during the current budget period, a detailed budget and justification for the upcoming budget period, and updated plans, designs, and models—amongst other inclusions. Appx46. The Award-Specific Terms and Conditions provided that following Sublime's submission of the application, DOE would conduct a review of the application, assessing the recipient's compliance and progress on the Cooperative Agreement, appropriations and program authority, and whether the "project continues to support DOE's programmatic goals[.]" Appx46-47.

Following review, pursuant to the Award-Specific Terms and Conditions, DOE could decide, by its own discretion, whether to (1) fund the Cooperative Agreement for the next budget period, (2) fund the Cooperative Agreement for the next budget period with additional conditions or requirements, or (3) not fund future budget periods of the Cooperative Agreement. Appx47; *see also id.* ("Should DOE decide not to fund the next Budget Period, DOE reserves the right to de-obligate any remaining federal funds under the Cooperative Agreement, including funds for any subsequent Budget Periods.").

The agreed upon Go/No-Go process in the Award-Specific Terms and Conditions did not obligate DOE to fund any future budget periods of the Cooperative Agreement. The Go/No-Go process also did not provide DOE the unilateral right to require Sublime's participation in all future budget periods of the Cooperative Agreement, especially where performance details and specific milestones for future budget periods were not yet incorporated in the Cooperative Agreement. *See* Appx46 (setting forth the process for DOE and Sublime to agree on updated project plans); *see also* 2 C.F.R. § 200.340(a)(3) (providing recipients the ability to terminate Cooperative Agreements as well).

Moreover, the Cooperative Agreement expressly disavowed any commitment by the DOE to fund the entire project:

> Each decision whether to authorize and fund activities in the next Budget Period is separate and distinct and the Recipient has no entitlement to any authorization or funding of activities beyond the current Budget Period. Should DOE decide not to fund the next Budget Period, DOE reserves the right to de-obligate any remaining federal funds under the Cooperative Agreement, including funds for any subsequent Budget Periods.

Appx47 (emphasis added). And by agreement of the parties to the language included in the Award-Specific Terms and Conditions, a decision by DOE not to continue with a Cooperative Agreement was a separate determination from any DOE decision to terminate the Cooperative Agreement. *Id.* ("A decision not to fund future Budget Periods of the Cooperative Agreement is distinct from termination of the Cooperative Agreement under the Cooperative Agreement Termination Standard Term and Condition and 2 C.F.R. § 200.340.").

## ARGUMENT

In its complaint, Sublime claims $2 billion dollars or otherwise "Massive Damages to Sublime." *See* ECF No. 1-1, at 1; ECF No. 1, at 15. In order to reach these windfall figures, Sublime relies on dubitable legal theories involving the loss of tax credits, loss of company value, and lost income. Essentially, Sublime seeks expectation and consequential damages based upon the monetary potential of a fully operational cement manufacturing facility, which presumes DOE's continued and repeated award of discretionary funding in future budgets, and supposes the eventual success of Sublime's enterprise. This remuneration is inconsistent with the terms of the contract and too speculative for recovery. Thus, Sublime's damages theories should be dismissed or struck by the Court at this stage under RCFC 12(b)(6) or 12(f).

Sublime's individual Counts, and arguments therein, should be dismissed for failure to state a claim upon which relief can be granted. Sublime's Counts I and III should be dismissed

7

because Sublime's arguments are premised on the notion that DOE did not provide Sublime with the level of individualized analysis and documented decision-making that Sublime desires, yet the Cooperative Agreement required no such compliance.  Sublime's Count II, purported breach of the duty of good faith and fair dealing, should also be dismissed where Sublime identifies no specific contractual promise that was impeded by DOE and thus Sublime seeks to create an additional implied duty that supersedes the Cooperative Agreement's direct language.  Further, Sublime's allegations in Count II are duplicative of its breach of contract claims.  Finally, Sublime's claim in Count IV that the Cooperative Agreement was terminated in bad faith should be dismissed because Sublime fails to plead animus or specific intent to harm.

I.        STANDARD OF REVIEW

Under RCFC 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief could be granted" unless it alleges facts "'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  When reviewing a motion to dismiss for failure to state a claim, the Court may consider both the pleadings as filed and the documents attached to a pleading directly or by reference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

In assessing the allegations in the complaint, the Court "must accept as true all the factual allegations, and . . . indulge all reasonable inferences in favor of the non-movant[.]" *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).  But the Court is not required to accept legal conclusions couched as factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  And a plaintiff's "nonconclusory factual allegations" must set "forth a plausible—as opposed to merely a conceivable—claim for relief." *Clean Team Janitorial Serv., Inc. v. United States*, 171 Fed. Cl. 1, 8 (2024) (citing *id.* at 680).

8

Simply put, "'the pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action[.]'" *Sanchez v. United States*, No. 25-565C, 2026 WL 248141, at *6 (Fed. Cl. Jan. 29, 2026) (alterations in original) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235–36 (3d ed. 2004)).

"A claim will only have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Indyke*, 457 F. Supp. 3d 278, 281 (S.D.N.Y. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 641 (9th Cir. 2024) (holding that a plaintiff's allegations can be dismissed for lack of available legal theory). Thus, should a plaintiff fail to set forth a cognizable legal theory for its damages, the Court may review and dismiss a party's damages theory. *See, e.g.*, *Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*, 2024 WL 815553, at *3 (N.D. Tex. Feb. 27, 2024), *aff'd*, No. 2024-1783, 2025 WL 3653227 (Fed. Cir. Dec. 17, 2025) (unpublished) (affirming dismissal after failure to plead viable damages theory); *Shaw v. Restoration Hardware, Inc.*, 93 F.4th 284, 290 (5th Cir. 2024).

Alternatively, the Court may strike from any pleading "any redundant, immaterial, [or] impertinent . . . matter[,]" such as the recovery of unattainable damages. RCFC 12(f); *see also Indyke*, 457 F. Supp. 3d at 283-85 (collecting cases and granting dismissal of an inappropriate claim for damages, whether construed as a motion to dismiss or a motion to strike). Like a motion to dismiss, "Rule 12(f) requires the Court to accept the non-moving party's well-pleaded facts as true and to draw all reasonable inferences in favor of that party." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 834 (D. Ariz. 2016); (citing *Farm Credit Bank of Spokane v. Parsons*, 758 F. Supp. 1368, 1371 n. 4 (D. Mont. 1990)). As discussed in *Indyke*, "[t]he

9

technical name given to a motion challenging a pleading is of little importance inasmuch as prejudice to the nonmoving party[.]" *Indyke*, 457 F. Supp. 3d at 284 (quoting C. Wright & A. Miller, 5C *Federal Practice and Procedure* § 1380 (3d ed.)).

II.    THE COURT SHOULD DISMISS OR OTHERWISE STRIKE SUBLIME'S DEMAND FOR INFLATED COSTS THAT SEEK RECOVERY FOR FUTURE BUDGET PERIODS

   a.   The Express Terms of the Cooperative Agreement Terms Preclude Sublime's Speculative Claimed Expectation and Consequential Damages

The Cooperative Agreement is not an open-ended, $86.9 million funding guarantee; rather, its express terms strictly limit the scope of DOE's financial obligations and Sublime's potential recovery.  By signing the agreement, Sublime agreed to a multi-tiered, discretionary funding structure that expressly incorporated federal financial assistance regulations under 2 C.F.R. Part 200, which confine a recipient's remedies upon termination to actual, allowable closeout costs.  *See* Appx4, 15.  Beyond these standard regulatory limits, the Cooperative Agreement contains explicit funding restrictions that limit Sublime's contract-based entitlement solely to the currently approved and authorized budget period, budget period 1.  Appx47. Because the agreement contractually disavows any right or entitlement to future funding, Sublime is barred as a matter of law from recovering speculative expectation or consequential damages, such as lost profits or diminution of company value, that are entirely dependent on optional, subsequent performance periods that the DOE never authorized.

   1.   Under 2 C.F.R. Section 200, Sublime Is Limited to Termination Costs

In Attachment 3 to the Cooperative Agreement, the Standard Terms and Conditions, the first contract terms addressed are the "Financial Assistance Regulations: Title 2 Subtitle A OMB Guidance for Federal Financial Assistance of the C.F.R. , including 2 C.F.R. Part 200 (effective October 1, 2024), and 2 C.F.R. Part 910[,]" which are incorporated into the Cooperative

10

Agreement by express reference.  Appx4.  Subparts and specific provisions of these OMB

regulations are referenced throughout the Cooperative Agreement.  2 C.F.R. Part 200 both sets

forth the standards for terminating the cooperative agreement, and for the costs associated with

any such termination.  Under 2 C.F.R. Part 200.340, a "Federal Award may be terminated in part

or its entirety" for four different reasons, including "if an award no longer effectuates the

program goals or agency priorities."

The Cooperative Agreement then incorporates the same termination discretion to DOE in

Term 30 of the document, titled "Cooperative Agreement Termination."  In this section, which

also expressly incorporates the termination standards at 2 C.F.R. § 200.340(a), Sublime agreed to

terms that allow DOE to terminate the Cooperative Agreement "to the greatest extent authorized

by law, if the Cooperative Agreement no longer effectuates the program goals or agency

priorities[.]"

Should a recipient dispute the grounds of its termination, the available relief is the

recovery of potentially appropriate termination costs.  *See Dep't of Educ. V. California*, 604 U.S.

650 (2025).  2 C.F.R. § 200.344 addresses the closeout responsibilities of both the Federal

agency and the recipient.  A recipient is obligated to submit all closeout reports within 120 days,

and to liquidate all financial obligations within 120 days.  2 C.F.R. § 200.344(b), (c).  And all

unobligated funds must be refunded to the Federal agency promptly.  2 C.F.R. § 200.344(c).

Accordingly, Sublime could be entitled to termination costs—if incurred—under the provisions

of 2 C.F.R. Part 200.

However, Sublime has not sought these costs in its complaint, nor costs reasonably tied to

the termination during the initial budget period.  In fact, Sublime does not even mention the

governing Cooperative Agreement guidelines in 2 C.F.R. Part 200 in its complaint.  Moreover,

11

Sublime has never submitted or identified any such costs to DOE. Sublime seeks extracontractual costs not permitted under the terms of the Cooperative Agreement, and far exceeding any cognizable recoverable.

2. Sublime Cannot Recover Expectation and Consequential Damages Based Upon the Award of Future Unexercised Budget Periods

Sublime does not seek termination costs under 2 C.F.R. Part 200, instead hoping that it might recover aggrandized theories of expectation and consequential damages involving lost income from a fully operational cement plant, ECF No. 1 at ¶¶ 60-62, lost funding from DOE or other unspecified sources, *id.* at ¶¶ 63-66, and loss of company value, *id.* at ¶ 68. Even if the Court were to agree with Sublime that expectation damages beyond the termination costs in 2 C.F.R. Part 200 are recoverable, any such expectation costs are limited by the budget period restrictions in the Cooperative Agreement. DOE's expressly disavowed that Sublime was entitled to any funding or expectations beyond the first budget period, yet Sublime targets expectation costs based on the exercise of all budget periods, and the subsequent success Sublime's untested facility.

i. The Cooperative Agreement Was Subject to Optional Budget Periods Never Awarded to Sublime

The cooperative agreement's attachment 4, "Award-Specific Terms and Conditions," sets forth the funding of the Cooperative Agreement. Under this agreed-upon structure, only budget period 1 had been authorized for Sublime's cooperative agreement. *See* Appx32-33. Within this first budget period, DOE funded a maximum of $12,792,364 of the total cost.

Three additional budget periods remained before the cement manufacturing facility would be completed. *Id.* DOE did not contractually commit to funding any of these future budget periods, instead only setting forth a maximum amount of DOE funding for each of these

years.  *See* Appx32.  The "maximum share" that DOE would provide for budget periods 2-4 was $74,114,833, far exceeding DOE's commitment during the first budget period.  *Id.*

As discussed in the background section above, this budget-period structure of the Cooperative Agreement specifically implemented an additional layer of DOE discretion in the contracting process with the "Go/No-Go Reviews and Continuation Decisions."  *Id.* at Term 5, page 2.[2]  These Go/No-Go determinations are a discretionary DOE determination distinct from termination decisions.  *Id.* at 17 ("a decision not to fund future Budget Periods of the Award is distinct from termination of the Award under the Cooperative Agreement Termination Standard Term and Condition and 2 CFR § 200.3").  Sublime is bound by the terms of this contract language, where it agreed that it "has no entitlement to any authorization or funding of activities beyond the current Budget Period."  *Id.*

Sublime's termination was the end of an existing, bound obligation before its scheduled expiration.  In contrast, a decision not to fund a future budget period is equivalent to an agency's decision not to exercise an option year.  By explicitly agreeing that these two actions are distinct, Sublime contractually acknowledged that termination only applies to the active budget period, conversely the conclusion of the budget period and non-continuation of future periods is not a termination, but rather the natural expiration of a limited funding increment.  In this way, the terminated cooperative agreement was subject to what are essentially option-year determinations

---

[2] The language in the Attachment 4 "Cooperative Agreement Specific Terms and Conditions" replaces Term 14 of the Standard Terms and Conditions, which also addresses "Go/No-Go Reviews."  *See* Appx46 ("The Go/No-Go Reviews and Continuation Decisions Term of the OCED Standard Terms and Conditions is replaced in its entirety as follows[.]").  Nonetheless, the Go/No-Go Review in the standard terms and conditions also emphasizes DOE's discretion in continuing the Cooperative Agreement and identifies this determination as "distinct from termination of the Cooperative Agreement under the Cooperative Agreement Termination Standard Term and Condition and 2 C.F.R. § 200.340."  Appx9.

to be made by the DOE.  *See, e.g.*, *Northrop Grumman Computing Sys., Inc. v. United States*, 120 Fed. Cl. 460, 466 (2015), *aff'd*, 823 F.3d 1364 (Fed. Cir. 2016); *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 385 (2013).  Sublime cannot use its termination of the design and planning stage of the first budget period as a hook for contractual rights from subsequent budget periods.

    ii.    This Budget Period Restriction Precludes Sublime from Recovering Damages Associated with the Exercise of the Three Future Option Periods and Potential Completion of a Functioning Facility

Even though Sublime is not entitled to future budget periods under the terms of the Cooperative Agreement, Sublime asserts cost theories based on the full construction of the cement manufacturing facility and the value of the eventual/possible cement itself.  Sublime argues for (1) "lost income" from partially alleged "offtake agreements and negotiated term sheets" because Sublime had already contracted for income from the allocation of Sublime cement after the construction of a functional plant, ECF No. 1 at 60-61; (2) the "lost funding" of the total value of the Cooperative Agreement with all option years exercised, *id.* at ¶ 64, as well as tens of millions of dollars of tax credits and investments that clearly implicate the full exercise of all budget periods, *id.* at ¶¶ 65-66, and the "loss of company value" based upon the ultimate construction of a "kiloton plant to demonstrate that its cement is commercially scalable," *id.* at ¶ 68.

All these theories of damages presume and/or incorporate Sublime's entitlement to the construction of a fully operational cement manufacturing facility under the terms of the Cooperative Agreement.  Although the Cooperative Agreement contemplated a multi-phase project, DOE did not, and could not, provide a blanket funding commitment for the full construction of the cement manufacturing facility.  Instead, the Cooperative Agreement utilized a phased funding structure that expressly limited DOE's financial obligation to the initial budget

14

period.  By design, this structure was intended to preserve DOE's discretion at each milestone, effectively precluding any reasonable reliance on the exercise of future budget periods.  Sublime cannot now ignore the limitations inherent in this multi-phase structure to claim a contractual entitlement to full project funding that was never authorized.  *See* Appx47 ("the Recipient has no entitlement to any authorization or funding of activities beyond the current Budget Period.").  DOE only awarded Sublime the Cooperative Agreement to partially fund the initial design and planning stages of the project, not the project in its entirety, and Sublime assumed the risk that DOE may not fund additional budget periods.

This is supported by the nature of the only budget period that DOE agreed to fund.  The "Critical Project Activities" are described in Term 3 of the Award-Specific Terms and Conditions.  In this initial budget period, DOE had only agreed to fund design, engineering, and general business and construction planning for the site construction.  Appx33-34.  When DOE terminated this Cooperative Agreement, it had agreed to nothing more than the preliminary work associated with the Cooperative Agreement—certainly not the full funding of the cement manufacturing plant, which itself involved uncertainty with novel and unproven cement manufacturing techniques.  Appx32-33.

This limited funding commitment is comparable to the option year structure in Government contracts incorporating the Federal Acquisition Regulations.  *Compare* Appx46-47 *with* 48 C.F.R. § 17.207 (demonstrating similar processes for an agency to determine whether to exercise its discretion to exercise a budget period or an option year); *see also* 48 C.F.R. § 52.217-5 Evaluation of Options ("Evaluation of options will not obligate the Government to exercise the option(s).").

15

This Court has repeatedly held that termination damages associated with potential future exercise of option years are too speculative to be recoverable.  *See Mktg. & Mgmt. Info., Inc. v. United States*, 62 Fed. Cl. 126, 130 (2004); *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 384 (2013).  "[G]ains which do not flow proximately out of the undertaking of the contract itself are too speculative."  *LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed. Cl. 64, 74 (1999), *aff'd in part, vacated in part,* 317 F.3d 1363 (Fed. Cir. 2003); *see also LaSalle Partners v. United States*, 48 Fed. Cl. 797, 813 n.21 (2001) ("The government cannot be held liable for the 'lost profits' that resulted from its failure to exercise the contract option.").

In *Mktg. & Mgmt. Info*, plaintiff sought to recover damages associated with future option years following a termination for convenience, arguing that had the agency not breached the contract, it was foreseeable that the agency would have exercised the option years.  *Mktg. & Mgmt. Info.,* 62 Fed. Cl. at 130.  The Court disagreed, holding that damages for the unexercised "option years would be inherently speculative," and that it was the United States' "sole discretion to exercise those option years."  *Id*.  The Court further noted that because the parties had only agreed to be bound for the base period of the agreement, "awarding damages for lost profits for the two option years would result in putting plaintiff in a better position than had the agency simply completed its three-year obligation."  *Id.* at 131.

The Court's decision in *Gulf Group* follows the same rationale.  In *Gulf Group*, a plaintiff again argued that its termination for convenience damages should include costs associated with unexercised option years, with the Court rejecting this theory following a comparable analysis.  *Golf Grp.*, 114 Fed. Cl. at 384-385; *see also Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1380 (Fed. Cir. 2004) (affirming a that a contractor was only entitled to costs associated with a base contract and any exercised option years).  Pages 384-85 of the Court's decision also

16

addresses allegations of abuse of discretion and bad faith similar to the allegations that Sublime brings in this case. But as the Court held in *Gulf Group*, where any allegations of abuse of discretion or bad faith are linked to the termination of the Cooperative Agreement, "an abuse of discretion giving rise to that breach generally only entitles a plaintiff to damages relating to the base year of the contract[,]" "not the government's option to extend those contracts." *Id*. This is especially true in a situation where a contract/Cooperative Agreement was terminated early into the performance, which was both the situation with the termination in *Golf Grp.*, and in this case where the Cooperative Agreement was terminated in its initial design phase. *Id*.

iii.    Sublime's Speculative Damages Claims Presume Contractual Entitlement to Unauthorized Future Budget Periods

Sublime's complaint reveals that its entire damages theory is built on a legal fallacy. To reach its massive damages, Sublime relies on categories of expectation and consequential damages—specifically lost commercial income, lost tax credits, and diminished company value, that could only accrue upon the successful completion and operation of a fully constructed cement manufacturing facility. By asserting these claims, Sublime's own pleadings demonstrate that it is attempting to arrogate a contractual entitlement to the full, multi-phase project.

However, this positioning flatly contradicts the express, phased funding structure of the Cooperative Agreement. DOE only authorized and obligated funding for the first budget period, reserving unilateral discretion over whether to fund subsequent periods. Because the contract's "Go/No-Go" framework constructively precluded any reasonable reliance on future funding increments, Sublime cannot recover damages that presume the completion of a facility that was never authorized. By seeking windfall damages tied to unexercised option periods, Sublime's pleadings demand recovery based upon theories that find no root in the contract itself.

*Lost Income*

17

First, Sublime seeks unstated damages associated with "lost income."  Sublime describes these damages as resulting from future income from the "unmet, domestic market demand for cement and that Sublime expected its Holyoke plant to be significantly oversubscribed for allocations of Sublime cement."  Compl. ¶ 61.  In other words, Sublime seeks the lost income associated with the eventual sale of Sublime cement.  *See also* Compl. ¶ 26 ("Sublime's application shared that the company's 'schedule for achieving long- term financial viability beyond DOE and other federal funding" would "be accomplished primarily through sales of materials produced by the plant.'").

However, as stated above, this theory of recovery is legally untenable and, as established by the express terms of the Cooperative Agreement, DOE did not contract with Sublime to fully fund the construction of a manufacturing facility nor did it guarantee the transition to future project phases.  Sublime's claim of "lost income" relies on the impermissible leap that DOE was contractually obligated to fund and approve all future budget periods.  Under long-standing Court of Federal Claims precedent, damages associated with the potential exercise of future, discretionary option periods are too speculative to be recoverable as a matter of law. *See Golf Grp.*, 114 Fed. Cl., at 384-385.  Because DOE's "Go/No-Go" continuation decisions were entirely discretionary, Sublime had no contractual right to, and could not reasonably rely on, the completion of the facility, which was the predicate for the income from the eventual, potential sale of cement.  Accordingly, because these speculative commercial profits do not flow proximately from the only authorized phase of the contract, Budget Period 1, Sublime's claim for lost income is not legally cognizable and must be dismissed or struck under RCFC 12(b)(6) or 12(f).

*Lost Funding*

Similarly, Sublime's claim for "lost funding" is legally deficient and must be dismissed. To start, Sublime seeks to hold the taxpayer liable for the maximum potential value of the Cooperative Agreement with all budget periods exercised. *See, e.g.*, Compl. ¶ 64. Sublime then additionally mentions a loss of tax credits, including the loss of a $46,700,000 federal tax credit. Compl. ¶¶ 64-65. Finally, Sublime argues that it has lost a commitment for tens of millions of dollars from an energy investment company. *Id.* ¶ 66.

As a matter of law, Sublime is not entitled to these costs because DOE did not commit to the full funding of the project with all budget periods. Sublime's damages demand for the maximum of the Cooperative Agreement with all budget periods exercised in paragraph 64 of the complaint directly contradicts the language of its own agreement in the Special Terms and Conditions to the Cooperative Agreement. Appx31-47. But even the claims for tax credits and unstated "tens of millions of dollars" of separate funding also clearly implicate future performance periods.

This massive damages claim flatly contradicts the express, incremental funding structure of the Cooperative Agreement. Under the "Award-Specific Terms and Conditions," DOE's binding financial obligation was strictly capped at the first budget period. Appx32. The stark contrast between the authorized funding for budget period 1 and the unauthorized, speculative amounts Sublime seeks is illustrated below:

**Table 1-1. Direct and Indirect Costs for the Current Budget Period**

| Cost Type | Maximum DOE Share | Minimum Recipient Share | Total |
|---|---|---|---|
| Direct Costs | $11,082,919 | $16,905,165 | $27,988,084 |
| Indirect Costs | $1,709,445 | $2,607,475 | $4,316,920 |
| Total | $12,792,364 | $19,512,640 | $32,305,004 |

19

*Id*.  Under this binding, bargained-for structure, DOE agreed only to maximum funding of $12,792,364, and Sublime itself only represented a minimum recipient share of $19,512,640. But in claiming "tens of millions of dollars" of separate funding, Compl. ¶ 66, and a "$46,700,000 federal tax credit," *id.* at ¶ 65, Sublime seeks the recovery of purported funding that far exceeds this initial budget period, clearly implicating a demand for compensation for future budget periods.  Because DOE never exercised its discretion to proceed past budget period 1, Sublime had no contractual right to, nor any reasonable basis to rely upon, the receipt of these future funds.  To allow Sublime to recover damages based on funding that was never authorized or obligated would completely nullify the contract's phased budget structure and penalize the government for exercising its lawful administrative discretion.  These claimed losses are flow from unauthorized future budget periods, and are consequently unrecoverable as a matter of law and must be dismissed

*Loss of Company Value*

Finally Sublime's claim for consequential damages in the form of "loss of company value" must be dismissed because it suffers from the same legal and factual issues as its claim for lost income and lost funding—Sublime was not entitled to Company valuation based upon a fully realized, multi-phase project with all budget periods exercised, and any such amount would be too speculative for recovery.

Sublime's complaint once against makes it clear that Sublime contemplates a recovery of the full value of its company with functional cement manufacturing capability.  In the single paragraph describing these costs, Sublime describes its need to "build a kiloton plant to demonstrate that its cement is commercially scalable."  *Id.* at ¶ 68.  Sublime also references a business development plan where the company's "long-term financial viability" was dependent

20

upon "sales of materials produced by the plant." *Id*. Crucially, Sublime does not, and cannot, plead any loss of company value associated only with DOE's decision to terminate the initial, $12.7 million design and planning phase of the project.

This theory again is precluded by the limited funding commitment DOE made under the Cooperative Agreement, which bound neither party to future budget periods. Regardless of whether Sublime may be ultimately successful in proving a breach of contract, any recovery is limited to issues implicated by the first performance period. *See Golf Grp.*, 114 Fed. Cl. at 384-385. Sublime cannot hold the taxpayer liable for a corporate valuation that presumes the successful completion of a commercial-scale plant when the contract itself disclaimed any guarantee of future funding.

In addition, Sublime does not plead that the construction of the cement facility has been stopped or will not proceed to completion. In fact, at other points in its complaint Sublime claims that any facility construction merely delayed. *Id.* at ¶ 67. Sublime's complaint does not allege that Sublime will not ultimately sell any prospective cement or that its company value will be impacted by any such delay.

At bottom, Sublime cannot recover these types of damages based upon the full completion of the cement manufacturing facilities where under the terms of the Cooperative Agreement, Sublime had no contractual right or reasonable expectation to the full value of the Cooperative Agreement with three subsequent unexercised budget periods. Under the terms of the Cooperative Agreement, and thus as a matter of law, Sublime does not and cannot demonstrate that it would be entitled to lost income, lost funding, or loss of company value that are all reliant upon the full Cooperative Agreement. *See S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) ("Contract interpretation is a matter of law and thus may be addressed by the

21

Court in resolving a motion to dismiss [for failure to state a claim].").  The Court should dismiss or otherwise strike Sublime's claims for expectation or consequential damages that presume the receipt of any or all future budget periods for the Cooperative Agreement as contrary to law by the terms of the Cooperative Agreement and too speculative to be recoverable.

III.    Sublime's Breach of Contract Claims Should be Dismissed for Failure to State a Claim Upon Which Relief May be Granted

Sublime's Claims I and III fail to state a claim for breach of contract.  Sublime's principal theory of its case fails as a matter of law because the grant regulations expressly allow termination when the funding instrument no longer effectuates Government policy.  2 C.F.R. § 200.340 was incorporated into this Cooperative Agreement by express reference.  That regulation, 2 C.F.R. § 340(a)(4), provides: "The Federal award may be terminated in whole or in part as follows: . . . By the Federal agency . . . to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  The termination section of the Cooperative Agreement documents DOE's warning to Sublime that termination was a possibility through an additional inclusion of the specific language identifying the right for DOE to terminate based upon changing agency priorities.  Appx4, 15.

Sublime agreed to a termination possibility encompassing changing agency priorities, but after DOE exercised this right to termination, Sublime now alleges that DOE's application of the termination provision itself breached the contract.  Sublime's arguments that DOE breached this agreement by improperly exercising its termination right are properly dismissed for failure to state a claim, where Sublime can only show breach through the invention of new contractual requirements not contained within the Cooperative Agreement itself.

a.    The Court Should Dismiss Sublime's Claims for Breach of Contract Because Sublime's Pleadings Impose and Rely Upon Invented and Extracontractual Duties

22

Counts I and III of Sublime's complaint both plead the same legal theory, that DOE's programmatic termination of the Cooperative Agreement constituted an actionable breach of contract. In Count I, Sublime pleads directly that DOE's termination of Sublime's Cooperative Agreement was a breach of contract. Count III, though titled "Abuse of Discretion," pleads the same legal theory: "DOE breached the contract in abusing its discretion in terminating the award." Compl. at ¶ 99. To establish this purported breach, Sublime argues first, in Count I, that DOE's grounds for terminating the award were insufficient because they were not "legally authorized." Compl. ¶ 77. But in this argument, Sublime misreads the Cooperative Agreement and largely seeks to impose an APA-like termination decision process into the agreement, which is not supported by any contract language or the incorporated federal regulations. In Count III, Sublime essentially twists this same argument, arguing for heightened decision-making and documentation standards that don't exist in either the contract nor the incorporated regulation providing DOE's unilateral right to terminate for a change in agency priorities. Both Counts are properly dismissed under RCFC 12(b)(6) for failure to state a claim, where Sublime identifies no breach of any Cooperative Agreement language.

To start, Sublime's attempts to incorporate decision-making records, review processes, and negotiations with Sublime prior to termination is an improper application of heightened standards into the termination context. Sublime cites nothing in the agreement itself that incorporates wholesale the APA-esq standards for an agency termination decision. And Sublime cites no law generally that layers APA standards on top of the Federal Government's contractual obligations. Thus, none of the supposed decision-making deficiencies set out in the complaint were ever required by the Cooperative Agreement and thus do not, as a matter of law, state a claim for breach of contract.

23

Sublime attempts to construct a contractual breach by pointing to the phrase "to the extent authorized by law" in 2 C.F.R. section 200.340(a)(4), claiming this language obligates DOE to additional standards before terminating an award. *Id.* at ¶ 77. Sublime's reading is grammatically and legally incorrect. *Id.* at ¶ 77. Here, the phrase "to the extent authorized by law" in section 200.340(a)(4) does not modify or otherwise attach to an agency's discretion to terminate an award (or multiple awards) that conflicts with program goals or agency priorities. Rather, the phrase "to the extent authorized by law" follows and is applicable to "the Federal agency or pass-through entity," such that a funding instrument cannot be terminated for a reason that violates substantive law unrelated to "program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). In other words, this Cooperative Agreement could not be terminated for an illegal purpose that is unrelated to program goals or agency priorities. For example, DOE could not terminate Sublime for a discriminatory purpose, or if the termination was the result of a kickback or some other illegal conduct. This is unrelated, however, to an agency's exercise of its contractual rights to terminate when an agreement no longer effectuates agency priorities.

Second, the complaint's invocation of the APA is misplaced as the APA is *not* a source of substantive law. *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 69 (D.D.C. 2015) ("To be sure, the APA itself does not create substantive rights."). Rather, the APA creates a cause of action for challenging final agency action "based on substantive law found elsewhere." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 58 (D.D.C. 2023) (citing *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188 (D.C. Cir. 2006)), *aff'd sub nom. Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144 (D.C. Cir. 2025). The APA "was enacted to define the uniform procedures that agencies could employ when administering public rights established in other statutes and to provide for judicial review of that

24

administration."  *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011).  But it does not "create any . . . substantive rights that might be violated."  *Id*.  This principle is well established. *See Buckeye Cablevision, Inc. v. United States,* 438 F.2d 948, 953 n.2 (6th Cir. 1971) ("Section 10(e) of the Administrative Procedure Act (5 U.S.C. § 706) . . . does not bestow any substantive rights upon parties to administrative action."); *Furlong v. Shalala,* 156 F.3d 384, 394 (2d Cir. 1998) (explaining that APA does not "confer a substantive right to be free from arbitrary agency action"); *Stockman v. Fed. Election Comm'n,* 138 F.3d 144, 151 n.14 (5th Cir. 1998) ("[T]he provisions of the APA 'do not declare self-actuating substantive rights . . . .' ") (quoting *Perales v. Casillas,* 903 F.2d 1043, 1050 n.4 (5th Cir. 1990)); *El Rescate Legal Servs. v. Executive Office of Immigration Review,* 959 F.2d 742, 753 (9th Cir. 1991) ("Section 702 does not create substantive rights.").  Thus, "to the extent authorized by law" in section 200.340(a)(4) does not mean "to the extent the decision complies with the APA standards."  Rather, the DOE's actions are governed by the terms of the Cooperative Agreement.

Third, there is no indication in the regulations that a funding instrument must be subjected to an APA-style review as a prerequisite to a decision to terminate.  This is made clear by the regulatory history behind OMB's 2020 changes to its grant guidelines, which states that the changes to section 200.340 were to "to *strengthen the ability of the Federal awarding agency to terminate Federal awards*, to the greatest extent authorized by law, when the Federal award no longer effectuates the program goals or Federal awarding agency priorities."  85 Fed. Reg. 49,506, 49,507 (2020) (emphasis added).  Nothing about OMB's comment suggests that OMB was simultaneously incorporating the APA into cooperative agreements.

Moreover, Sublime cites nothing in the agreements themselves that incorporates

25

wholesale the APA standards into DOE's decision making.  And Sublime cites no law generally

that layers APA-standards on top of the Federal Government's contractual obligations.  Thus,

none of the supposed decision-making deficiencies set out in complaint were ever required by the

Cooperative Agreement and thus do not, as a matter of law, state a claim for breach of contract.

And because the language "to the extent authorized by law" does not have the meaning

that Sublime subscribes, *see supra*, Sublime's allegations in paragraph 77(b) fail to state a claim

for breach of the cooperative agreement in which Sublime alleges that the termination was not

"legally authorized because DOE terminated the award for the express purpose of not carrying

out Congress's directive in § 50161 of the IRA to spend appropriated funds . . . in violation of

the Inflation Reduction Act and the Impoundment Control Act."  Compl. ¶ 77(b).  Additionally,

even if "to the extent authorized by law" is construed as Sublime suggests, there are no factual

allegations in the complaint to support this conclusory assertion that DOE terminated the award

for *express purpose* of not carrying out Congress's intent.  In any event, the allegation is not

based on any promises or obligations within the Cooperative Agreement itself.

Sublime asserts that its Cooperative Agreement "permits termination" only if it "'no

longer effectuates' the agency's goals or priorities *that existed at the time that the DOE issued*

*the award*."  Compl. ¶ 75 (emphasis added); *see also* ¶ 78.  This frozen-in-time theory of agency

policy finds no support in the contract, the regulations, or federal law.  Indeed, *nothing* in the

relevant Federal Register provisions relied on by plaintiffs require that an agency's assessment of

its priorities be frozen in time when the contract is executed.  Rather, the Federal Register states

that the "intent of this change [incorporating the termination provisions] is to ensure that Federal

awarding agencies prioritize *ongoing support* to Federal awards that *meet program goals*."  85

Fed. Reg. at 49,507 (emphases added).  In other words, agencies do not have to prioritize

26

continuing support for awards that no longer meet program goals, especially where a former award may be inconsistent with changed, evolving, or corrected agency priorities.  Similarly, the revisions to section 200.340, were to "to *strengthen* the ability of the Federal awarding agency to terminate Federal awards."  *Id*.  Tying an administration's assessment of its own program goals and priorities to prior goals and priorities (such as those of a prior administration) hardly "strengthens" an agency's ability to terminate awards that are no longer aligned with current policies of the United States.  *Id*.  As a matter of law, the executive branch is entitled to realign its policy priorities, particularly in keeping with a "change in administration brought about by the people casting their votes."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part).

Sublime also argues that its termination is a breach of contract because "the parties would have reasonably understood the relevant provision[,]" 2 C.F.R. § 200.340, "to require the agency make an individualized determination that Sublime's award 'no longer effectuates the program goals or agency priorities.'"  Compl. ¶ 81; *see also* Compl. ¶ 96 ("DOE abused its discretion" when it "terminated the award with without any genuine individualized consideration.").  And Sublime additionally argues that the regulation "did not permit DOE to make a mass determination to terminate" Sublime's Cooperative Agreement.  *Id*.  Sublime cites nothing in the regulation or terms of its Cooperative Agreement to support their subjective expectation.  As with the Sublime's failed invocation of the APA, nothing in the regulation calls for "individualized determinations."  Indeed, Sublime's attempt here (and elsewhere in the complaint) to impose an obligation for an individualized determination into the Cooperative Agreement actively contradicts the broader incorporated language in the award addressing "agency priorities."  2 C.F.R. § 200.340(a)(4).  By executing a written instrument with the

27

Government incorporating the flexible termination options, Sublime accepted the risk that termination of its Federal assistance award could arise from application of pertinent regulations.

Sublime's erroneous interpretation (and extrapolation) of these additional requirements is instead undermined by the language elsewhere in 2 C.F.R. § 200.340, Termination.  Sublime's claim that DOE breached the contract by failing to conduct an "individualized determination" or by making a "mass termination" (Compl. ¶¶ 81, 96) is refuted by the structure of 2 C.F.R. section 200.340.

The regulations establish distinct tracks for terminating an award.  Section 200.340(a)(4), the language applied to Sublime's termination, permits termination under broad umbrella of changing "agency priorities."  By comparison, Section 200.340(a)(1) implicates a more individualized analysis of a recipient's compliance with the specific award's terms and conditions.  The immediately subsequent section of 2 C.F.R. Part 200—Section 200.341, Notification of termination requirement—supports the differentiation between individualized termination decisions under (a)(1), and broader termination power allowed for changes in agency priorities under (a)(4).  Under the Notification of termination requirement, if a recipient is terminated for compliance failure under (a)(1), DOE would be specifically required to notify the recipient of the reasons for the termination, provide a recipient an opportunity to comment on the cause of termination, and require agencies to consider a recipient's comments about any such terminations.  2 C.F.R. § 200.341(b).  That is, the regulations covering for-cause termination specifically address parameters when an agency is required to provide individualized determinations, and demonstrate that OMB could have incorporated such standards into policy-based terminations.  But no such individualized analysis is offered in the regulations for a change in agency priorities, instead these separate standards demarcate the difference between

individualized award terminations and the broader agency decisions permitted under the regulations and terms of the Cooperative Agreement.

At most, the plaintiffs are left only with their express challenge to the reasonableness of the termination decisions, which is little more than a challenge to DOE's policy choices. Sublime disputes the underlying federal law and appropriations and lobs a plethora of theories for why DOE's exercise of its termination powers was a breach of the agreement, but all of Sublime's allegations fail for the same reason—none of the heightened termination requirements are actually present in the language of the contract or in the incorporated termination regulation. *See* Appx15; 2 C.F.R. ¶ 200.340(a)(4).  In this context, "[i]t is not the province of the courts to decide de novo whether termination was the best course." *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (Fed. Cir. 1990).  It follows that, in implementing energy policy by exercising the Government's contractual right to terminate, DOE did not abuse its discretion under the Cooperative Agreement by failing to provide explanations for its termination decisions that satisfied Sublime's preferred policy choice, nor conduct individualized assessments to Sublime's satisfaction, nor any of the other myriad factors that Sublime complains were not done.  Under this circumstance, therefore, the termination does not constitute a breach of contract.  *Accord T & M Distributors, Inc. v. United States*, 185 F.3d 1279, 1283 (Fed. Cir. 1999) ("In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive.").  By attempting to force DOE to provide an "individualized determination" and pre-termination "dialogue" for a programmatic priority termination, Sublime is trying to rewrite the Cooperative Agreement to graft the strict procedural requirements of a *for-cause* termination onto a *programmatic* termination.  In signing the

29

Cooperative Agreement, Sublime accepted the risk that its assistance award could be terminated unilaterally if national energy priorities shifted.

IV.    The Court Should Dismiss Sublime's Count II, Breach of the Duty of Good Faith and Fair Dealing, Where Sublime Seeks to Impose New Unstated Contractual Duties and Otherwise Impermissibly Duplicates Sublime's Breach of Contract Claims

Pursuant to RCFC 12(b)(6), the Court must dismiss Sublime's Count II for failure to state a claim upon which relief may be granted.  Sublime claims that DOE breached the duty of good faith and fair dealing when it terminated the Cooperative Agreement, but Sublime fails to identify any specific contractual promise that supports Sublime's claimed breach.  In lieu of identifying this specific promise, Sublime merely repeats its arguments for breach of contract, impermissibly duplicating its claims.

Every contract "imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement."  *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)).  "[A] claim for breach of good faith and fair dealing must include (1) a specific promise that was undermined, plus some combination of (2) subterfuge, evasion, or dishonesty, and (3) reappropriation of a reasonably expected benefit."  *Aries Const. Corp. v. United States*, 164 Fed. Cl. 290, 297 (2023) (citations omitted).  This specific promise "must be grounded in the terms of the contract, because 'what that duty entails depends in part on what that contract promises (or disclaims).'" *Id.* (cleaned up) (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 830 (Fed. Cir. 2010); *see also Dobyns*, 915 F.3d at 739.  The implied duty created by this specific promise cannot "expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions."  *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010); *Irwin County v. United States*, 170 Fed. Cl. 355, 368-69 (2024).

When a breach of the duty of good faith and fair dealing claim coexists with a breach of contract claim in a complaint, a plaintiff must also delineate the issues between the claims. Where a "breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim are based on the same facts, the latter claim should be dismissed as redundant." *Portland Mint v. United States*, 102 F.4th 1371, 1384 (Fed. Cir. 2024); *see also BGT Holdings LLC v. United States*, 984 F.3d 1003, 1016 (Fed. Cir. 2020) (noting that should the contract itself provide the appropriate relief, it "preempt[s] the need to invoke the doctrine of good faith and fair dealing").

Sublime's allegations of breach of the duty of good faith and fair dealing boil down to a theory that Sublime's reasonable expectations were destroyed when DOE terminated the award. But DOE made no promise that the award would not be terminated. In fact, the Cooperative Agreement contained specific language warning Sublime of that possibility. Appx15. This language not only advised that the Cooperative Agreement might be terminated at any time due to a change in agency priorities, but the incorporated regulations also laid out a structure to allow Sublime to recover its costs associated with that act of termination. *See* 2 CFR §§ 200.344-345. Under the agreement, DOE did not promise the completion of the first budget period of the cooperative agreement, but DOE did promise that termination was a possibility, and that it would pay out appropriate termination costs in such an instance.

Rather than identify a specific promise in the Cooperative Agreement that DOE allegedly undermined, Sublime claims that its subjective expectations were violated. This is merely a legal conclusion couched as a factual allegation. *See Clean Team Janitorial Serv.*, 171 Fed. Cl. at 8. This type of "'[n]aked assertion[] devoid of 'further factual enhancement''' is insufficient to state a claim." *Shell Oil Co. v. United States*, 148 Fed. Cl. 781, 788 (2020) (cleaned up) (quoting

31

*Ashcroft*, 556 U.S. at 679, and citing *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.")).  Without identifying the requisite specific contractual promise that Sublime believes was undermined, Sublime has failed to state a claim for breach of the duty of good faith and fair dealing and the Court should dismiss the claim under RCFC 12(b)(6).

In addition, Sublime's claim for breach of the duty of good faith and fair dealing should be dismissed where it merely duplicates its breach of contract claims.  Sublime discusses the contractual root of its implied claim in paragraphs 90-91 of its complaint.  At core, Sublime disputes, once again, the termination provisions in the Standard Terms and Conditions of the Cooperative Agreement and the incorporated termination regulations at 2 C.F.R. § 200.340.  But these termination standards are not a separately implied specific promise, they are the express contract language.  This specific language is challenged throughout Sublime's complaint, and particularly in Counts I and III.

Sublime's reasons for disputing DOE's use of this specific language are also repeated across the claims.  Sublime repeats its argument that the Court should review the termination language based upon the context at the time of award.  *Compare* ¶ 90 *with* ¶¶ 75, 80.  Sublime repeats its argument that the current administration's focus on manufacturing means that the termination did not evince changing agency priorities.  *Compare* ¶ 90 *with* ¶ 83.  Sublime repeats its arguments that DOE did not cite a valid legal basis for termination, that DOE did not provide APA-esq warning and discussion opportunities, and that DOE relied on a purportedly false factual premise.  *Compare* ¶ 91 *with* ¶¶ 73-83.  Not only are these arguments cut and pasted from its breach of contract claims, Sublime develops the arguments with more specificity and argument in those claims originally.  Thus, even should the Court conclude that Sublime

32

sufficiently alleges a specific promise in its complaint sufficient to sustain a breach of the duty of good faith and fair dealing claim, Count II is nonetheless properly dismissed as entirely redundant with Sublime's breach of contract claims, where Sublime argues against the same express termination provision using the same arguments.

V.      Count IV, Termination in Bad Faith, Should Be Dismissed Where Sublime Fails to Plead the Requisite Animus or Intent to Harm

Sublime's Count IV alleges that its Cooperative Agreement was terminated in bad faith, but Sublime fails to sufficiently plead the requisite animus or specific intent to injure required to sustain this legal theory, and therefore this claim is properly dismissed under RCFC 12(b)(6). Sublime's complaint purports that bad faith is present in this termination due to the Government's choices to terminate different Federal awards in different circumstances, Compl. ¶ 103, or because Sublime's Cooperative Agreement was terminated a few weeks after DOE awards were reviewed, Compl. ¶ 104. Yet these allegations are insufficient to state a theory of bad faith, nor are any of allegations that Sublime has tied to Count IV of its complaint. Sublime simply fails to plead sufficient facts to tie its termination to an act in bad faith, and accordingly the Court should dismiss Count IV for failure to state a claim.

"'[T]he government is not permitted to terminate a contract in bad faith.'" Compl. ¶ 102 (quoting *Irwin Cnty*, 170 Fed. Cl. at 370). But to state a claim that a contract was terminated in bad faith, Sublime must plead "conduct that evinces a 'specific intent to injure' and 'animus' toward the opposing party in terminating the contract." *Id.* (quoting *Irwin*, 170 Fed. Cl. at 370; *see also Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118 (2016) (bad faith includes "specific intent to injure" or "animus").

Such animus must be directed against the party in question. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("In the cases where the court has

33

considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff.") (quoting *Torncello v. United States*, 231 Ct. Cl. 20, 681 F.2d 756, 770 (1982)).  For example, in *Libertatia Associates.* the Court found bad faith after trial where a contracting officer's representative made known his disdain for plaintiff, including, for example, regularly voicing his personal dislike of the plaintiff's president.  *Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 708 (2000).  In contrast, in *Librach* the Court distinguished the general termination of a class of Cooperative Agreements from an act of bad faith, in part because all related contracts had been terminated, not merely plaintiffs.  *See Librach v. United States*, 147 Ct. Cl. 605, 614 (1959); *see also Irwin*, 170 Fed. Cl. at 370 ("The two prototypical examples of bad faith conduct are when the government terminates a contract simply to acquire a better bargain from another source and when the Government enters a contract with no intention of fulfilling its promises.") (interior quotations omitted).

Sublime attempts to plead bad faith termination through three allegations.  First, Sublime alleges bad faith because of the circumstances of separate Federal award terminations not relevant to this dispute.  Compl. ¶ 103.  Second, Sublime alleges bad faith seemingly because DOE spent a couple of weeks reviewing Sublime's Cooperative Agreement before issuing a termination with general language.  *Id.* ¶ 104.  Third, Sublime alleges bad faith termination because Sublime is unhappy that DOE did not provide the amount of detailed evidence that Sublime desired in the termination, and therefore Sublime makes an "inference" that bad faith is present.  *Id.* ¶ 105.  None of these allegations, cumulatively or independently, demonstrate animus against Sublime or intent to injure Sublime, and thus fail to state a claim.

Under its first theory in paragraph 103 of its complaint, Sublime alleges that "the administration has made it a priority to terminate thousands of Cooperative Agreements issued

34

by the prior administration *en masse*, including specifically because they were issued under the prior administration[,]" and because the administration "specifically targeted and sought to injure companies seeking to reduce greenhouse gas emissions[.]" Compl. ¶ 103.  For both of these theories, however, Sublime fails to connect the circumstances in separate cases involving other grants with those surrounding its own Cooperative Agreement termination.  Pointing to other cases fails to amount to a showing of a specific intent to harm Sublime by terminating Sublime's grant.

In any event, none of the cases that Sublime cites are similar to Sublime's Cooperative Agreement.  Sublime cites *Am. Council of Learned Societies v. McDonald*, No. 25 CIV. 3657 (CM) (BCM), 2025 WL 2097738, at *30 (S.D.N.Y. July 25, 2025)—but this case involves allegations of purported first amendment viewpoint discrimination—an issue not present in Sublime's termination.  And the awards terminated in that case are significantly differentiable from the Cooperative Agreement at issue in this matter, involving entirely distinct termination decisions through the National Endowment for the Humanities.  Sublime's citations to *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 103 (D.D.C. 2025), and *City of Saint Paul, Minnesota v. Wright*, No. 25-CV-03899 (APM), 2026 WL 88193, at *2 (D.D.C. Jan. 12, 2026) are no better.  *Climate United Fund* reviewed APA claims involving the termination of grants at the Environmental Protection Agency.  *City of St. Paul*—though a case involving the DOE— discusses allegations involving a separate instance of DOE grant terminations, which took place months after Sublime's own Cooperative Agreement termination, and which were in a clearly differentiable context of alleged political viewpoint discrimination and retaliation.

Sublime's disagreement with the Cooperative Agreement terminations in separate circumstances involving distinct Federal agencies does not give rise to its own claim for bad

faith termination.  Sublime cannot show bad faith through allegations that the Government acted in bad faith to others, it must sufficiently plead bad faith in relation to its own termination.  *See Galen Med. Assocs.*, 369 F.3d at 1330 (addressing that the standard imposes a "specific intent to injure the plaintiff").  Sublime's reliance on group termination of awards does not demonstrate specific intent to injure. The termination of a class of projects indicates a programmatic policy shift, which is an executive prerogative, not a personal vendetta.

Sublime next purports that its termination was in bad faith because "DOE abruptly terminated Sublime's Cooperative Agreement just weeks after announcing a purported 'review' of awards[.]"  Compl. ¶ 104.  Sublime's allegation that the United States took weeks to review the Cooperative Agreement before termination certainly does not constitute bad faith on its own.  And the Cooperative Agreement makes no reference to any particular amount of time DOE is required to spend on Cooperative Agreement termination decisions, nor does the Cooperative Agreement preclude DOE from reviewing its projects.  Nothing in the Cooperative Agreement obligated DOE to do any of the things about which Sublime complains, such as giving Sublime a particularized explanation for the termination or affording Sublime an "opportunity to participate in" the decision making about the termination.  *Id*.  Thus, the alleged "failure" to do these things is not only not a breach, but also not evidence of bad faith.  Under the terms of the Cooperative Agreement, the United States may terminate through its own discretion, and Sublime has identified no contractual entitlement to influence that termination decision.  *See* Appx15 (addressing the Government's ability, "to the greatest extent authorized by law," to terminate the Cooperative Agreement if it "no longer effectuates the program goals or agency priorities[.]").

Finally, Sublime assumes that bad faith must exist because "in the absence of" DOE providing an explanation or evidence sufficiently detailed for Sublime, "*the most plausible*

36

*inference* is that DOE terminated the Cooperative Agreement to injure beneficiaries of Cooperative Agreements[.]"  Compl. ¶ 105 (emphasis added).  However, as a matter of settled law Sublime cannot presume bad faith on the part of government officials.

Government officials enjoy a "strong presumption" that they "carry out their duties lawfully and in good faith."  *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1238 (Fed. Cir. 2002).  It is "[t]he contractor's burden to prove the Government acted in bad faith," a "very weighty" burden that contractors have rarely succeeded in demonstrating. *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (citing *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301 (Ct. Cl. 1976), cert. denied, 434 U.S. 830 (1977) ("Any analysis of a question of Governmental bad faith must begin with the presumption that public officials act 'conscientiously in the discharge of their duties'").  It is "'well-established that a high burden must be carried to overcome this presumption[.]'"  *See Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012) (citing *Am-Pro*, 281 F.3d at 1239-40) (cleaned up).

Beyond Sublime's conclusory assertions of bad faith, Sublime brings no allegations to sustain an inference of bad faith.  Rather Sublime merely complains of administrative changes in priorities, not "conduct that evinces a 'specific intent to injure' and 'animus' toward the opposing party in terminating the contract."  *Irwin*, 170 Fed. Cl. at 370.  Sublime's "plausible inference" that the Federal employees acted in bad faith runs directly afoul of the "strong presumption" that they "carry out their duties lawfully and in good faith[,]" and this Court must reject this unfounded leap.  *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1238 (Fed. Cir. 2002).  Similarly, Sublime's "bare assertions" and legal conclusion that bad faith existed is insufficient to sustain its claim.  *Iqbal*, 556 U.S. at 678-680.

37

Finally, the single piece of evidence that Sublime identifies to support its inference its Cooperative Agreement was terminated in bad faith does not relate to Sublime's termination. Sublime cites, in a footnote, to a Department of Energy article titled: "Energy Department Returns $13 Billion in Unobligated Wasteful Spending to American Taxpayers." But this article postdates Sublime's termination by several months. The article also addresses the return of "unobligated funds," in contrast to Sublime's Cooperative Agreement which was both obligated and funded until the time of termination. *See also* Compl. ¶ 2 (admitting that the funds for this project were obligated—*i.e.*, not the unobligated funds mentioned in the publication). Sublime once again fails to relate separate administrative decisions to specific intent to injure Sublime or animus towards Sublime.

The Court should dismiss Count IV alleging termination in bad faith where Sublime fails to plead the required animus or intent to injure Sublime. Instead, Sublime's allegations amount to bare assertions and legal conclusions. Where Sublime addresses specific instances of purported bad faith, it relies upon facts and disputes that are not related to Sublime or the circumstances of its own termination. Accordingly, the Court should dismiss this claim pursuant to RCFC 12(b)(6).

CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court dismiss or strike Sublime's claims for massive damages associated with Sublime's desired future budget periods, and dismiss Counts I-IV for failure to state a claim upon which relief may be granted.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CORINNE A. NIOSI
Assistant Director

Of Counsel:                /s/ Matthew D. Lewis
BRIGHTON SPRINGER     MATTHEW D. LEWIS
Office of the General Counsel    Trial Attorney
U.S. Department of Energy      Commercial Litigation Branch
1000 Independence Ave., S.W.   Civil Division
Washington, D.C. 20585        Department of Justice
                             P.O. Box 480
                             Ben Franklin Station
                             Washington, D.C. 20044
                             (202) 880-6321
                             matthew.lewis@usdoj.gov

Dated: July 1, 2026           Attorneys for Defendant

39

## INDEX TO THE APPENDIX

*Cooperative Agreement Standard Terms and Conditions* ..................................................... Appx1

*Cooperative Agreement Program and Award-Specific Terms and Conditions* .................. Appx31



**THE OFFICE OF**
## CLEAN ENERGY DEMONSTRATIONS

# Cooperative Agreement
# Standard Terms and Conditions

## Table of Contents

**General** ................................................................................................................4

    **Term 1.**     **Legal Authority and Effect** ..............................................................4

    **Term 2.**     **Incorporation by Reference and Definitions**....................................4

    **Term 3.**     **Flow Down Requirement** ...............................................................5

    **Term 4.**     **Resolution of Potentially Conflicting Conditions** ...........................5

    **Term 5.**     **Compliance with Federal, Tribal, State, and Local Laws, and Additional Tribal Considerations** .....5

    **Term 6.**     **Permits and Approvals**..................................................................5

    **Term 7.**     **Senior and Key Personnel** .............................................................5

    **Term 8.**     **Project Management Plan** .............................................................6

    **Term 9.**     **Community Benefits Plan Implementation**......................................6

    **Term 10.**     **Cybersecurity Plan**......................................................................6

    **Term 11.**     **Project and Budget Changes**..........................................................6

    **Term 12.**     **Pre-Procurement Reviews** ............................................................7

    **Term 13.**     **Subawards** ................................................................................7

    **Term 14.**     **Go/No-Go Reviews and Continuation Decisions** .............................8

**Financial**................................................................................................................9

    **Term 15.**     **Cost Sharing**..............................................................................9

    **Term 16.**     **Refund Obligation** .....................................................................10

    **Term 17.**     **Allowable Costs** ........................................................................10

    **Term 18.**     **Program Income** .......................................................................10

    **Term 19.**     **Insolvency, Bankruptcy, or Receivership**......................................11

    **Term 20.**     **Audits**.....................................................................................11

    **Term 21.**     **Contingency**.............................................................................12

**Administrative**................................................................................................................12

    **Term 22.**    **Independent Cost Reviews and Independent Cost Estimates**..........................................12

    **Term 23.**    **Recipient Inspection Requirements** ..................................................................................13

    **Term 24.**    **Independent Engineering Reviews and Assessments**......................................................13

    **Term 25.**    **Recipient Administrative Organizational Reviews**...........................................................14

    **Term 26.**    **Record Retention and Access** ...........................................................................................14

    **Term 27.**    **Modifications** ...................................................................................................................14

    **Term 28.**    **At-Risk Oversight and Monitoring** ...................................................................................14

    **Term 29.**    **Government Access to Award Information**........................................................................14

    **Term 30.**    **Cooperative Agreement Termination** ..............................................................................15

    **Term 31.**    **Budget Period Modifications and Extensions** ..................................................................16

    **Term 32.**    **Insurance Coverage** .........................................................................................................16

    **Term 33.**    **Liability** ............................................................................................................................16

    **Term 34.**    **Indemnity** ........................................................................................................................16

    **Term 35.**    **Decontamination and/or Decommissioning Costs** .........................................................16

    **Term 36.**    **Contaminated Sites** .........................................................................................................17

    **Term 37.**    **Publications, Public Relations Activities, and Design Elements** .......................................17

    **Term 38.**    **System for Award Management (SAM.gov) and Universal Identifier Requirements** ...................17

    **Term 39.**    **Corporate Felony Convictions and Federal Tax Liability Assurances** ...............................18

    **Term 40.**    **Conference Spending** .......................................................................................................18

    **Term 41.**    **Risk Mitigation and Due Diligence Reviews** ....................................................................19

    **Term 42.**    **Changes to Recipient's Board of Directors**.......................................................................19

    **Term 43.**    **Disclosure of Connections with Foreign Countries of Risk** .............................................19

    **Term 44.**    **Foreign Commitments in Support of the Award**..............................................................20

    **Term 45.**    **Waiver Requests – Foreign Entity Participation as a Recipient or Subrecipient**..............20

    **Term 46.**    **Foreign National Participation**.........................................................................................21

    **Term 47.**    **Waiver Requests – Performance of Work in the United States** .......................................21

    **Term 48.**    **Prohibition Related to Foreign Government-Sponsored Talent Recruitment Programs** ..............22

    **Term 49.**    **Reporting Requirements**..................................................................................................22

    **Term 50.**    **Property Standards** .........................................................................................................23

    **Term 51.**    **Real Estate Transaction Approval**....................................................................................23

**National Policy Requirements** .........................................................................................23

    **Term 52.**    **Davis-Bacon Act Requirements** .......................................................................................23

    **Term 53.**    **Export Control** .................................................................................................................25

**Term 54.**    **Notice Regarding the Purchase of American-Made Equipment and Products** ...............................25

**Term 55.**    **Affirmative Action and Pay Transparency Requirements**...............................................................25

**Term 56.**    **Human Subjects Research**.................................................................................................................26

**Term 57.**    **Environmental, Safety, and Health and Performance of Work at DOE Facilities** ...........................26

**Term 58.**    **Lobbying Restrictions**.......................................................................................................................26

**Term 59.**    **National Historic Preservation Act Requirements** ..........................................................................26

**Term 60.**    **National Environmental Policy Act Requirements**..........................................................................27

**Term 61.**    **National Security: Classifiable Information Originating Under an Award** ......................................28

**Term 62.**    **Fraud, Waste and Abuse** ..................................................................................................................28

**Term 63.**    **Nondisclosure and Confidentiality Agreements Assurances**...........................................................29

**Term 64.**    **Interim Conflict of Interest Policy for Financial Assistance** ..........................................................29

**Term 65.**    **Organizational Conflicts of Interest**................................................................................................30

These Standard Terms and Conditions apply except as modified by the Program and Award-Specific Terms and Conditions.

## General

### Term 1.    Legal Authority and Effect

This Award is valid only if it is in writing and is signed, either in writing or electronically, by a DOE Grants and Agreements Officer.

The Recipient is free to accept or reject this Award. Either of the following constitutes the Recipient's acceptance of this Award: (1) a request to draw down DOE funds or (2) acknowledgement of the award documents by the Recipient's authorized representative through the electronic system used by DOE, which is currently FedConnect.

### Term 2.    Incorporation by Reference and Definitions

The following are incorporated into this Award by reference:
- Financial Assistance Regulations: Title 2 Subtitle A OMB Guidance for Federal Financial Assistance of the CFR, including Chapter 2  2 CFR Part 200 (effective October 1, 2024), and 2 CFR Part 910.
- The Reporting of Matters Related to Recipient Integrity and Performance Requirements Term in Appendix XII of 2 CFR Part 200.
- National Policy Requirements, available at https://www.energy.gov/oced/award-negotiations.

For the purposes of the Award, the following definitions apply:

"Disadvantaged communities" means the census tracts that are defined and identified by the White House Council on Environmental Quality's Climate and Economic Justice Screening Tool ("**CEJST**") and all Federally Recognized Tribes and Tribal entities. For additional information about the Justice40 Initiative and the CEJST, please reference DOE's Justice40 General Guidance. The Justice40 Initiative directs that 40% of the overall benefits of certain federal investments flow to disadvantaged communities that are marginalized by underinvestment and overburdened by pollution. For information about whether a particular DOE program is covered under the Justice40 Initiative, see the White House's Justice40 Initiative webpage and DOE's Justice40 Initiative list of covered programs.

Pursuant to Executive Order 14008 on Tackling the Climate Crisis at Home and Abroad and Justice40 Initiative interim guidance by the White House Office of Management and Budget, White House Council on Environmental Quality, and White House Office of Domestic Climate Policy, M-21-28 and M-23-09.

"Underrepresented" refers to communities or populations sharing a particular characteristic, as well as geographic communities, that are shown to have been systematically denied a full opportunity to participate in aspects of economic, social, and civic life, as exemplified by communities that have been denied fair, just, and impartial treatment, which may include Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; persons otherwise adversely affected by persistent poverty or inequality; women and veterans.

## Term 3.       Flow Down Requirement

The Recipient must apply the terms and conditions of this Award to all subrecipients (and contractors as applicable). *See* 2 CFR § 200.332; 2 CFR § 200.101(b).

## Term 4.       Resolution of Potentially Conflicting Conditions

The Recipient should promptly refer any questions about the application of a specific law, regulation, policy, term, or other requirement to the Grants and Agreements Officer for clarification. The Grants and Agreements Officer may require the Recipient to submit any of these questions in writing.

The Recipient must promptly refer any apparent inconsistency between Federal law(s) and regulation(s) and the requirements of this Award to the Grants and Agreements Officer in writing for resolution. The Recipient must provide a detailed description of the apparent inconsistency.

## Term 5.       Compliance with Federal, Tribal, State, and Local Laws, and Additional Tribal Considerations

The Recipient must comply with all applicable Federal, Tribal, State, and Local laws and regulations for all activities performed under this Award.

If any activities anticipated to take place under this Award could potentially impact the resources or reserved rights of Indian Tribe(s), as defined in 25 U.S.C. § 5304(e), then the Recipient agrees to develop and maintain active and open communications with the potentially impacted Indian Tribe(s), during the period of performance of the Award, and, if necessary, after the end of the Award.

The Recipient must obtain approval by DOE before any activities take place that could impact Tribal resources or reserved rights, including but not limited to lands, cultural sites, sacred sites, water rights, mineral rights, fishing rights, and hunting rights. The Recipient must coordinate with DOE on all Tribal interactions. DOE will determine if formal government-to-government consultation is needed, and if so, DOE will conduct that consultation.

## Term 6.       Permits and Approvals

The Recipient is required to obtain and maintain all applicable permits, licenses, authorizations, and approvals for activities under this Award.

## Term 7.       Senior and Key Personnel

The Recipient must obtain prior written approval from the Grants and Agreements Officer for any changes of senior and key personnel as listed in the Assistance Agreement. The Recipient must submit the request at least 30 calendar days prior to the requested effective date of the change, or immediately if the change will occur within 30 days.

## Term 8.    Project Management Plan

The Recipient must develop and regularly maintain, update, and implement the Project Management Plan.

## Term 9.    Community Benefits Plan Implementation

The Recipient must implement the community benefits plan objectives and commitments.

DOE review, comments, or feedback provided to the Recipient do not constitute an endorsement of any specific elements in the proposed approach and such feedback should not be referenced or used in marketing or promotional materials.

## Term 10.    Cybersecurity Plan

The Office of Cybersecurity, Energy Security, and Emergency Response ("**CESER**") is responsible for coordinating cybersecurity project plans for certain Infrastructure Investment and Jobs Act ("**IIJA**") provisions. CESER may coordinate with DOE National Laboratory Subject Matter Experts to provide support activities to help the Recipient maintain or improve the project's cybersecurity over its lifecycle.

The Recipient is responsible for maintaining and improving the project's cybersecurity during the life of the Award. The Recipient must submit a Cybersecurity Plan unless otherwise specified in the Program and Award-Specific Terms and Conditions.

DOE may require the Recipient to respond to DOE feedback on the Cybersecurity Plan, submit updates or revisions to the Cybersecurity Plan, and attend Cybersecurity Plan lifecycle support meetings with DOE.

The Recipient must submit the Cybersecurity Plan and any updates or revisions to the Cybersecurity Plan securely in the form and manner specified by DOE.

DOE review, comments, or feedback provided to the Recipient do not constitute an endorsement or approval of any specific elements within the Cybersecurity Plan or the proposed security approach and such feedback should not be referenced or used in marketing or promotional materials. All cybersecurity plans and deliverables are exempt from disclosure under the Freedom of Information Act (5 U.S.C. § 552) pursuant to Section 40126(e). This exemption is limited to information provided to or collected by the Federal government as described in Pub. L. 117-58 § 41026, 42 U.S.C. § 18725.

## Term 11.    Project and Budget Changes

The Recipient must obtain prior written approval from the Grants and Agreements Officer for project and budget changes as stated in 2 CFR § 200.308.

In addition, per 2 CFR § 200.308(i) DOE is electing to restrict the transfer of funds among direct cost categories. The recipient is required to receive prior approval from DOE if the cumulative amount of the transfer exceeds or is expected to exceed 10 percent of the total budget for the budget period, including cost share, as last approved by DOE.

## Term 12.    Pre-Procurement Reviews

Prior to executing a contract as described in 2 CFR § 200.325(b)(1)-(5), the Recipient must provide DOE all relevant procurement documents related to that contract. Relevant procurement documents include, but are not limited to, a description of the supplies or services required, proposed type of contractual arrangement to be issued, requests for proposals, invitations for bid, cost estimates, proposals or bids, and price or cost analysis of proposals or bids.

DOE may require changes or incorporation of DOE feedback prior to executing the contract. DOE review does not constitute a determination by DOE of the allowability of any cost under the contract. DOE will not review contracts for legal sufficiency.

The Recipient is exempt from the pre-procurement review in 2 CFR § 200.325(b) if DOE determines that the Recipient's procurement systems comply with the standards of 2 CFR Part 200 Subpart D.

The Recipient may request that DOE review its procurement system consistent with 2 CFR § 200.325(c)(1). The Recipient may self-certify its procurement system consistent with 2 CFR § 200.325(c)(2).

## Term 13.    Subawards

The Recipient is required to obtain prior written approval from the Grants and Agreements Officer prior to issuance of any subaward. Approvals will be listed in the Program and Award-Specific Terms and Conditions.

These requests must be in writing, and must, at a minimum, include the following:

1. A detailed description of the work to be performed, the service(s) to be provided, and/or the equipment to be purchased;
2. Budget and budget justification;
3. Cost share commitment letter if the subrecipient is providing cost share;
4. A completed Environmental Considerations Summary or similar document or a statement that such documents are inapplicable;
5. An assurance that the subrecipient is not a debarred or suspended entity;
6. An assurance that all required Award provisions will be flowed down in the resulting subrecipient agreement(s); and
7. An assurance that no potential, actual, or apparent conflict of interest exists between the Recipient and the selected subrecipient and that the Recipient's written standards of conduct were followed. The existence of a "covered relationship" as defined in 5 CFR § 2635.502 between a member of the Recipient's ownership or senior management and a member of a subrecipient's ownership or senior management creates an apparent conflict of interest. In such an event, the Recipient must notify the Grants and Agreements Officer and provide detailed information, justification, and mitigation measures to ensure there is no actual conflict of interest.

   The Recipient must also notify the Grants and Agreements Officer of any new subrecipient agreement with:

   a. an entity that is owned or otherwise controlled by the Recipient;

b. an entity that is owned or otherwise controlled by another entity that also owns or otherwise controls the Recipient; or

c. an entity that is owned or otherwise controlled by a board member, principal, or executive of the Recipient.

The Recipient is responsible for complying with 2 CFR § 200.332. The Recipient is responsible for monitoring the activities of all subrecipients as necessary to ensure that the subaward is used for authorized purposes and is in compliance with applicable laws, regulations, and the terms and conditions of the subaward. The Recipient is also responsible for ensuring that subrecipients maintain all necessary documentation for the same retention period as the Recipient's retention period. The Recipient must make all documentation available to DOE upon request. The Recipient shall include subaward activities in the project reports that are submitted to DOE.

## Term 14.    Go/No-Go Reviews and Continuation Decisions

The Recipient must submit an application to continue to the next Budget Period in the Award ("**Continuation Application**"). The Grants and Agreements Officer will communicate the requirements for the continuation application in writing approximately 180 calendar days before the end of the Budget Period. The Recipient must submit its continuation application at least 120 calendar days before the end of the Budget Period.
The Grants and Agreements Officer may modify these timeframes as appropriate.

### A.  Continuation Application Requirements

The continuation application requirements may include, but are not limited to, the following:

1. A report on the Recipient's progress towards meeting the objectives, milestones, and deliverables of the Award and that explains how the Recipient is addressing any significant findings, conclusions, or developments.
2. An estimate of any balance not drawn down at the end of the Budget Period. If the remaining balance is estimated to exceed 20 percent of the total funds available for the Budget Period, the Recipient must provide an explanation of why the unused funds have not been drawn down, and whether and how the Recipient proposes to use the funds in subsequent Budget Periods.
3. A detailed budget and supporting justification for the upcoming Budget Period, which may include subrecipient budgets and justifications, as applicable.
4. An updated Project Management Plan and associated attachments for the next Budget Period.
5. Updated models and analyses, including but not limited to, financial models, techno-economic analyses, and life-cycle analyses with clear identification of significant changes or refinements.
6. Updated engineering designs and evaluations.
7. Information pertaining to any other requirements identified in the Award.

DOE may further elaborate on continuation requirements in the Program and Award-Specific Terms and Conditions.

DOE will conduct a Go/No-Go Review of the Recipient's application and performance under the Award to date at the end of each Budget Period to inform its decision on whether to fund the Award in the next Budget Period ("**Continuation Decision**"). DOE's continuation decision is contingent upon:

1. The Recipient submitting a continuation application;
2. Availability of federal appropriations, program authority, and future-year budget authority for the purpose of the program;
3. Satisfactory performance, including the Recipient's progress on project objectives and identified milestones and deliverables, and consideration of the project's cost/performance index and schedule/performance index;
4. The Go/No-Go Review Criteria specified in the Award;
5. The Recipient's submittal of required information and reports;
6. The Recipient's compliance with the terms and conditions of the Award;
7. The Recipient meeting the cost share requirements for the current Budget Period and providing evidence that sufficient funds are available to meet the cost share requirements for subsequent Budget Periods as well as demonstrating access to any required reserves; and
8. The project continuing to support DOE's programmatic goals and be economically viable.

As a result of this review, DOE, in its sole discretion, may choose to: (1) fund the Award in the next Budget Period; (2) fund the Award in the next Budget Period with additional conditions or requirements; or (3) not fund future Budget Periods of the Award. DOE will communicate its continuation decision in writing. If DOE chooses to fund the next Budget Period, it will update the Award to reflect the revised funding level, Budget Period, milestones, deliverables, and any other changes. Each decision whether to authorize and fund activities in the next Budget Period is separate and distinct and the Recipient has no entitlement to any authorization or funding of activities beyond the current Budget Period.

A decision not to fund future Budget Periods of the Award is distinct from termination of the Award under the Cooperative Agreement Termination Standard Term and Condition and 2 CFR § 200.340.

# Financial

## Term 15.     Cost Sharing

### A.   Recipient Cost Sharing Obligations

The Recipient must provide at least its share of total project costs ("**Recipient cost share**") for the entire Period of Performance of the Award and for each Budget Period as specified in the Award. DOE's contribution of funds for the entire Period of Performance of the Award and for each Budget Period is limited as specified in the Award. DOE will not provide funding in addition to what is specified in the Award and will not move DOE funding anticipated for any future Budget Period into the current Budget Period.

### B.   Cost Sharing Records

The Recipient must retain records of all project costs that are claimed as Recipient cost share as well as records of costs to be paid by the Government. These records are subject to audit. If the Recipient cost share includes in-kind contributions, the Recipient must document the basis for determining the valuation for the in-kind contributions.

C.  Inability to Meet Cost Sharing Obligations

If the Recipient determines that it is or may become unable or unwilling to meet its cost sharing obligations, the Recipient must notify the Grants and Agreements Officer in writing immediately. The notification must include at least the following information: (1) whether the Recipient intends to continue with the Award, and (2) if the Recipient intends to continue with the Award, a plan for how the Recipient will provide (and secure replacement funding for, if applicable) the Recipient cost share.

Should DOE agree to the Recipient's plan, the Grants and Agreements Officer will modify the Award accordingly, including, if appropriate, adjusting the total amount of DOE funding. If DOE finds the Recipient's proposed plans unacceptable, it may terminate or decide not to continue funding the Award.

If the Recipient fails to meet its cost sharing obligations, DOE may recover the amount of funds under this Award needed to satisfy cost sharing requirements.

## Term 16.    Refund Obligation

The Recipient must refund any excess payments received from DOE, including any costs determined unallowable by the Grants and Agreements Officer.

## Term 17.    Allowable Costs

DOE determines the allowability of costs in accordance with 2 CFR Part 200 and 2 CFR Part 910. The Recipient must document and maintain records of all project costs, including, but not limited to, the costs paid by Federal funds, costs claimed by its subrecipients, and project costs that the Recipient claims as cost sharing, including in-kind contributions.

The Recipient is responsible for maintaining records adequate to demonstrate that costs claimed have been incurred, are reasonable, allowable, and allocable, and comply with the appropriate cost principles. Upon DOE request, the Recipient must provide such records to DOE. These records are subject to audit. The Recipient's failure to provide DOE adequate supporting documentation may result in a determination by the Grants and Agreements Officer that those costs are unallowable.

## Term 18.    Program Income

The Recipient must request prior written approval from the Grants and Agreements Officer to use program income to increase the total amount of funds committed to the Award or to meet its cost share obligations, in accordance with 2 CFR § 200.307. Tax credits are not considered program income.

# Term 19.    Insolvency, Bankruptcy, or Receivership

The Recipient must immediately, but no later than five (5) calendar days after, notify the Grants and Agreements Officer of the occurrence of any of the following events: (i) filing by the Recipient or its parent entity(ies) of a voluntary case seeking liquidation or reorganization under the Bankruptcy Code (11 USC §§ 101-1532); (ii) the Recipient's consent to the institution of an involuntary case under the Bankruptcy Code against the Recipient or its parent entity(ies); (iii) the filing of any similar proceeding for or against the Recipient or its parent entity(ies), or its or their consent to the dissolution of, winding-up or readjustment of debts, appointment of a receiver, conservator, trustee, or other officer with similar powers over the Recipient or its parent entity(ies) under any other applicable state or Federal law; or (iv) insolvency of the Recipient or its parent entity(ies) due to the inability to pay debts generally as they become due.

# Term 20.    Audits

## A.  Annual Independent Audit (Single Audit or Compliance Audit)

The Recipient must comply with the annual independent audit requirements in 2 CFR Part 200 Subpart F for entities other than for-profit organizations ("**Single Audit**") and 2 CFR Part 910 Subpart F for For-Profit Organizations ("**Compliance Audit**").

The annual independent audits are separate from Government-initiated audits discussed in part B of this Audits Standard Term and Condition.

To minimize expense, the Recipient may conduct a Single Audit, Compliance Audit, and/or Incurred Cost Audit in conjunction with its annual audit of financial statements. However, the annual audit of financial statements will not be accepted as a substitute for the Single Audit, Compliance Audit, or Incurred Cost Audit.

## B.  Government-Initiated Audits

The Recipient must provide any information, documents, site access, or other assistance required by DOE or Federal auditing agencies (e.g., DOE Inspector General, Government Accountability Office, Department of Justice) for the purpose of audits and investigations. Such assistance may include, but is not limited to, reasonable access to the Recipient's records relating to this Award.

Consistent with 2 CFR Part 200 and 2 CFR Part 910, DOE may audit the Recipient's financial records or administrative records relating to this Award at any time, including records of subrecipients. Government-initiated audits under this Award are generally paid for by DOE. Government-initiated audits can include but are not limited to accounting system audits and incurred cost audits.

Upon completion of an audit, the Recipient may be required to refund to DOE any payments for costs that were determined to be unallowable or may provide a corrective action plan. If the audit has not been performed or completed prior to the closeout of the Award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.
DOE will provide reasonable advance notice of government-initiated audits and will minimize interference with ongoing work to the extent practicable.

C.  Accounting System Audit

In accordance with 2 CFR Part 200 and 2 CFR Part 910, DOE reserves the right to initiate an accounting system audit. The Recipient is required to maintain an accounting system with records that adequately reflects the costs charged to DOE and the nature and extent of the cost contribution. DOE may require the accounting system audit anytime during the Period of Performance. DOE will make reasonable efforts to notify the Recipient prior to any accounting system audit. DOE will cover the cost of any accounting system audits.

D.  Incurred Cost Audit and Final Incurred Cost Audit

In accordance with 2 CFR Part 200 and 2 CFR Part 910, DOE reserves the right to initiate an incurred cost audit on this Award to monitor project costs. The incurred cost audit may be required annually, during, or after a specific phase of the project (e.g., construction). DOE will make reasonable efforts to notify the Recipient prior to any incurred cost audit. DOE will cover the cost of any incurred cost audit.

If the final incurred cost audit has not been performed or completed prior to the closeout of the Award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final incurred cost audit.

Such notification must be in writing and must: (i) specifically set out the details of the occurrence of an event referenced in the above paragraph; (ii) provide the facts surrounding that event; and (iii) provide a discussion of the impacts such event may have on the activities funded by this Award.

Upon the occurrence of any of the events described in the first paragraph of this term, DOE reserves the right to conduct a review to determine the Recipient's compliance with the requirements of the Award. This includes, but is not limited to, DOE review of any records related to cost share, progress toward project objectives, submission of required reports, and other records DOE deems relevant.

## Term 21.    Contingency

The Recipient must account for reasonably foreseeable potential risks, uncertainty of estimates, and cost overruns in its budget estimates.

# Administrative

## Term 22.    Independent Cost Reviews and Independent Cost Estimates

DOE may conduct Independent Cost Reviews ("**ICR**") and Independent Cost Estimates ("**ICE**") or other cost estimate reviews to assess and validate the Recipient's cost estimates at any time during the Award.

The Recipient must develop its cost estimates consistent with the following standards and guidance as appropriate, and DOE will use these standards and guidance in its evaluation of Recipient cost estimates:

1.  Association for the Advancement of Cost Engineering ("**AACEI**") Recommended Practice ("**RP**") 17R-97, Cost Estimate Classification System;

2. AACEI RP 18R-97, Cost Estimate Classification System – as Applied in Engineering, Procurement, and Construction for the Process Industries; and
3. Government Accountability Office ("**GAO**") Guide GAO-20-195G, Cost Estimating and Assessment Guide, March 1, 2020.

If there is a potential conflict between these guidance documents, the Recipient should follow the GAO Cost Estimating and Assessment Guide as appropriate.

DOE will require the Recipient to submit information needed for DOE to conduct an ICR, ICE, or other cost estimate review. DOE will provide written instructions on required submissions. DOE may require information including, but not limited to, the following:

1. Executive Summary
2. Estimate Purpose
3. Technical Baseline Description
4. Cost Estimating Plan and Cost Model
5. Work Breakdown Structure ("**WBS**") and WBS Dictionary
6. Current Schedule and Cost Estimate files with reference data
7. Basis of Estimate, including supporting methodologies and assumptions
8. Sensitivity Analysis
9. Current Risk Register, including cost and schedule risk and uncertainties.

## Term 23.    Recipient Inspection Requirements

The Recipient is responsible for performing any needed inspections, tests, start-up, commissioning, and other related activities under this Award.

The Recipient must maintain inspection system(s) acceptable to DOE that covers the activities under this Award. DOE may perform technical inspections and specialized inspections or tests as DOE deems necessary. DOE will make reasonable efforts to ensure these inspections or tests do not interfere with or unduly delay project work. The Recipient is required to maintain complete records, including of inspections, tests, start-up, commissioning, and operations and provide those records when requested by DOE.

## Term 24.    Independent Engineering Reviews and Assessments

DOE may, with prior notification, conduct independent engineering reviews and assessments of the Award. DOE may use DOE and/or DOE contractor personnel to conduct these independent engineering reviews and assessments. The Recipient must cooperate with the conduct of these reviews and assessments by providing to DOE and/or DOE's contractor access to all facilities and information that are required to successfully complete these reviews and assessments. DOE shall ensure that all DOE contractor personnel are subject to confidentiality and non-disclosure requirements prior to receiving Recipient information. The Recipient is responsible for providing all required training for site or system access. DOE and/or its contractor personnel are responsible for completing all required training.

## Term 25.    Recipient Administrative Organizational Reviews

DOE may conduct Recipient Administrative Organizational Reviews to review the project and management control systems and to provide technical assistance.

## Term 26.    Record Retention and Access

The Recipient must retain and allow access to records relating to this Award consistent with 2 CFR § 200.334 through 2 CFR § 200.338.

## Term 27.    Modifications

The Grants and Agreements Officer must unilaterally modify the agreement where required by law.
The Grants and Agreements Officer may also unilaterally modify the Award for administrative matters such as for updating regulatory citations, lines of accounting, and DOE contacts. Other types of modification to the Award will be made only by mutual agreement. Drawing down DOE funds or acknowledgement of the Award documents by the Recipient's authorized representative through the electronic system used by DOE, which is currently FedConnect, constitutes acceptance of the modification.

## Term 28.    At-Risk Oversight and Monitoring

DOE reserves the right to increase oversight and monitoring of the Recipient based on factors including, but not limited to, schedule or cost performance, technology or supply chain risks, environmental or community impacts, meeting cost sharing requirements, obtaining project financing, or management of the project. DOE may require the Recipient to provide additional information and may modify existing requirements or impose additional requirements including, but not limited to, those listed in 2 CFR § 200.208(c) and 2 CFR § 910.372.

DOE may also terminate or partially terminate the Award or decide not to fund future Budget Periods under the Award without first increasing oversight or monitoring or imposing additional requirements.

## Term 29.    Government Access to Award Information

The Recipient must provide DOE, including designated DOE contractors, unfettered access to all facilities, documents, papers, personnel, accounts, books, records, and other supporting documentation and information that are pertinent to the Award. DOE will make reasonable efforts to ensure this access does not interfere with or unduly delay project work.

The access may include, but is not limited to, the following:

1. Facility sites before, during, and after construction
2. Contractor component manufacturing facilities
3. Facility sites during operations
4. Drawings and specifications
5. Construction and execution plans
6. Resource loaded schedules
7. Design functions and requirements for the final site design review

8. Risk management plans
9. Value management and engineering studies and/or plans
10. Acquisition strategies
11. Project controls including earned value management systems
12. Qualifications of the integrated project team
13. Financial/cost share strategy for funding the construction project
14. Quality assurance and quality control plans
15. Financial modeling and financial cost data
16. Project agreements and contracts
17. Community benefits activities and proceedings
18. Facility start-up and commissioning plans
19. Facility operation plans
20. Facility operating costs
21. Decommissioning plans
22. Environmental information
23. Security and cybersecurity plans
24. Technical performance data and supporting information
25. Engineering design documentation and supporting information
26. Data strategy and management plan
27. Economic data and analyses
28. Lifecycle emissions and environmental impact data, analyses, and supporting information
29. Community, workforce, local and regional economic impact data, analyses, and supporting information

## Term 30.     Cooperative Agreement Termination

Pursuant to 2 CFR § 200.340(a), this Award may be terminated in whole or in part as follows:

1. By DOE, if the Recipient fails to comply with the terms and conditions of this Award;
2. By DOE, to the greatest extent authorized by law, if the Award no longer effectuates the program goals or agency priorities;
3. By DOE with consent of the Recipient, in which case the two parties must agree in writing on the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;
4. By the Recipient upon sending to the Grants and Agreements Officer written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. The effective date must be at least 30 calendar days after the date of the written notification. However, if DOE determines in the case of partial termination that the reduced or modified portion of the Federal Award or subaward will not accomplish the purposes for which the Federal Award was made, DOE may terminate the Award in its entirety.

Disputes and appeals are governed by 2 CFR § 910.128. If the Award is terminated or partially terminated, both DOE and the Recipient remain responsible for compliance with the requirements in 2 CFR § 200.344 and 2 CFR § 200.345.

## Term 31.    Budget Period Modifications and Extensions

Prior written approval from the Grants and Agreements Officer is required for modifications to any Budget Period or extension of the Period of Performance. The Recipient must request the modification at least 90 calendar days before the modification would take effect. The Grants and Agreements Officer will promptly respond to such requests. If approved, the change will be implemented by a modification to the Award.

## Term 32.    Insurance Coverage

The Recipient must at minimum obtain and maintain insurance consistent with the requirements in 2 CFR § 200.310 and 2 CFR § 910.360(e) but may choose to obtain and maintain additional insurance. The Grants and Agreements Officer may also require the Recipient to obtain and maintain additional insurance related to the Award.

## Term 33.    Liability

The Recipient agrees not to seek to hold the United States ("**US**") Government liable, or to seek contribution from the US Government for any liabilities, including but not limited to environmental liabilities and third party liabilities resulting from or arising out of any activities undertaken pursuant to the Award, except to the extent that such liability results from a negligent or wrongful act or omission of the US Government or to the extent such liability may be covered by applicable allowable cost provisions and then only to the extent of available funds obligated by the US Government to the Award.

## Term 34.    Indemnity

To the extent allowed by applicable law, the Recipient shall indemnify DOE and its officers, agents, or employees for any and all liability, including litigation expenses and attorneys' fees, arising from suits, actions, or claims of any character for death, bodily injury, or loss of or damage to property or to the environment, resulting from any activities undertaken pursuant to the Award, except to the extent that such liability results from a negligent or wrongful act or omission  of DOE officers, agents or employees, or to the extent such liability may be covered by applicable allowable costs provisions. The parties shall inform each other as soon as practicable of any suit or action alleging an indemnifiable claim.

## Term 35.    Decontamination and/or Decommissioning Costs

The US Government shall not be responsible for or have any obligation to the Recipient for (i) Decontamination and/or Decommissioning ("**D&D**") of any of the Recipient's facilities, or (ii) any costs which may be incurred by the Recipient in connection with the D&D of any of its facilities due to activities under this Award either before or after the effective date of this Award.

## Term 36.    Contaminated Sites

The Recipient must notify DOE if any activities under the Award will occur on previously contaminated or potentially contaminated sites with hazardous substances, including, but not limited to, Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**") "Superfund sites" or properties where redevelopment or reuse may be complicated by hazardous substance contamination ("Brownfield sites"). The Recipient is solely responsible for handling and disposal of any hazardous substances and wastes arising from activities under this Award.

## Term 37.    Publications, Public Relations Activities, and Design Elements

The Recipient must follow the OCED Communications Guidelines and the OCED Engagement Guidelines when issuing publications, presentations, public relations activities, news releases, and engaging with Congress arising out of, or relating to, work performed under this Award, whether copyrighted or not.

The Recipient must provide DOE access to, either electronically or in paper form, a copy of every publication or presentation of material based on or developed under this Award, clearly labeled with the Award number and other appropriate Award identifying information, at least seven (7) calendar days prior to publication or public presentation.

Use of the OCED logo, name, or brand in all applications including but not limited to design, facility signage, and other markings including DOE Investing in America signage during and after construction must be in accordance with the OCED Communications Guidelines and the OCED Engagement Guidelines. The Recipient must consult with the Grants and Agreements Officer on the cost, timeline, design, and placement of any works using the OCED logo or name in any location, physical or digital, prior to use.

## Term 38.    System for Award Management (SAM.gov) and Universal Identifier Requirements

A.  Requirement for System for Award Management.

Unless exempt from this requirement under 2 CFR § 25.110, the Recipient must maintain a current and active registration in SAM.gov. The Recipient's registration must always be current and active until the Recipient submits all final reports required under this Federal Award or receives the final payment, whichever is later. The Recipient must review and update its information in SAM.gov at least annually from the date of its initial registration or any subsequent updates to ensure it is current, accurate, and complete. If applicable, this includes identifying the Recipient's immediate and highest-level owner and subsidiaries and providing information about the Recipient's predecessors that have received a Federal Award or contract within the last three years.

B.  Requirement for Unique Entity Identifier (UEI).

If the Recipient is authorized to make subawards under this Federal Award, the Recipient:
   1.  Must notify potential subrecipients that no entity may receive a subaward until the entity has provided its UEI to the Recipient.

2. Must not make a subaward to an entity unless the entity has provided its UEI to the Recipient. Subrecipients are not required to complete full registration in SAM.gov to obtain a UEI.

C. Definitions.

For the purposes of this Award term:

1. **System for Award Management** ("**SAM**") means the Federal repository into which a Recipient must provide the information required for the conduct of business as a Recipient. Additional information about registration procedures may be found in SAM.gov (currently at *https://www.sam.gov/*).
2. **Unique entity identifier** means the universal identifier assigned by SAM to uniquely identify an entity.
3. **Entity** is defined at 2 CFR § 25.400 and includes all of the following types as defined in 2 CFR § 200.1:
   a. Non-Federal entity;
   b. Foreign organization;
   c. Foreign public entity;
   d. Domestic for-profit organization; and
   e. Federal agency.
4. **Subaward** has the meaning given in 2 CFR § 200.1.
5. **Subrecipient** has the meaning given in 2 CFR § 200.1.

# Term 39.    Corporate Felony Convictions and Federal Tax Liability Assurances

If a Recipient is organized as a corporation and has filed articles of incorporation in any of the 50 states, the District of Columbia, or the territories of the United States, including both for-profit and non-profit organizations but not foreign corporations, then the Recipient hereby attests that its corporation has not been convicted of a felony criminal violation under Federal law in the 24 months preceding the date of signature.

The Recipient further attests that its corporation does not have any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

# Term 40.    Conference Spending

The Recipient must not expend any funds on a conference that is not directly and programmatically related to the purpose for which the cooperative agreement was awarded that would defray the cost to the United States Government or a conference held by any Executive branch department, agency, board, commission, or office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office of the Inspector General (or senior ethics official for any entity without an Inspector General), of the date, location, and number of employees attending such conference.

## Term 41.    Risk Mitigation and Due Diligence Reviews

DOE may conduct ongoing due diligence reviews, through Government resources, including to identify potential risks of undue foreign influence. In the event a risk is identified, DOE may require risk mitigation measures including, but not limited to, requiring that an individual or entity not participate in the Award.

## Term 42.    Changes to Recipient's Board of Directors

The Recipient must notify the Grants and Agreements Officer no later than fifteen (15) business days of learning of any changes to the Recipient's board of directors, including additions to the number of directors, the identity of new directors, as well as each new director's citizenship and shareholder affiliation (if applicable).

Each notification must include a complete up-to-date list of all directors (and board observers), including their full name, citizenship and shareholder affiliation, date of appointment, duration of term, as well as a description of observer rights as applicable. This notification requirement applies only to the Recipient's Board of Directors.

## Term 43.    Disclosure of Connections with Foreign Countries of Risk

The Recipient must notify the Grants and Agreements Officer no later than fifteen (15) business days of learning of any of the following connections in relation to the Recipient or any subrecipients:

1. Any current or pending subsidiary, foreign business entity, or offshore entity that is based in or funded by a foreign country of risk;
2. Any current or pending contractual or financial obligation or other agreement specific to a business arrangement, joint venture or joint venture-like arrangement with an entity owned by a foreign country of risk or foreign entity based in a foreign country of risk;
3. Any current or pending change in ownership structure of the Recipient or subrecipients that increases foreign ownership related to a foreign country of risk. Each notification shall be accompanied by a complete and up-to-date capitalization table showing all equity interests held, including limited liability company (LLC) and partnership interests, as well as derivative securities. Include both the number of shares issued to each equity holder, as well as the percentage of that series and of all equity on fully diluted basis. For each equity holder, provide the place of incorporation and the principal place of business, as applicable. If the equity holder is a natural person, identify the citizenship(s).
4. Any current or pending venture capital or institutional investment by an entity that has a general partner or individual holding a leadership role in such entity who has an affiliation with a foreign country of risk; and
5. Any current or pending technology licensing or intellectual property sales to a foreign country of risk.

Should DOE determine the connection poses a security risk, DOE will require measures to mitigate or eliminate the risk.

Recognizing the disclosures may contain business confidential information, subrecipients may submit their disclosures directly to DOE.

**Foreign Country of Risk.** DOE has designated the following countries as foreign countries of risk: Iran, North Korea, Russia, and China. This list is subject to change.

## Term 44.    Foreign Commitments in Support of the Award

The Recipient must provide DOE with advanced written notice at least 30 calendar days before any potential commitment with foreign entities, organizations, or governments in connection with the Award. Commitments include any contractual, financial, or other binding commitment in which the Recipient, a subrecipient or a contractor will be obligated or entitled to provide or receive a sensitive service, product, or information resource. DOE may prohibit or impose conditions on the Recipient relating to such commitments.

The Recipient must also provide DOE with a written list of all existing foreign commitments in which it has entered in connection with this Award.

## Term 45.    Waiver Requests – Foreign Entity Participation as a Recipient or Subrecipient

The Recipient and all subrecipients must be organized, chartered, or incorporated (or otherwise formed) under the laws of a state or territory of the United States; have majority domestic ownership and control; and have a physical location for business operations in the United States. To request a waiver of this requirement for the Recipient and any subrecipients, the Recipient must submit a written waiver request.

The waiver must demonstrate to the satisfaction of DOE that the foreign entity's participation would further the purposes of the FOA and is otherwise in the best interest of the DOE programmatic objectives.

A foreign entity waiver request must include the following:

1. The entity's name, point of contact, and proposed type of involvement in the project;
2. The entity's country of incorporation, the extent of ownership/level of control by foreign entities, whether the entity is state owned or controlled, a summary of the ownership breakdown of the foreign entity and the percentage of ownership/control by foreign entities, foreign shareholders, foreign state or foreign individual(s) (DOE may require capitalization table);
3. Rationale for proposing that a foreign entity participate;
4. Description of how the foreign entity's participation is essential to the project:
5. Description of the likelihood of Intellectual Property being created from the work and the treatment of any such IP; and
6. Countries where the work will be performed. If any work is proposed to be conducted outside the United States and the Recipient does not already have a waiver of the Performance of Work in the United States requirement, the Recipient must also submit a waiver request regarding the Performance of Work in the United States requirement.

DOE may require additional information in considering a waiver request. DOE's decision regarding a waiver request is not appealable.

## Term 46.    Foreign National Participation

A "foreign national" is defined as any person without U.S. citizenship or nationality (may include a stateless person).

If the Recipient (including any of its subrecipients and contractors) anticipates involving foreign nationals in the performance of the Award, the Recipient must, upon DOE's request, provide DOE with specific information about each foreign national to ensure compliance with the requirements for participation and access approval.
The volume and type of information required may depend on various factors associated with the Award.
The DOE Grants and Agreements Officer will notify the Recipient if this information is required.

DOE may elect to deny a foreign national's participation in the Award, in its discretion, at any point during the performance of the Award. Likewise, DOE may elect to deny a foreign national's access to a DOE sites, information, technologies, equipment, programs, or personnel. DOE's determination to deny participation or access is not appealable.

## Term 47.    Waiver Requests – Performance of Work in the United States

All work (including but not limited to purchases and labor) performed under this Award must be performed in the United States, unless otherwise approved as part of the original application, or during performance, by DOE.

To seek a waiver of the Performance of Work in the United States requirement, the Recipient must submit a waiver request to the Grants and Agreements Officer. A waiver request must satisfactorily demonstrate that a waiver would further the purposes of the Notice of Funding Opportunity ("**NOFO**") and is otherwise in the best interest of the DOE programmatic objectives. A request for a foreign work waiver must include the following:

1. A description of the work proposed to be performed outside of the United States;
2. An explanation of how the foreign work is essential to the project;
3. The name of the entity that would perform the foreign work and information about the entity(ies) involved in the work proposed to be conducted outside of the United States (e.g., the entity seeking a waiver and the entity(ies) that will conduct the foreign work).
4. The rationale for performing the work outside of the United States ("foreign work") and why the work cannot be done within the US;
5. A description of the likelihood of Intellectual Property being created from the foreign work and the treatment of such IP;
6. The total estimated cost (DOE and Recipient cost share) of the proposed foreign work;
7. The country(ies) in which the foreign work is proposed to be performed; and
8. Timeline by which the waiver must be approved to support project schedules.

DOE may require additional information in considering a waiver request. DOE's decision regarding a waiver request is not appealable.

If the Recipient fails to comply with the Performance of Work in the United States requirement, DOE may deny reimbursement for the work conducted outside of the United States and such costs may not be recognized as allowable cost share. The Recipient is responsible for any work performed outside the United States without a waiver, regardless of whether the work is performed by the Recipient, subrecipients, contractors, or other project partners.

## Term 48.    Prohibition Related to Foreign Government-Sponsored Talent Recruitment Programs

### A.  Prohibition

Persons participating in a Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk are prohibited from participating in this Award. The Recipient must exercise ongoing due diligence to reasonably ensure that no individuals participating in the DOE-funded award are participating in a Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk. Consequences for violations of this prohibition will be determined according to applicable law, regulations, and policy.

Further, the Recipient must notify DOE within five (5) business days upon learning that an owner of the Recipient or subrecipient or individual on the project team is or is believed to be participating in a Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk. DOE may modify and add requirements related to this prohibition to the extent required by law.

### B.  Definitions

For purposes of this Award, these definitions apply:

1. **Foreign Government-Sponsored Talent Recruitment Program.** An effort directly or indirectly organized, managed, or funded by a foreign government, or a foreign government instrumentality or entity, to recruit science and technology professionals or students (regardless of citizenship or national origin, or whether having a full-time or part-time position). Some foreign government-sponsored talent recruitment programs operate with the intent to import or otherwise acquire from abroad, sometimes through illicit means, proprietary technology or software, unpublished data and methods, and intellectual property to further the military modernization goals and/or economic goals of a foreign government.  Many, but not all, programs aim to incentivize the targeted individual to relocate physically to the foreign state for the above purpose.

   Some programs allow for or encourage continued employment at United States research facilities or receipt of federal research funds while concurrently working at and/or receiving compensation from a foreign institution, and some direct participants not to disclose their participation to U.S. entities. Compensation could take many forms including cash, research funding, complimentary foreign travel, honorific titles, career advancement opportunities, promised future compensation, or other types of remuneration or consideration, including in-kind compensation.

2. **Foreign Country of Risk.** DOE has designated the following countries as foreign countries of risk: Iran, North Korea, Russia, and China. This list is subject to change.

## Term 49.    Reporting Requirements

The Recipient must comply with the reporting requirements for this Award including, but not limited to, the requirements identified in the Federal Assistance Reporting Checklist. (e.g. 2 CFR 170 Appendix A)

## Term 50.    Property Standards

The Recipient must comply with the applicable property standards regulations at 2 CFR §§ 200.310-16 and 2 CFR § 910.360. Pursuant to Section 309 of Division D of the Consolidated Appropriations Act of 2023 (Pub. L. No. 117-328), for energy development, demonstration, and deployment programs, DOE may vest unconditional title or other property interests acquired under projects in the Recipient, a subrecipient, or successor in interest, including the United States, at the conclusion of the Award period.

## Term 51.    Real Estate Transaction Approval

Should the Recipient propose to acquire real property under the Award, the Recipient must comply with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 USC § 4601 *et seq.*) and implementing regulations at 49 CFR Part 24 as applicable. At least 60 calendar days prior to consummating a real property acquisition under the Award, the Recipient must submit the proposed real estate transaction to the Grants and Agreements Officer for review and approval.

Should the Recipient propose that a project under the Award be located on DOE or other Federally-controlled land, authorization from the appropriate agency will be required. Such authorization may take the form of a lease, permit, easement, right-of-way, license, agreement, or any other appropriate legal instrument. Any such instrument will be subject to normal DOE real estate activity rules and procedures.

The Recipient must contact the Grants and Agreements Officer at least 150 calendar days in advance of the real property need date for guidance and to begin making the arrangements for the authorization.

# National Policy Requirements

## Term 52.    Davis-Bacon Act Requirements

This Award is funded under Division D of the Bipartisan Infrastructure Law (BIL). All laborers and mechanics employed by the Recipient, subrecipients, contractors or subcontractors in the performance of construction, alteration, or repair work in excess of $2,000 on an award funded directly by or assisted in whole or in part by funds made available under this Award shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with Subchapter IV of Chapter 31 of Title 40, United States Code commonly referred to as the "Davis-Bacon Act" ("**DBA**").

The Recipient shall provide a written assurance acknowledging the DBA requirements for the Award or project and confirming that all of the laborers and mechanics performing construction, alteration, or repair work in excess of $2,000 on projects funded directly by or assisted in whole or in part by funding under the Award are paid or will be paid wages at rates not less than those prevailing on a project of a character similar in the locality as determined by Subchapter IV of Chapter 31 of Title 40, United States Code.

The Recipient must comply with all DBA requirements including, but not limited to:

1. Ensuring that the wage determination(s) and appropriate Davis-Bacon clauses and requirements are flowed down to and incorporated into any applicable subcontracts or subrecipient awards.

2. Being responsible for compliance by any subcontractor or subrecipient with the Davis-Bacon labor standards.

3. Receiving and reviewing certified weekly payrolls submitted by all subcontractors and subrecipients for accuracy and to identify potential compliance issues.

4. Maintaining original certified weekly payrolls for 3 years after the completion of the project and must make those payrolls available to the DOE or the Department of Labor upon request, as required by 29 CFR § 5.6(a)(2).

5. Conducting payroll and job-site reviews for construction work, including interviews with employees, with such frequency as may be necessary to assure compliance by its subcontractors and subrecipients and as requested or directed by the DOE.

6. Cooperating with any authorized representative of the Department of Labor in their inspection of records, interviews with employees, and other actions undertaken as part of a Department of Labor investigation.

7. Posting in a prominent and accessible place the wage determination(s) and Department of Labor Publication: WH-1321, Notice to Employees Working on Federal or Federally Assisted Construction Projects.

8. Notifying the Grants and Agreements Officer of all labor standards issues, including all complaints regarding incorrect payment of prevailing wages and/or fringe benefits, received from the Recipient, subrecipient, contractor, or subcontractor employees; significant labor standards violations, as defined in 29 CFR 5.7; disputes concerning labor standards pursuant to 29 CFR parts 4, 6, and 8 and as defined in FAR 52.222-14; disputed labor standards determinations; Department of Labor investigations; or legal or judicial proceedings related to the labor standards under this contract, a subcontract, or subrecipient award.

9. Preparing and submitting to the Grants and Agreements Officer, the Office of Management and Budget Control Number 1910-5165, Davis Bacon Semi-Annual Labor Compliance Report, by April 21 and October 21 of each year in accordance with the reporting instructions the Federal Assistance Reporting Checklist.

The Recipient must undergo DBA compliance training must maintain competency in DBA compliance.
The Grants and Agreements Officer will notify the Recipient of any DOE sponsored DBA compliance trainings.
The Department of Labor offers free Prevailing Wage Seminars several times a year that meet this requirement, at
https://www.dol.gov/agencies/whd/government-contracts/construction/seminars/events.

The Recipient must ensure the timely submission of weekly certified payrolls as part of its compliance with the Davis-Bacon Act. DOE has contracted with a LCPtracker, a third-party DBA electronic payroll compliance software application. A waiver for the use of LCPtracker may be granted to a particular contractor or subcontractor if they are unable or limited in their ability to use or access the software.

A. DBA Electronic Certified Payroll Submission Waiver

A waiver must be granted before the start of work subject to DBA requirements (e.g., construction, alteration, or repair work). The Recipient does not have the right to appeal DOE's decision concerning a waiver request.

For additional guidance on how to comply with the DBA provisions and clauses, see https://www.dol.gov/agencies/whd/government-contracts/construction and https://www.dol.gov/agencies/whd/government-contracts/protections-for-workers-in-construction.

# Term 53.     Export Control

The United States government regulates the transfer of information, commodities, technology, and software considered to be strategically important to the US to protect national security, foreign policy, and economic interests without imposing undue regulatory burdens on legitimate international trade. There is a network of Federal agencies and regulations that govern exports that are collectively referred to as "Export Controls." The Recipient is responsible for ensuring compliance with all applicable United States Export Control laws and regulations relating to any work performed under the resulting Award.

The Recipient must immediately report to DOE any export control charges, indictments, convictions, and violations related to the project funded under this Award and any export control investigations potentially implicating any technologies or equipment under the subject Award, at the Recipient or subrecipient level, and, if the charge/indictment/investigation results in a conviction or violation, provide the corrective action(s) to prevent future violations.

# Term 54.     Notice Regarding the Purchase of American-Made Equipment and Products

It is the sense of Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this Award should be American-made.

# Term 55.     Affirmative Action and Pay Transparency Requirements

All federally assisted construction contracts exceeding $10,000 annually will be subject to the requirements of Executive Order 11246 as amended:

1. Recipients, subrecipients, and contractors are prohibited from discriminating in employment decisions on the basis of race, color, religion, sex, sexual orientation, gender identity, or national origin.
2. Recipients and contractors are required to take affirmative action to ensure that equal opportunity is provided in all aspects of their employment. This includes flowing down the appropriate language to all subrecipients, contractors, and subcontractors.
3. Recipients, subrecipients, contractors, and subcontractors are prohibited from taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or, under certain circumstances, the pay of their co-workers.

The Department of Labor's ("**DOL**") Office of Federal Contractor Compliance Programs ("**OFCCP**") uses a neutral process to schedule contractors for compliance evaluations. The Recipient is encouraged to consult OFCCP's Technical Assistance Guide to gain an understanding of the requirements and possible actions the Recipient, subrecipient, contractors, and subcontractors must take.

For a construction project valued at $35 million or more and lasting more than one year, the Recipient and its contractors or subrecipients may be selected by the DOL OFCCP to participate in the *Mega Construction Project Program*. If selected by the DOL OFCCP, DOE, under relevant legal authorities including Sections 205 and 303(a) of Executive Order 11246, will require participation as a condition of the Award. This program offers extensive compliance assistance with Executive Order 11246. For more information regarding this program, see https://www.dol.gov/agencies/ofccp/construction/mega-program.

## Term 56.    Human Subjects Research

Research involving human subjects, biospecimens, or identifiable private information conducted with DOE funding is subject to all applicable laws, including the requirements of DOE Order 443.1C, Protection of Human Subjects Research, 45 CFR Part 46, Protection of Human Subjects (subpart A which is referred to as the "Common Rule"), and 10 CFR Part 745, Protection of Human Subjects. Additional information on the DOE Human Subjects Research Program can be found at: https://science.osti.gov/ber/human-subjects.

## Term 57.    Environmental, Safety, and Health and Performance of Work at DOE Facilities

For activities under the Award performed at a DOE owned or controlled site, the Recipient agrees to comply with all Federal and State Environmental, Safety, and Health ("**ES&H**") regulations and with all other ES&H requirements of the operator of such site. Prior to the performance of any portion of the work under this Award at a DOE owned or controlled site, the Recipient shall contact the site facility manager for information on DOE and site-specific ES&H regulations. The Recipient shall apply this term to its subrecipients and contractors.

## Term 58.    Lobbying Restrictions

The Recipient agrees that none of the funds obligated for the Award shall be expended, directly or indirectly, to influence in any manner a Member of Congress, a jurisdiction, or an official of any government on action on any legislation, law, ratification, or appropriation matters pursuant to 18 USC § 1913. This restriction is in addition to those prescribed elsewhere in statute or regulation.

## Term 59.    National Historic Preservation Act Requirements

DOE must comply with the National Historic Preservation Act ("**NHPA**"), 54 USC § 306108 *et seq*., which requires federal agencies to consider the effects of any undertaking (Federally funded or assisted projects and activities) on historic properties that are listed in or eligible for listing in the National Register of Historic Places prior to the expenditure of Federal funds.

The Recipient is required to cooperate with DOE in its compliance with the requirements of Section 106 of the NHPA. The Recipient may not alter any structure or site, including any groundbreaking for any purpose, prior to the resolution of the NHPA process without DOE approval. The requirements of this part are applicable to activities funded under the Award and shall be coordinated in conjunction with DOE and, as appropriate, other federal agencies, the State Historic Preservation Officer or Tribal Historic Preservation Officer, Tribal representatives, and consulting parties.

## Term 60.    National Environmental Policy Act Requirements

DOE must comply with the National Environmental Policy Act ("**NEPA**"), 42 USC §§ 4321 *et seq*. and NEPA implementing regulations at 40 CFR Parts 1500 *et seq.* and 10 CFR Part 1021 prior to authorizing the expenditure of Federal funds. DOE is required to assess the impact of the activities authorized under this Award on the human environment and determine whether the work requires a preparation of an Environmental Impact Statement ("**EIS**"), an Environmental Assessment ("**EA**"), or if the activities fall into a class of actions that a Federal agency has determined do not individually or cumulatively have a significant effect. The Recipient is required to provide any information, documents, site access, or other assistance requested by DOE to complete the NEPA review.

The Recipient may not start work under this Award until the OCED NEPA Compliance Officer has produced a written NEPA document or determination and the Grants and Agreements Officer has provided written authorization.

The Recipient is restricted from using Federal funds to take any action prior to authorization from the Grants and Agreements Officer. If the Recipient elects to undertake activities prior to authorization from the Grants and Agreements Officer, the Recipient does so at the risk of not receiving Federal funding for those activities and such costs may not be recognized as allowable cost share.

The Recipient agrees to:

1.  Abide by the conditions, limitations, mitigation requirements, and monitoring requirements specified in the final NEPA document or determination;
2.  Negotiate changes to the project schedule, costs, and/or scope as necessary to make effective the requirements or conditions in the final NEPA document or determination;
3.  Allow DOE's authorized representatives to visit the site and facilities upon notice to verify project status and compliance to include conditions and requirements in the final NEPA document or determination; and
4.  Submit data or otherwise meet specified reporting requirements that may be in the final NEPA document or determination.

If the Recipient later intends to add to or modify the activities or locations as described in the approved work scope and the final NEPA document or determination, both those additions and modifications are subject to additional NEPA review and are not authorized for Federal funding until the Grants and Agreements Officer provides written authorization on those additions or modifications. Should the Recipient elect to undertake activities or change locations prior to written authorization from the Grants and Agreements Officer, the Recipient does so at the risk of not receiving Federal funding for those activities, and such costs may not be recognized as allowable cost share.

## Term 61.    National Security: Classifiable Information Originating Under an Award

DOE does not expect that this Award will involve classified information. Under certain circumstances, however, a classification review of information originated under the Award may be required. DOE may review information generated under this Award at any time to determine if it requires classification.

Some information concerning (among other things) scientific, technological, or economic matters relating to national security or cryptology may arise during the Award and require classification. If the Recipient originates information during the course of this Award that the Recipient believes requires classification, the Recipient must promptly:

1.  Notify the Grants and Agreements Officer; and
2.  Submit the information by registered mail directly to the Director, Office of Classification and Information, SO-10.2; U.S. Department of Energy; P.O. Box A; Germantown, MD 28075-0963, for classification review; and
3.  Restrict access to the information to the maximum extent possible until the Recipient is informed that the information is not classified, but no longer than 30 days after receipt by the Director, Office of Classification and Information Control.

If DOE determines any of the information requires classification, the Recipient agrees that the DOE may terminate the Award with consent of the Recipient in accordance with 2 CFR § 200.340(a)(2). All material deemed to be classified must be forwarded to DOE in a manner specified by DOE. If DOE does not respond within the specified time periods, the Recipient is under no further obligation to restrict access to the information.

## Term 62.    Fraud, Waste and Abuse

The mission of the DOE Office of Inspector General ("**OIG**") is to strengthen the integrity, economy and efficiency of DOE's programs and operations including deterring and detecting fraud, waste, abuse, and mismanagement. The OIG accomplishes this mission primarily through investigations, audits, and inspections of DOE activities to include grants, cooperative agreements, loans, and contracts. The OIG maintains a Hotline for reporting allegations of fraud, waste, abuse, or mismanagement. To report such allegations, please visit https://www.energy.gov/ig/ig-hotline.

The Recipient must be cognizant of the requirements of 2 CFR § 200.113 Mandatory disclosures, which states:

> An applicant, recipient, or subrecipient of a Federal award must promptly disclose whenever, in connection with the Federal award (including any activities or subawards thereunder), it has credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. 3729-3733). The disclosure must be made in writing to the Federal agency, the agency's Office of Inspector General, and pass-through entity (if applicable). Recipients and subrecipients are also required to report matters related to recipient integrity and performance in accordance with Appendix XII of this part.
> Failure to make required disclosures can result in any of the remedies described in § 200.339.
> (See also 2 CFR part 180, 31 U.S.C. 3321, and 41 U.S.C. 2313.)

# Term 63.    Nondisclosure and Confidentiality Agreements Assurances

By entering into this Award, the Recipient attests that it does not and will not require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contactors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

The Recipient further attests that it does not and will not use any Federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

A.    ''These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.''

B.    The limitation above shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

C.    Notwithstanding the provision listed in paragraph A, a nondisclosure or confidentiality policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

# Term 64.    Interim Conflict of Interest Policy for Financial Assistance

The DOE interim Conflict of Interest Policy for Financial Assistance ("**COI Policy**") can be found at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance. This policy is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant, cooperative agreement, or technology investment agreement) and, through the implementation of this policy by the entity, to each key personnel who is planning to participate in, or is participating in, the project funded wholly or in part under this Award. The interim COI Policy establishes standards that provide a reasonable expectation that the design, conduct, and reporting of projects funded wholly or in part under DOE financial assistance awards will be free from bias resulting from financial conflicts of interest or organizational conflicts of interest.

The Recipient is subject to the requirements of the interim COI Policy, and the Recipient must certify that it is compliant with all requirements in the interim COI Policy. The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, except for DOE National Laboratories. Further, the Recipient must identify all financial conflicts of interests ("**FCOI**"), i.e., managed, and unmanaged/unmanageable, in its initial and ongoing FCOI reports.

Prior to award, the Recipient was required to: 1) ensure all key personnel on this Award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed, and unmanaged/unmanageable). Within 180 calendar days of the date of the Award, the Recipient must be in full compliance with the other requirements set forth in the DOE interim COI Policy.

## Term 65.    Organizational Conflicts of Interest

Organizational conflicts of interest are those where, because of relationships with a parent company, affiliate, or subsidiary organization, the Recipient is unable or appears to be unable to be impartial in conducting procurement action involving a related organization (2 CFR § 200.318(c)(2)).

The Recipient must immediately disclose in writing any potential or actual organizational conflict of interest to the Grants and Agreements Officer. The Recipient must provide the disclosure prior to engaging in a procurement or transaction using project funds with a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe. For a list of the information that must be included the disclosure, see Section VI. of the DOE interim Conflict of Interest Policy for Financial Assistance.

If the effects of the potential or actual organizational conflict of interest cannot be avoided, neutralized, or mitigated, the Recipient must procure goods and services from other sources when using project funds. Otherwise, DOE may terminate the Award in accordance with 2 CFR § 200.340 unless continued performance is determined to be in the best interest of the Federal government.

The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with the exception of DOE National Laboratories. The Recipient is responsible for ensuring subrecipient compliance with this term.

If the Recipient has a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe, the Recipient must maintain written standards of conduct covering organizational conflicts of interest.

# Cooperative Agreement Program and Award-Specific Terms and Conditions

## Table of Contents

Term 1.    Approved Budget ................................................................................................................ 2

Term 2.    Period of Performance and Budget Periods ................................................................... 2

Term 3.    Critical Project Activities for the Current Budget Period .............................................. 3

Term 4.    Deliverables and Delivery Requirements ...................................................................... 4

Term 5.    Go/No-Go Review Criteria ............................................................................................. 4

Term 6.    Subawards ...................................................................................................................... 7

Term 7.    Incorporation by Reference .......................................................................................... 8

Term 8.    Payment Procedures ..................................................................................................... 8

Term 9.    Indirect and Fringe Costs .............................................................................................. 9

Term 10.    Prior Approvals for Real Property and Equipment Acquisition with Federal Funds .................. 10

Term 11.    National Environmental Policy Act (NEPA) Requirements ........................................... 10

Term 12.    Security Framework and Security Coordinator ........................................................... 11

Term 13.    Long-Lead Procurement .............................................................................................. 12

Term 14.    OCED Use of Protected Data ....................................................................................... 13

Term 15.    Cybersecurity Plan ...................................................................................................... 13

Term 16.    Program Income .......................................................................................................... 13

Term 17.    DOE's Property Interest ............................................................................................... 13

Term 18.    Davis-Bacon Act Requirements ................................................................................... 14

Term 19.    Go/No-Go Reviews and Continuation Decisions ......................................................... 16

Case 1:26-cv-00458-FDK    Document 11    Filed 07/01/26    Page 77 of 92

## Term 1.      Approved Budget

The Department of Energy (DOE) has selected this Award for a maximum Federal share of $86,907,197. DOE is obligating funds in this amount, as shown in Block 13 of the Assistance Agreement. Only funds for the current Budget Period are authorized for use. Use of funding for any future Budget Period is contingent upon DOE's continuation decision, the availability of funds appropriated by Congress, and the availability of future- year budget authority.

DOE's share must not exceed 39.6% of the total project costs, and $12,792,364, of the current Budget Period, and the minimum Recipient cost share percentage for the current Budget Period is 60.4%. The Recipient must meet its estimated Budget Period 1 cost share contribution percentage on a cumulative basis by the end of the Budget Period. The Recipient cost share contribution on an invoice basis might be lower than 60.4%, but cumulatively must be greater than or equal to the minimum 50% at any given time. No invoice will be approved if the cumulative Recipient cost share contribution (including the invoice under review) would fall below the minimum statutory requirement of 50%.

Table 1-1 lists the maximum Federal share, the minimum Recipient share, and the total direct and indirect costs for the current Budget Period.

**Table 1-1.  Direct and Indirect Costs for the Current Budget Period**

| Cost Type | Maximum DOE Share | Minimum Recipient Share | Total |
|---|---|---|---|
| Direct Costs | $11,082,919 | $16,905,165 | $27,988,084 |
| Indirect Costs | $1,709,445 | $2,607,475 | $4,316,920 |
| Total | $12,792,364 | $19,512,640 | $32,305,004 |

## Term 2.      Period of Performance and Budget Periods

Consistent with 2 CFR § 200.1, Period of Performance means the time between the award start and the end date, and it can include one or more Budget Periods. The Period of Performance for this Award is stated in Block 7 of the Assistance Agreement.

DOE is authorizing the Budget Period stated below. The Recipient is responsible for its share as described below and any additional amounts needed to complete the objectives of the Award.

**Table 2-1.  Future Budget Period Funding**

| Budget Period | Start Date | Anticipated End Date | Estimated Total Cost | Maximum DOE Funding |
|---|---|---|---|---|
| 1 | 11/02/2024 | 10/01/2025 | $32,305,004 | $12,792,364 |

Case 1:26-cv-00458-EDK    Document 11    Filed 07/01/26    Page 78 of 92

The maximum share that DOE will provide for each future Budget Period is listed below.

**Table 2-2.  Anticipated Future Funding**

| Budget Period | Maximum DOE Funding |
|---|---|
| 2 | $19,143,585 |
| 3 | $45,905,089 |
| 4 | $9,066,159 |
| Budget Periods 2-4 Total | $74,114,833 |

## Term 3.        Critical Project Activities for the Current Budget Period

In the currently authorized Budget Period, the Recipient will identify, minimize, and mitigate project business risks. During the currently authorized Budget Period, the Recipient will work towards the completion of the following critical project activities:

**Table 3-1. Critical Project Activities for the Current Budget Period (Phase 1). Critical Project Activities for Phase 1**

| Topic | Phase 1 Critical Project Activities |
|---|---|
| Design and Engineering | <ul><li>Develop Front End Loading (FEL)-2 Design Packages.</li><li>Complete Value engineering. Optimize site layout, size basis, and equipment needs.</li><li>Update total project cost (TPC) to include all scope developments from Phase 1.</li><li>Complete FEL-3 Bid Package, award FEL-3 Contract, and complete FEL-3 design activities.</li><li>Provide updated Techno-Economic Analysis (TEA) and Life Cycle Analysis (LCA).</li><li>Provide Initial Air Quality Plan.</li><li>Complete environmental, geotechnical, stormwater, and emissions assessments.</li></ul> |
| Siting | <ul><li>Secure primary site control and any necessary rights of way.</li><li>Complete an Interconnection Plan.</li><li>Submit an Environmental Considerations Summary (ECS) for the activities to be conducted during Phase 2.</li><li>Prepare the Environmental Information Volume (EIV) for Phase 3 and 4 activities.</li><li>Complete an initial permit list and a Permit Plan in Phase 1.</li></ul> |
| Construction Planning | <ul><li>Complete 30% Constructability review.</li><li>Update Integrated Project Schedule (IPS).</li><li>Update the Procurement Plan to identify the major costs, long lead items, or critical equipment.</li></ul> |
| Operational Planning | <ul><li>Update mass and energy balance with most recent key inputs, assumptions, material flows and energy use.</li></ul> |

| | |
|---|---|
| | • Complete signed agreements, Memoranda of Understanding (MOUs), or equivalent, and price justifications for supply of primary feedstocks and commercial relationships developed with viable suppliers of secondary feedstocks. |
| Financial and Commercial Planning | • Update project pro-forma.<br>• Assess market demand and develop Offtake Agreements through "capacity reservation agreement" contract structure. |
| Organizational Planning | • Draft Intellectual Property Management Plan (IPMP).<br>• Update the Risk Management Plan and Register.<br>• Develop the Project Management Plan (PMP) for Phase 2. |
| Community Benefits | • Establish two-way communication through Community Stewardship Committee.<br>• Complete Community Benefits Summary Report.<br>• Develop Training and Staffing Plan.<br>• Develop draft Air Monitoring Communication Plan.<br>• Develop public data reporting platform and approach. |

## Term 4.      Deliverables and Delivery Requirements

The Recipient must submit all the deliverables as stated in the Deliverables Table in Attachment 4A of these Program and Award-Specific Terms and Conditions. DOE will review all submitted deliverables, and DOE may require the Recipient to revise or supplement any deliverables.

## Term 5.      Go/No-Go Review Criteria

Consistent with the Go/No-Go Reviews and Continuation Decisions Term of the OCED Standard Terms and Conditions, DOE will evaluate whether the Recipient has satisfied the following Go/No-Go Review Criteria in making a continuation decision for advancement to Budget Period 2. The documents and information listed in the verification method column are not exhaustive. The Recipient may provide additional documents and information to DOE. DOE may request additional documents and information and may consider other documents and information when evaluating whether the Recipient has satisfied these Go/No-Go Review Criteria.

**Table 5-1. Go/No-Go Review Criteria to Advance from Budget Period 1 (Phase 1) to Budget Period 2 (Phase 2)**

**Go/No-Go Review Criteria to Advance from Phase 1 to Phase 2**

| Topic | Go/No-Go Review Criteria | Verification Method |
|---|---|---|
| Design and Engineering | Engineering and design for all systems has reached the 30% complete level and is appropriate to execute Phase 2. | Design Documentation Package. |
| Technology Maturation Plan (TMP) and Key Technical Risks | Provide a TMP(s), which describes the current Technology Readiness Level (TRL) of the selected technology/technologies and describes any known post-project research and development necessary to further mature the technology. The TMP addresses | TMP. |

Case 1:26-cv-00458-EDK Document 11 Filed 07/01/26 Page 80 of 92

| | | |
|---|---|---|
| | key technology development goals, metrics, risks, and mitigations capturing the capacity, scale-up, and integration of all unit operations. First generation electrochemically assisted process shows a clear path towards viability for timely and successful project implementation. | |
| LCA Confirmation of Project Objectives | The updated LCA substantiates carbon intensity reduction pathway from the Project Vision & Objectives. | Evaluation of LCA Modeling results. |
| Siting | Recipient has a full list of all permits required for the project and has submitted National Environmental Policy Act (NEPA) documentation to DOE for Phase 2 ECS and an EIV for Phases 3 and 4. | Permitting Plan, ECS, and EIV. |
| Construction Planning | Recipient must complete a project schedule decomposed to level 3-4 for Phase 2 tasks which identifies critical paths for Phase 3 and 4 tasks that is reasonably satisfactory to DOE. | Integrated Project Schedule (IPS) in the Project Management Plan (PMP). |
| Financial and Commercial Planning | Evidence of firm commitments funding the non-Federal cost share are reasonably satisfactory to DOE and confirm that sufficient capital has been allocated to the Recipient to satisfy its anticipated non-Federal cost share obligations for the next Phase. | Financial documents and financial statements. |
| Financial and Commercial Planning | The updated TEA substantiates the economic viability of the project while achieving target carbon intensity reduction claims. The Total Project Cost estimate (Class 3) is consistent with the financial planning and project scope. | TEA and Revised Financial Model. |
| Community Benefits: Engagement | The Recipient must have completed initial engagements with labor, community, and workforce development partners; shared basic project information publicly; solicited stakeholder feedback and identified actions taken in response to feedback; formalized partnerships for Community Benefits implementation; consulted with labor and community groups to pursue negotiated workforce and community agreements and made any commitments to pursue negotiated agreements public; and consulted with community to co-develop Community Stewardship Committee membership, recruitment, and scope. | Evidence of two-way community, workforce development partners and labor engagement that impacts project decisions (documented in the Phase 1 Community Benefit Summary Report and/or reporting required as part of the Federal Assistance Reporting Checklist (FARC)). Documentation of publicly shared |

| | | |
|---|---|---|
| | | information (documented in Phase 1 Community Benefit Summary Report and/or reporting required as part of the FARC). |
| | | Documentation of progress towards Community Benefits Agreement or other public written documentation committing to negotiate in good faith towards specific outcomes with coalitions of community groups, as applicable. |
| | | If established, documentation of fully executed workforce agreements or MOU/ Memorandum of Agreement (MOA). |
| | | Documentation of Community Stewardship Committee scope, membership, and recruitment efforts, including how community consultation impacted plans. |
| Community Benefits: Impacts | The Recipient must have completed an initial assessment of project benefits and negative impacts, developed a preliminary implementation strategy to maximize benefits and minimize negative impacts, and consulted the community to collect input regarding their priorities related to benefits and impacts. Consistent with applicable laws and regulations, the Recipient commits to partnering or contracting with Minority-Serving Institutions (MSIs), businesses majority owned or controlled by | Justice40 Assessment and Justice40 Implementation Strategy (standalone documents). DEIA baselines, goals, and strategies (documented in Phase 1 Community Benefit Summary Report and/or |

Case 1:26-cv-00458-EDK    Document 11    Filed 07/01/26    Page 82 of 92

| | | |
|---|---|---|
| | residents of Disadvantaged communities, and/or Underrepresented persons or groups of Underrepresented persons. Baseline assessments are complete, goals set, and strategies developed to advance these commitments.<br><br>Baseline assessments are complete, goals set, and strategies developed for hiring local residents as well as recruitment, training and retention for workers from Underrepresented or Disadvantaged communities; and investments in wrap-around services and on-the-job training (i.e., pre-apprenticeship programs with a pathway to registered apprenticeships). | reporting required as part of the FARC).<br><br>Local and targeted hiring goals in Project Labor Agreement (PLA) or Community Workforce Agreements or MOU, or outlined in the Training and Staffing Plan. |
| Community Benefits: Training and Staffing | The Training and Staffing Plan is developed and includes: qualitative and quantitative goals for quality job creation, registered apprenticeship utilization, pre-apprenticeship programs, on-the-job training, and quantitative goals for hiring local residents.<br><br>The Training and Staffing Plan also includes established partnerships to achieve plans for recruitment, training, and retention for local residents, dislocated workers/workers from energy or industrial facilities, and/or Underrepresented workers and workers from Underrepresented or Disadvantaged communities.<br><br>The Training and Staffing Plan also includes plans to engage hourly workers in the design and implementation of workplace health and safety plans. | Training and Staffing Plan (documented in Phase 1 Community Benefit Summary Report).<br><br>Reporting required as part of the FARC.<br><br>MOUs with registered pre-apprenticeship programs and other workforce development partners.<br><br>Local and targeted hiring goals are stated in the PLA or Community Workforce Agreement or MOU/MOA, as applicable, or outlined in the Training and Staffing Plan. |

## Term 6.      Subawards

The following subawards are approved:

1.    Smithsonian Science Education Center, KQ1KJG78NNS9, Washington, D.C.

## Term 7.　　Incorporation by Reference

In addition to the items listed in the Incorporation by Reference Standard Term and Condition, the following are incorporated into this Award by reference:

1. Final Budget Submission Workbook dated 10/23/2024.
2. NEPA Categorical Exclusion Determination, OCED-0000103-CX-001, issued on 10/16/2024.
3. The Recipient's application except as amended or superseded.
4. The Provisional Fringe and Indirect Rate Agreement issued on 10/29/2024.

## Term 8.　　Payment Procedures

### A.　Requesting Payment

The Recipient is required to request payments electronically through the US DOE's Vendor Invoicing Portal & Electronic Reporting System (VIPERS). The Recipient must request payments in amounts necessary to meet its current needs. To access and use VIPERS, the Recipient must enroll at https://vipers.doe.gov. Detailed instructions on how to enroll are provided on the website.

### B.　Adjusting Payment Requests for Available Cash

In accordance with 2 CFR § 200.305(b)(5), to the extent available, the Recipient must disburse any funds that are available from repayments to, and interest earned on a revolving fund, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments from DOE.

### C.　Payments

Upon DOE approval of the Recipient's electronic payment request, DOE will disburse payment electronically to the Recipient's registered bank account. DOE will approve payment requests in 30 calendar days unless the billing and/or supporting documentation provided by the Recipient is improper. The Recipient may check the status of payments at the VIPERS website.

### D.　Reimbursement Limitation of Federal Funds

For each Budget Period, the Recipient may not request more than the Federal share authorized for that Budget Period.

### E.　Supporting Documents for Agency Approval of Payments

The Recipient must submit a Standard Form SF-270 "Request for Advance or Reimbursement" and attach the following supporting documentation:

1. Summary cost data, for the billing period and cumulative cost data, showing all categories listed in the SF-424A and identifying Federal, non-Federal, and total amounts.
2. Explanation of cost share for invoicing period, including cost category and rationale if cost share exceeds or is below award requirement.
3. Invoices for all equipment costs.
4. Invoices and summary cost data showing all budget cost categories listed in the SF-424A for subrecipients.

Case 1:26-cv-00458-EDK    Document 11    Filed 07/01/26    Page 84 of 92

5. A statement affirming that invoiced costs are related only to tasks or activities authorized by a final NEPA determination.
6. Detailed cost information by Work Breakdown Structure (WBS) element and/or project activities.

DOE may request additional information from the Recipient to support the payment requests prior to release of funds. The Recipient must comply with these requests. Supporting documents may include, but are not limited to, invoices, copies of contracts, vendor quotes, and other expenditure explanations that justify the payment requests.

### F. Post Payment Review
The Recipient must provide documentation supporting DOE's post payment review of invoices and costs in a form and manner specified by DOE. These post payment reviews are in addition to audits.

## Term 9.        Indirect and Fringe Costs

### A. Indirect Cost Allocation
Indirect Cost Rate(s) for this Award are stated in the Provisional Fringe and Indirect Rate Agreement between Sublime Systems, Inc., and DOE Office of Clean Energy Demonstrations, dated 10/29/2024, which is incorporated into the Award.

### B. Fringe Cost Allocation
Fringe Cost Rate(s) for this Award are stated in the Provisional Fringe and Indirect Rate Agreement between Sublime Systems, Inc., and DOE Office of Clean Energy Demonstrations, dated 10/29/2024, which is incorporated into the Award.

### C. Reconciliation
Consistent with applicable regulations, the indirect cost billing rates shall be reconciled or trued up on an annual basis via the annual incurred cost proposal within six months after the Recipient's fiscal year end. If an audit is performed, the indirect cost billing rates can be subsequently trued up based on the results of the audit.

### D. Modifications to Indirect Cost Billing Rates
Proposed modifications to the Recipient's cost billing rates must be approved by the Recipient's Cognizant Agency for Indirect Costs (as defined in 2 CFR § 200.1) or Cognizant Federal Official (for OCED, the Director of Financial Oversight and Performance is the Cognizant Federal Agency Official).

If the Recipient enters into a Negotiated Indirect Cost Rate Agreement ("NICRA") or updates a NICRA and OCED is not the Recipient's Cognizant Agency for Indirect Costs, the Recipient must promptly provide OCED with a copy of the NICRA.

When OCED is the Recipient's Cognizant Agency for Indirect Costs, to change indirect cost billing rate(s), the Recipient must submit proposed changes to OCED for approval.

Case 1:26-cv-00458-EDK   Document 11   Filed 07/01/26   Page 85 of 92

### E.   Rebudgeting and Recovery

If actual allowable costs are less than those budgeted and funded under the Award, the Recipient may use the difference to pay additional allowable direct costs during the Period of Performance. If at the completion of the Award DOE's share of total allowable costs (i.e., direct costs and indirect costs) is less than total costs reimbursed, the Recipient must refund the difference.

The Recipient must manage its indirect and fringe costs. DOE will not amend this Award solely to provide additional funds for changes in indirect or fringe costs. DOE recognizes the inability to obtain full reimbursement for indirect costs means the Recipient must absorb the underrecovery. Such underrecovery may be allocated as part of the Recipient's required cost sharing.

### F.   Cost Sharing

The Recipient may use unrecovered indirect costs as Recipient cost share only with prior approval from the Grants and Agreements Officer.

### G.   Subrecipient Indirect Costs

The Recipient must ensure its subrecipient's indirect costs are appropriately managed, have been found to be allowable, and comply with the requirements of this Award and 2 CFR Part 200 and 2 CFR Part 910.

### H.   Closeout

The closeout of the Award does not affect (1) the right of the DOE to disallow costs and recover funds on the basis of a later audit or other review; (2) the requirement for the Recipient to return any funds due as a result of later refunds, corrections or other transactions including final indirect

cost billing rate adjustments; and (3) the ability of the DOE to make financial adjustments to a previously closed award resolving indirect cost payments and making final payments.

## Term 10.   Prior Approvals for Real Property and Equipment Acquisition with Federal Funds

The Recipient must obtain prior written approval from the Grants and Agreements Officer for real property or equipment purchases with a per unit cost of $250,000 or more that is not already approved in the budget.

## Term 11.   National Environmental Policy Act (NEPA) Requirements

DOE must comply with the National Environmental Policy Act (NEPA), 42 USC §§ 4321 *et seq.*, and implementing regulations at 40 CFR Parts 1500 *et seq.* and 10 CFR Part 1021, prior to authorizing the expenditure of Federal funds. DOE issued a categorical exclusion (CX) determination on October 16, 2024, for specific activities under the award as specified in CX determination OCED-0000103-CX-001.

The Recipient is thereby authorized to use Federal funds for the activities and locations specified in the CX determination, except where any such activity is subject to a restriction set forth elsewhere in this Award. The authorized activities are subject to any and all conditions included in the CX determination, which are hereby incorporated into this Term. Undertaking activities that are not specified in the CX determination is not authorized. Undertaking any such activity, regardless of funding source, may jeopardize federal involvement in the Award.

If the Recipient later intends to add to or modify the activities or locations specified in the CX determination, those new or modified activities/locations are subject to additional NEPA review and are not authorized until the Grants and Agreements Officer provides written authorization for those additions or modifications.

## Term 12.    Security Framework and Security Coordinator

**A. Security Framework**

1. **Initial Submission.** The Recipient must submit a Security Framework for DOE's review and approval within 30 calendar days of the Period of Performance start date. The Security Framework must document the Recipient's approach to ensure compliance with the terms stated in section A.3 below. DOE will provide comments or feedback to the Security Framework approximately 30 calendar days following receipt. The Recipient and DOE will coordinate to address DOE objections and comments as soon as practicable for both Parties but no later than 30 calendar days.

2. **Changes to the Security Framework.** The Recipient must notify DOE of any substantive changes to its Security Framework prior to finalization of the same for review and approval in a form and manner specified by DOE. DOE will provide comments or feedback as soon as practicable. The Recipient and DOE will coordinate to address DOE objections and comments as soon as practicable for both Parties.

3. **Security Framework Scope.** The Security Framework must document the Recipient's approach to ensuring compliance with the following Security Requirements:
   - Regulations
     - 2 CFR § 200.216 – Prohibition on Certain Telecommunications and Video Surveillance Equipment
   - Standard Terms and Conditions
     - Risk Mitigation and Due Diligence Reviews
     - Changes to Board of Directors
     - Disclosure of Connections with Foreign Countries of Risk
     - Waiver Requests – Foreign Entity Participation as a Recipient or Subrecipient
     - Foreign Commitments in Support of the Award
     - Foreign National Participation
     - Waiver Requests – Performance of Work in the United States
     - Prohibition Related to Foreign Government-Sponsored Talent Recruitment Programs
     - Export Control
   - Federal Assistance Reporting Checklist Requirements
     - Current and Pending Support Disclosures
     - Participants and Collaborating Organizations
     - Special status report requirements relating to potentially duplicative funding
     - Special status report requirements that pertain to safety, security, and cybersecurity

**B. Security Coordinator**

1. **Roles and Responsibilities.** The Recipient must designate a Security Coordinator to enforce the Security Framework. The Security Coordinator will have sufficient authority to enforce the Security Framework. The Recipient will submit the name of the Security Coordinator, along with

contact information, to DOE when it submits the Security Framework. The Security Coordinator will act as the Recipient's Point of Contact for DOE relating to compliance with the Security Framework and the Security Requirements.

The Security Coordinator will have physical and logical access to records, information, networks, and resources necessary to ensure monitor, document, and report on compliance. The Security Coordinator will continuously monitor Recipient's compliance with Security Requirements. The Security Coordinator will provide instruction and training to Recipient's personnel as appropriate. The Security Coordinator will coordinate with subrecipients to ensure that subrecipient personnel are properly trained and that subrecipients are following all applicable Security Requirements.

2.  **Qualifications.** The minimum requirements for a Security Coordinator are:
    a.  be a United States national;
    b.  physically resides in the United States;
    c.  be an employee of the Recipient; and
    d.  have the appropriate senior-level authority and necessary skills and resources across the Recipient's corporate structure to fulfill the responsibilities of his or her position and to ensure compliance with the security requirements of this Award.

3.  **Security Coordinator Changes.** The Recipient must notify DOE of the removal, resignation, reassignment, or any other change to the Security Coordinator position. To prevent a vacancy from taking place, the Recipient should designate a new Security Coordinator for the position and notify DOE of the designee within 14 calendar days.

## Term 13.    Long-Lead Procurement

**A.  Definition**

Long-lead procurement includes procurement of equipment as defined in 2 CFR § 200.1 and/or construction materials that must be ordered prior to the estimated physical construction start date to ensure availability at the time needed so as not to delay construction performance.

**B.  DOE Approval**

The Recipient may only incur costs and be reimbursed through the Award for long-lead procurement purchases that have been reviewed and approved by DOE. The Recipient must notify DOE of any additions, changes, or updates to proposed long-lead procurement items.

If additional long-lead procurements are proposed by the Recipient, DOE prior approval is required and contingent on DOE's review of total costs, review of schedule, project progress, and consideration of NEPA.

**C.  Iterative Payments**

In the event the Award is not continued into subsequent phases or available Federal funding is not adequate to cover the Recipient's future payments on long-lead procurement purchases and/or construction materials, DOE is not responsible for providing additional funding to cover the Recipient's commitments.

## Term 14.     OCED Use of Protected Data

Notice Regarding Data: In furtherance of OCED's mission, and to support the further private investment in and deployment of clean energy technologies, as well as to support clean energy markets, OCED expects to utilize specific data provisions that will enable OCED to publish aggregated and anonymized data derived from Recipient, subrecipient, and contractor protected data sets provided to DOE. The goal is to appropriately share aggregated and anonymized data for the benefit of the nation's broader clean energy ecosystem while ensuring robust protection of any underlying protected/proprietary information or data. The Recipient will be responsible for obtaining the necessary data from the subrecipients and contractors.

## Term 15.     Cybersecurity Plan

The Cybersecurity Plan Term of the OCED Standard Terms and Conditions is replaced in its entirety as follows:

The Recipient is not required to submit a Cybersecurity Plan. However, DOE may require that the Recipient's Project Management Plan (PMP) include a summary of the Recipient's cybersecurity approach and may require the Recipient to provide updates on its cybersecurity approach during the life of the Award. DOE review, comments, or feedback do not constitute an endorsement or approval of any specific elements in the summary. Any feedback from DOE should not be referenced or used in marketing or promotional materials.

## Term 16.     Program Income

The Program Income term of the OCED Standard Terms and Conditions is replaced in its entirety as follows:

Consistent with 2 CFR 200.1 and 2 CFR 200.307:
   a. Program income does not include tax credits, including elective pay or transferable tax credits or Environmental Attribute Credits earned by the Recipient.
   b. Consistent with 2 CFR 200.307(b), approval is hereby given to use program income to increase the total amount of funds committed to the Award or to meet cost share obligations.
   c. For purposes of 2 CFR 200.307(d), "costs incidental to generating program income" may include, but are not limited to, operating and maintenance costs, debt service, required reserves and other payments or reserves required by third-party lenders, provided these costs have not been charged to the Federal Award.

## Term 17.     DOE's Property Interest

The Property Standards Term of the OCED Standard Terms and Conditions is supplemented as follows: While the Award is in effect and DOE retains its reversionary interest in real property and equipment acquired under the Award, DOE will not assert its rights in the property as long as it: (1) is being used for the authorized purposes set forth in Objective 1 of the Project Vision and Objectives (the "Authorized Purpose"); and (2) is not encumbered without permission. DOE may assert its rights in the property consistent with the terms of any applicable Consent Agreement or other agreement regarding encumbered Award property.

DOE will cooperate with the Recipient and/or Subrecipient and potential debt and/or tax equity financing providers ("Financing Providers") to establish arrangements, including a Consent Agreement, relating to DOE's undivided reversionary interest in the Project or Sub-Project's real property and equipment that address the reasonable requests of Financing Providers, including with respect to the exercise of remedies by Financing Providers. Consistent with applicable regulation, upon Recipient's or Subrecipient's request, DOE will consent to a pari passu position with the Financing Providers which arrangements shall be set forth in a Consent Agreement or other agreement.

Upon Recipient's request for vesting, including on behalf of a Subrecipient, DOE will vest unconditional title to real property and equipment of a project or Sub-Project when it is demonstrated to DOE's satisfaction that the real property or equipment subject of the request has achieved its Authorized Purpose. Provided that no requirements in the Project Vision and Objectives related to the use of the property or equipment subject of the request extend beyond the date of commencement of commercial operations for the project or Sub-Project, the parties agree that the date upon which such property may be deemed to have achieved its Authorized Purpose will be no later than the date of the commencement of commercial operations for the project or Sub-Project.

Any such vesting will be contingent upon the Recipient and, if applicable, Subrecipient agreeing to the following conditions:

1. Not selling the property to entities owned, incorporated in, or controlled by Foreign Countries of Risk;
2. Using the property for the Authorized Purposes for the duration of the Period of Performance; and
3. Complete all Award commitments as agreed to by DOE and the Recipient or Subrecipient in the Phase 3 or Phase 4 Cooperative Agreement, as applicable.

Requests to vest at a different time or under other circumstances will be addressed on a case-by-case basis.

## Term 18.    Davis-Bacon Act Requirements

The Davis-Bacon Act Requirements Term of the OCED Standard Terms and Conditions is replaced in its entirety as follows:

This Award is a contract in excess of $2,000 entered into for the actual construction, alteration and/or repair, including painting and decorating, of a public work financed in whole or in part with funds from DOE and is therefore subject to the Davis-Bacon Act ("DBA"). The clauses at 29 CFR § 5.5 shall be incorporated by reference, with the same force and effect as if it were given in full text. The clauses incorporated by reference which require a fill-in by the DOE does not limit the affected clauses, and the Recipient is responsible for understanding and complying with the entire clause.

The Recipient shall provide a written assurance acknowledging the DBA requirements for the Award or project and confirming that all of the laborers and mechanics performing construction, alteration, or repair work in excess of $2,000 on projects funded directly by or assisted in whole or in part by funding under the Award are paid or will be paid wages at rates not less than those prevailing on a project of a

Case 1:26-cv-00458-EDK   Document 11   Filed 07/01/26   Page 90 of 92

character similar in the locality as determined by Subchapter IV of Chapter 31 of Title 40, United States Code.

The Recipient must comply with all DBA requirements including, but not limited to:

1. Ensuring that the wage determination(s) and appropriate Davis-Bacon clauses and requirements are flowed down to and incorporated into any applicable subcontracts or subrecipient awards.
2. Being responsible for compliance by any subcontractor or subrecipient with the Davis-Bacon labor standards.
3. Receiving and reviewing certified weekly payrolls submitted by all subcontractors and subrecipients for accuracy and to identify potential compliance issues.
4. Maintaining original certified weekly payrolls for 3 years after the completion of the project and making those payrolls available to the DOE or the Department of Labor upon request, as required by 29 CFR § 5.6(a)(2).
5. Conducting payroll and job-site reviews for construction work, including interviews with employees, with such frequency as may be necessary to assure compliance by its subcontractors and subrecipients and as requested or directed by the DOE.
6. Cooperating with any authorized representative of the Department of Labor in their inspection of records, interviews with employees, and other actions undertaken as part of a Department of Labor investigation.
7. Posting in a prominent and accessible place the wage determination(s) and Department of Labor Publication: WH-1321, Notice to Employees Working on Federal or Federally Assisted Construction Projects.
8. Notifying the Grants and Agreements Officer of all labor standards issues, including all complaints regarding incorrect payment of prevailing wages and/or fringe benefits, received from the Recipient, subrecipient, contractor, or subcontractor employees; significant labor standards violations, as defined in 29 CFR 5.7; disputes concerning labor standards pursuant to 29 CFR parts 4, 6, and 8 and as defined in FAR 52.222-14; disputed labor standards determinations; Department of Labor investigations; or legal or judicial proceedings related to the labor standards under this contract, a subcontract, or subrecipient award.
9. Preparing and submitting to the Grants and Agreements Officer, the Office of Management and Budget Control Number 1910-5165, Davis Bacon Semi-Annual Labor Compliance Report, by April 21 and October 21 of each year in accordance with the reporting instructions the Federal Assistance Reporting Checklist.

The Recipient must undergo DBA compliance training and must maintain competency in DBA compliance. The Grants and Agreements Officer will notify the Recipient of any DOE-sponsored DBA compliance trainings. The Department of Labor offers free Prevailing Wage Seminars several times a year that meet this requirement, at https://www.dol.gov/agencies/whd/government-contracts/construction/seminars/events.

The Recipient must ensure the timely submission of weekly certified payrolls as part of its compliance with the Davis-Bacon Act.

## Term 19.    Go/No-Go Reviews and Continuation Decisions

The Go/No-Go Reviews and Continuation Decisions Term of the OCED Standard Terms and Conditions is replaced in its entirety as follows:

The Recipient must submit an application to continue to the next Budget Period in the Award ("**Continuation Application**"). The Grants and Agreements Officer will communicate the requirements for the continuation application in writing approximately 180 calendar days before the end of the Budget Period. The Recipient must submit its continuation application at least 120 calendar days before the end of the Budget Period. The Grants and Agreements Officer may modify these timeframes as appropriate.

The continuation application requirements must include the following:
1. A report on the Recipient's progress towards meeting the objectives, milestones, and deliverables of the Award and that explains how the Recipient is addressing any significant findings, conclusions, or developments.
2. An estimate of any balance not drawn down at the end of the Budget Period. If the remaining balance is estimated to exceed 20 percent of the total funds available for the Budget Period, the Recipient must provide an explanation of why the unused funds have not been drawn down, and whether and how the Recipient proposes to use the funds in subsequent Budget Periods.
3. A detailed budget and supporting justification for the upcoming Budget Period, which may include subrecipient budgets and justifications, as applicable.
4. An updated Project Management Plan and associated attachments for the next Budget Period.
5. Updated models and analyses, including but not limited to, financial models, techno-economic analyses, and life-cycle analyses with clear identification of significant changes or refinements.
6. Updated engineering designs and evaluations.
7. Information pertaining to any other requirements identified in the Award.

DOE may further elaborate on continuation requirements in the Program and Award-Specific Terms and Conditions.

DOE will conduct a Go/No-Go Review of the Recipient's application and performance under the Award to date at the end of each Budget Period to inform its decision on whether to fund the Award in the next Budget Period ("**Continuation Decision**"). DOE's continuation decision is contingent upon DOE's determination that:

1. The Recipient has submitted a continuation application;
2. Federal appropriations, program authority, and future-year budget authority for the purpose of the program are available;
3. The Recipient has completed identified milestones and deliverables within the established schedule and budget;
4. The Recipient has satisfied the Go/No-Go Review Criteria specified in the Award;
5. The Recipient has submitted required information and reports;
6. The Recipient has complied with the terms and conditions of the Award; and
7. The Recipient has met the cost share requirements for the current Budget Period, provided evidence that sufficient funds are available to meet the cost share requirements for subsequent Budget Periods, and demonstrated access to any required reserves.

Case 1:26-cv-00458-FDK     Document 11     Filed 07/01/26     Page 92 of 92

8. The project continues to support DOE's programmatic goals and be economically viable, in each case as addressed in the Award Project Vision and Objectives.

Given these determinations, DOE will (1) fund the Award in the next Budget Period; (2) fund the Award in the next Budget Period with additional conditions or requirements; or (3) not fund future Budget Periods of the Award. DOE will communicate its continuation decision in writing. DOE will negotiate in good faith with the Recipient regarding any award modifications necessary for the next Budget Period and will update the Award accordingly.

Each decision whether to authorize and fund activities in the next Budget Period is separate and distinct and the Recipient has no entitlement to any authorization or funding of activities beyond the current Budget Period. Should DOE decide not to fund the next Budget Period, DOE reserves the right to de-obligate any remaining federal funds under the Award, including funds for any subsequent Budget Periods.

A decision not to fund future Budget Periods of the Award is distinct from termination of the Award under the Cooperative Agreement Termination Standard Term and Condition and 2 CFR § 200.340.