**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

SUBLIME SYSTEMS, INC.,

        *Plaintiff*,

   v.

UNITED STATES OF AMERICA,

        *Defendant*.

Case No. 26-458-C
Judge Kaplan

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND DEFENDANT'S ALTERNATIVE MOTION TO STRIKE**

Daniel F. Jacobson
John Robinson
Brian C. Rosen-Shaud
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

I. Sublime's Award .............................................................................................................2

II. Sublime Performs ...........................................................................................................6

III. The Government Terminates the Agreement.................................................................7

IV. Sublime's Harms ...........................................................................................................9

LEGAL STANDARD............................................................................................................10

ARGUMENT ........................................................................................................................10

I. The Court Should Not Dismiss or Strike Damages Theories........................................13

    A.    The Government's Arguments Are Procedurally Improper and Foreclosed at the Pleadings Stage .........................................................................................13

    B.    Sublime Has Met Its Burden to Plead Economic Injury.......................................16

    C.    The Government's Arguments Regarding Available Damages Are Erroneous ....20

II. The Court Should Not Dismiss Any Counts for Failure to State a Claim ...............................23

    A.    Sublime Plausibly Alleges Breach of the Express Contract Terms (Count I) .......24

    B.    Sublime Plausibly Alleges Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II) .........................................................................30

    C.    Sublime Plausibly Alleges Abuse of Discretion (Count III) ................................35

    D.    Sublime Plausibly Alleges Termination in Bad Faith (Count IV)........................37

CONCLUSION.....................................................................................................................39

## TABLE OF AUTHORITIES

**Cases**

*27-35 Jackson Ave LLC v. United States*,
127 F.4th 1314 (Fed. Cir. 2025) ...................................................................................... 36

*A & D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) ........................................................................................ 5

*AccelGov, LLC v. United States*,
164 Fed. Cl. 345 (2023) .................................................................................................. 27

*ASI Constructors, Inc. v. United States*,
129 Fed. Cl. 707 (2016) .............................................................................................. 32, 35

*Balboa Ins. Co. v. United States*,
3 Cl. Ct. 543 (1983) ........................................................................................................ 15

*Barseback Kraft AB v. United States*,
36 Fed. Cl. 691 (1996) .................................................................................................... 31

*Bluebonnet Savings Bank, F.S.B. v. United States*,
266 F.3d 1348 (Fed. Cir. 2001) ...................................................................................... 20

*Boston Edison Co. v. United States*,
152 Fed. Cl. 358 (2021) .................................................................................................. 15

*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005) ...................................................................................... 31

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ........................................................................................ 26

*Danziger v. United States*,
181 Fed. Cl. 93 (2026) .................................................................................................... 39

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ........................................................................................................ 19

*Doe v. Indyke*,
457 F. Supp. 3d 278 (S.D.N.Y. 2020) ............................................................................ 16

*Energy Cap. Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002) ...................................................................................... 22

*Fisherman's Harvest, Inc. v. United States*,
74 Fed. Cl. 681 (2006) .................................................................................................... 10

*Green & Healthy Homes Initiative, Inc. v. EPA*,
    788 F. Supp. 3d 676 (D. Md. 2025) ................................................................. 30

*Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*,
    114 Fed. Cl. 258 (2013) ................................................................................... 36

*H.B. Mac, Inc. v. United States*,
    153 F.3d 1338 (Fed. Cir. 1998) ...................................................................... 30

*Hamilton Square, LLC v. United States*,
    160 Fed. Cl. 617 (2022) ............................................................ 31, 32, 34, 35

*Hansen Bancorp, Inc. v. U.S.*,
    367 F.3d 1297 (Fed. Cir. 2004) ...................................................................... 18

*Hous. Auth. of Slidell v. United States*,
    149 Fed. Cl. 614 (2020) ............................................................ 31, 32, 33, 35

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ....................................................................... 26

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*,
    903 F.3d 278 (3d Cir. 2018) ..................................................................... 14, 16

*Launch Alaska v. Dep't of the Navy, Off. of Naval Rsch.*,
    No. 3:25-CV-00141-GMS, 2025 WL 2223744 (D. Alaska Aug. 5, 2025) ............................... 30

*Metcalf Const. Co. v. United States*,
    742 F.3d 984 (Fed. Cir. 2014) ................................................................... 31, 34

*Mktg. & Mgmt. Info. v. United States*,
    62 Fed. Cl. 126 (2004) .................................................................................... 22

*New Jersey v. OMB*,
    No. 1:25-cv-11816, 2026 WL 2069832 (D. Mass. July 17, 2026) ................................... 28, 29

*NIH v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) .................................................................................... 19

*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
    284 F.3d 1261 (Fed. Cir. 2002) ...................................................................... 27

*Oliva v. United States*,
    961 F.3d 1359 (Fed. Cir. 2020) ............................................................... *passim*

*Orange Cove Irr. Dist. v. United States*,
    28 Fed. Cl. 790 (1993) .................................................................................... 33

*Ortiz & Assocs. Consulting, LLC v. Vizio, Inc.*,
   No. 2024-1783, 2025 WL 3653227 (Fed. Cir. Dec. 17, 2025) ................................. 13

*S. California Fed. Sav. & Loan Ass'n. v. U.S.*,
   422 F.3d 1319 (Fed. Cir. 2005) ................................................................................ 17

*San Juan City Coll., Inc. v. United States*,
   391 F.3d 1357 (Fed. Cir. 2004) ..................................................................... *passim*

*Sanders v. United States*,
   252 F.3d 1329 (Fed. Cir. 2001) ................................................................................ 19

*Seneca Sawmill Co. v. United States*,
   130 Fed. Cl. 774 (2017) ........................................................................................... 22

*Sommers Oil Co. v. United States*,
   241 F.3d 1375 (Fed. Cir. 2001) .................................................................................. 9

*Sunrez Corp. v. United States*,
   157 Fed. Cl. 640 (2022) ...................................................................................... 32, 35

*TigerSwan, Inc. v. United States*,
   110 Fed. Cl. 336 (2013) ........................................................................................... 36

*TigerSwan, Inc. v. United States*,
   118 Fed. Cl. 447 (2014) ...................................................................................... 37, 38

*TrinCo Inv. Co. v. United States*,
   722 F.3d 1375 (Fed. Cir. 2013) .................................................................................. 9

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996) ................................................................................................. 19

*Vanquish Worldwide, LLC v. United States*,
   147 Fed. Cl. 390 (2020) ........................................................................................ 9, 32

*Waltner v. United States*,
   98 Fed. Cl. 737 (2011) ............................................................................................... 9

**Statutes**

5 U.S.C. § 706(2)(A) ....................................................................................................... 30

35 U.S.C. § 287 ............................................................................................................... 13

Pub. L. 117-169 § 50161, 136 Stat. 1818 (2022) ....................................................... 2, 3

## Rules

RCFC 12(b)(6) ............................................................................................ 9, 10, 12, 23

RCFC 12(f) ............................................................................................... 9, 10, 12, 13

## Regulations

2 C.F.R. § 200.340 ...................................................................................... 26, 27, 30, 31

2 C.F.R. § 200.344 .................................................................................................. 17

2 C.F.R. § 200.472 .................................................................................................. 18

2 C.F.R. part 200 .................................................................................................... 18

10 C.F.R. § 1003.17 .......................................................................................... 30, 31

48 C.F.R. § 31.205-42 ............................................................................................ 18

85 Fed. Reg. 49506, 49507-08 (Aug. 13, 2020) ........................................................ 29

## Other Authorities

*Energy and Water Development Appropriations for Fiscal Year 2026: Hearings Before the Subcomm. on Energy & Water Development of the S. Comm. on Appropriations*, 119th Cong. (2025) (S. Hrg. 119-64) ........................................................................................ 39

Restatement (Second) of Contracts § 205 ................................................................ 32

**INTRODUCTION**

The government has oddly filed a motion to dismiss that does not principally seek to dismiss the complaint or counts thereof. The government devotes the majority of its motion to its request that the Court dismiss or strike some, but not all, of Sublime's "damages theories," because the government views the damages outlined in the complaint as "inflated." The Federal Circuit has squarely foreclosed this approach in precedent the government does not cite, holding that this Court cannot address the availability of particular forms of damages for breach at the pleading stage, before liability for breach of contract has been adjudicated. The Federal Circuit has held that a contractor alleging breach need only plausibly allege that it suffered some economic harm, which Sublime has alleged in spades in connection with the termination of an $87 million award that was central to the company's business. Indeed, the government does not even dispute the availability of several of the categories of damages detailed in the complaint, including lost grant funds, reliance damages, and termination costs.

The Court should therefore swiftly reject the government's effort to have this Court preemptively opine on the availability of expectation damages associated with future budget years under the cooperative agreement. Those arguments are premature and procedurally improper. And in any event, they are wrong. Through cropping relevant contract language, the government elides the fact that DOE had to apply only objective, enumerated criteria in determining whether the award would proceed to the next budget period. The continuation decision was not discretionary at all. Sublime plausibly alleges that it was on track to meet these objective criteria, and any argument to the contrary presents a disputed question of fact.

When the government does belatedly argue for dismissing the counts of the complaint, it becomes clear why it led with other requests. The government does not even address several of

the grounds upon which Sublime alleges breach of the express terms of the contract in Count I, meaning that count must move forward no matter what. With Counts II and III, the government does not recognize or apply the settled legal standards for claims of breach of the implied covenant of good faith and fair dealing and abuse of discretion. Sublime alleges more than sufficient facts to state these claims under those settled standards, given DOE's arbitrary, capricious, and unreasonable conduct in rushing to mass terminate awards, without any individualized assessment of whether Sublime's project aligned with DOE's goals and priorities. Sublime also plausibly alleges that DOE acted in bad faith in terminating Sublime's award, based on DOE's stated animus for the recipients of the awards that were mass terminated in May 2025.

## BACKGROUND

This case concerns the Department of Energy's abrupt termination of a cooperative agreement with Sublime Systems, Inc., a Massachusetts technology company that has developed a low-carbon process for manufacturing cement. Compl. ¶¶ 1, 17–21.

## I.    Sublime's Award

In 2022, Congress appropriated billions of dollars for DOE to fund advanced industrial technology projects that would reduce greenhouse-gas emissions. Compl. ¶ 11. Specifically, in § 50161 of the Inflation Reduction Act (IRA), Congress appropriated $5.8 billion to the Department of Energy (DOE) to provide financial assistance, through its Office of Clean Energy Demonstrations (OCED), to carry out projects for, among other things, "the purchase and installation, or implementation, of advanced industrial technology at an eligible facility." Pub. L. 117-169 § 50161(a)-(b), 136 Stat. 1818, 2049 (2022). Congress defined "advanced industrial technology" to require that the technology be "designed to accelerate greenhouse gas emissions

2

reduction progress to net-zero at an eligible facility." *Id.* § 50161(g)(1). And Congress defined an "eligible facility" as a "domestic, non-Federal, nonpower industrial or manufacturing facility engaged in energy-intensive industrial processes, including production processes for," *inter alia*, "cement." *Id.* § 50161(g)(3). Congress specified that applications for awards under the program had to include "the expected greenhouse gas emissions reductions to be achieved by carrying out the project." *Id.* § 50161(c).

In 2023, DOE issued a funding opportunity announcement for the Advanced Industrial Facilities Deployment Program, explaining that the program would support large-scale industrial facilities capable of manufacturing products with low-carbon footprints. Compl. ¶ 12. DOE identified cement and concrete as areas of interest because traditional cement manufacturing is a major source of greenhouse gas emissions. *Id.* ¶ 14.

DOE's announcement sought first- or early-of-a-kind commercial-scale projects. Compl. ¶ 13. Projects selected for funding would proceed in phases, beginning with initial planning and analysis and culminating in ramp-up to full operations and evaluation of plant performance and financial viability. *Id.* DOE anticipated awarding between 10 and 30 awards, with anticipated federal funding of $75 million to $500 million per award. *Id.* ¶ 15.

Sublime applied for federal assistance in August 2023 to build a new ultra-low-carbon cement manufacturing facility in Holyoke, Massachusetts, known as the Kiloton Project. *Id.* ¶ 22. The facility would have a capacity of 30,000 tonnes per year and would implement Sublime's proprietary electrochemical cement-manufacturing process. Compl. ¶¶ 22–23. The Kiloton Project was intended to demonstrate technology that could be scaled into numerous megaton-scale plants in the United States and to validate Sublime's cement in real-world applications. *Id.* ¶ 23. Sublime's application explained that DOE funding was critical to bridging the final

3

demonstration "valley of death" before full-scale commercial production facilities could be financed through traditional project financing. *Id.* ¶ 24.

Sublime's application also explained the commercial importance of the DOE award. Sublime told DOE that a cooperative agreement would unlock private follow-on investment for the scale-up, that Sublime was in advanced discussions with offtake partners, and that Sublime expected the Holyoke plant to be significantly oversubscribed for allocations. Compl. ¶ 25. Sublime further informed DOE that the project's long-term financial viability would be accomplished primarily through sales of materials produced by the plant. *Id.* ¶ 26. Sublime's business development and management plan likewise informed DOE that the cooperative agreement would unlock significant private-sector follow-on investment through a Series B fundraise. *Id.* ¶ 27. In addition to reducing greenhouse-gas emissions, Sublime explained that the Holyoke plant would help reshore manufacturing in the United States and reduce reliance on foreign imports. *Id.* ¶ 28.

In March 2024, Sublime received notice that its Kiloton Project had been selected for federal financial assistance. Compl. ¶ 30. Sublime then entered negotiations with DOE and became "under award" in November 2024. *Id.* Under the award, DOE agreed to provide total government assistance of $86,907,197, while Sublime agreed to invest $132,562,589, for a total project investment of $219,469,786. Compl. ¶ 31. In the initial award in November 2024, DOE obligated $12,792,364 of the funds to Sublime. In December 2024, DOE modified the award and legally obligated the remaining award balance of $74,114,833 to the project, meaning DOE obligated the full award amount of $86,907,197. *Id.* ¶ 32; *see* Pl. Appx 1 (Assistance

4

Agreement).[1] The modified Assistance Agreement required Sublime to contribute a cost share of $132,562,589 over the life of the award. Pl. Appx 1. DOE also set the period of performance for the award to run from November 2, 2024 through April 1, 2028. *Id.*

DOE and Sublime entered into a cooperative agreement. Compl. ¶ 33. The principal project objective under the agreement was to "[c]onstruct and commence commercial operations of an industrial scale Sublime Cement plant" that would demonstrate the feasibility of producing 20,000 to 30,000 tonnes per year of cement. *Id.* ¶ 34. The agreement encompassed both OCED's Standard Terms and Conditions, Appx 1–30, and Award-Specific Terms and Conditions, Appx 31–47, with the latter governing in the event of a conflict between the two. The agreement authorized four budget periods and allocated a DOE funding amount for each period. DOE's maximum share for Budget Period 1 was $12,792,364. Appx 32.

The agreement further provided "Go/No-Go Review Criteria" that Sublime had to satisfy to advance from Budget Period 1 to Budget Period 2. Compl. ¶ 35; Appx 34–37. These criteria were all *objective.* Compl. ¶ 35. DOE was to "verif[y]" that Sublime had met the criteria, using a particular "Verification Method" specified for each requirement. Appx 34–37.

The agreement also included a term for "Go/No-Go Reviews and Continuation Decisions," to govern DOE's decision whether to continue the award from one budget period to the next. Appx 46. Again, the criteria to determine whether to continue the award were all objective. They included satisfaction of the Go/No Go Review Criteria, as well as DOE's determination that "[t]he project continues to support DOE's programmatic goals and be

---

[1] The modified Assistance Agreement is incorporated by reference into the complaint and therefore may be considered in adjudicating the government's motion. *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014). The same is true of the other award documents appended to this filing.

economically viable, *in each case as addressed in the Award Project Vision and Objectives*." Appx 46-47 (emphasis added). The "Award Project Vision and Objectives" set forth a series of technical objectives for the project, such as the number of tonnes of cement that would be produced, the carbon reduction levels to be achieved, and so on. Pl. Appx 5–6. The Project Vision and Objectives further confirmed that continuation decisions would be based on objective considerations; the document explained that DOE's role included "performing technical or performance reviews to determine whether to continue funding the next Budget Period." *Id.* at 7.

The cooperative agreement also defined DOE's termination authority. Compl. ¶ 37. It did not include a termination-for-convenience provision. *Id.* Instead, DOE could unilaterally terminate the agreement only in two circumstances: if Sublime failed to comply with the award's terms and conditions, or "to the greatest extent authorized by law," if the award no longer effectuated program goals or agency priorities. *Id.*

## II.    Sublime Performs

Sublime began to perform and made substantial progress. Sublime hired staff, secured commitments from customers and investors, and submitted all required deliverables on schedule, including design packages, environmental information, and a project management plan. Compl. ¶ 38. Sublime was on track to proceed to Budget Period 2 on schedule. *Id.* DOE never questioned Sublime's performance, had been paying invoices for work performed under the agreement, and had never suggested that Sublime had failed to comply with the agreement. *Id.* ¶¶ 4–5.

Sublime also secured significant financing and commercial commitments based on DOE's entry into the agreement. Compl. ¶¶ 39–40. Three leading cement companies prepaid for more than one-third of the Kiloton Plant's capacity and were actively planning multiple megaton-scale cement plants with Sublime. *Id.* ¶ 41. After entering into the DOE agreement,

Sublime received federal tax credits contingent on hitting certain milestones, the earliest being in January 2027, *id.* ¶¶ 42-43, and Sublime also received a letter of intent from a major energy investment company to provide tens of millions of dollars in funding, *id.* ¶ 44. In addition, Sublime also entered into offtake agreements with some of the nation's largest corporations to buy the cement that would be produced at the Holyoke facility. *Id.* ¶¶ 46–47. At the time DOE terminated the award, the Kiloton Project was significantly oversubscribed, with 205% of the plant's projected production allocated. *Id.* ¶ 48.

Sublime had updated DOE on its commercial progress through deliverables, including market-assessment reports, letters of commitment, and capacity-reservation deliverables prior to termination. Compl. ¶ 50. And Sublime had completed successful commercial demonstrations of its product, including successfully completing a concrete pour using Sublime cement in a new state-of-the-art office building. *Id.* ¶ 49.

### III. The Government Terminates the Agreement

In May 2025, Secretary of Energy Chris Wright announced that DOE would conduct a "review" of awards issued under the prior administration. Compl. ¶ 51. A press release stated that Secretary Wright had concerns about certain awards issued by the prior administration but did not identify the awards or explain those concerns. *Id.* DOE then announced that a committee would conduct a "review process" for certain awards "on a case-by-case basis." *Id.* ¶ 52.

During the next two weeks, Sublime heard nothing from DOE. *Id.* Although DOE's press release contemplated that DOE might request information from recipients to inform its decision-making—and although DOE did request such information from other companies—DOE did not contact Sublime to request information or even notify Sublime that its award was under review. *Id.* Two weeks after announcing the review, DOE sent Sublime a letter terminating the

7

cooperative agreement "effective immediately." *Id.* ¶ 53. The letter was not sent to Sublime's designated award contacts, but to a junior accountant. *Id.* DOE's purported "case-by-case" review did not include any genuine individualized review of Sublime's award. *Id.* ¶¶ 52–53, 96.

The termination notice did not assert that Sublime had failed to comply with the agreement, nor did it identify any deficiency in Sublime's performance. Compl. ¶ 54. Instead, DOE gave three reasons for termination: first, that Sublime allegedly "only considered the emissions reduction at the facility and did not consider emissions generation of electricity to power the project"; second, that the award "fails to meet the goals or priorities of DOE and the Administration"; and third, that the project "no longer effectuates the program/agency priorities." *Id.* The letter did not provide any explanation for why Sublime's award supposedly failed to meet, or no longer effectuated, program goals or agency priorities. *Id.*

DOE's first stated reason was demonstrably false. Compl. ¶ 55. Sublime's application accounted for greenhouse gas emissions from the electricity consumed in making Sublime's cement. *Id.* The life cycle assessment Sublime submitted with its application described that electricity for the Holyoke plant would have emissions of 15.0 kilograms of carbon dioxide per megawatt hour. *Id.* Sublime's industry value proposition also acknowledged that Sublime's process would consume energy, while explaining that the process could run on renewable energy and therefore reduce emissions. *Id.* Sublime submitted an updated life cycle assessment in April 2025 as a Phase 1 deliverable, again confirming that electricity for the Holyoke plant would have emissions of 15.0 kilograms of carbon dioxide per megawatt hour. *Id.*

The government's second stated reason was not a valid basis for termination under the cooperative agreement because the agreement did not authorize termination because the award "fails to meet the goals or priorities of DOE and the Administration." As to DOE's third stated

8

reason, the Department never explained how Sublime's project no longer effectuated program or agency priorities, even though the agreement permitted termination on that basis only as "authorized by law." *Id.* ¶ 57.

DOE's termination of Sublime's award was part of a broader mass termination of DOE awards funded by the IRA and IIJA. Compl. ¶ 58. On May 30, 2025, DOE announced the termination of 24 awards—all issued by OCED—comprising $3.7 billion in total funding. *Id.* Secretary Wright announced these terminations in a single press release, stating that the terminated projects all purportedly failed to advance the energy needs of the American people, were not economically viable, and would not generate a positive return on taxpayer dollars. *Id.* The announcement did not explain how Sublime's award, or any other, was not economically viable or would not generate a positive return on investment. *Id.* This characterization was plainly untrue as to Sublime, which had already received significant commitments from major corporations to acquire cement produced through the federal award. *Id.*

## IV.    Sublime's Harms

DOE's termination of the cooperative agreement has been devastating to Sublime. The Kiloton Project was the linchpin of Sublime's business plan, and the DOE award was essential to getting the project off the ground. Compl. ¶¶ 22–29, ¶ 68. Unsurprisingly, the abrupt termination of the award has caused Sublime numerous forms of damages.

Most immediately, the termination deprived Sublime of the award funds it would have received but for the termination, wasted Sublime's investments made in reliance on the award, and caused Sublime to incur significant termination costs. The lost award funds include, but are not limited to, the millions in Budget Period 1 funds that had not yet been disbursed at the time of termination, and the $19.1 million in Budget Period 2 funds that Sublime was fully on track to

9

receive. *Id.* ¶ 38; Appx 33. As for reliance, Sublime lost the value of millions of dollars it had invested in the Kiloton Project in reliance on the cooperative agreement. Compl. ¶ 67. And the award termination forced Sublime to let go a significant number of employees and contractors, resulting in termination costs including but not limited to severance and legal fees. *Id.*

On top of those harms, Sublime has lost or is set to lose a major investment it had received, the income from the offtake agreements it had entered, and tax credits that depended on progress of the Kiloton Project.  Compl. ¶¶ 60–66.

## LEGAL STANDARD

The government moves to dismiss the complaint under RCFC 12(b)(6) or, alternatively, to "strike Sublime's demand for inflated costs," under RCFC 12(f). Mot. 10. "When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court must accept as true all the factual allegations in the complaint, and must indulge all reasonable inferences in favor of the non-movant." *Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 399 (2020) (quotations omitted). "To avoid dismissal under RCFC 12(b)(6), a party need only plead facts to state a claim to relief that is plausible on its face, with facts sufficient to nudge claims across the line from conceivable to plausible." *Id.* (quotations omitted).

Under RCFC 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Courts "view motions to strike with disfavor and rarely grant them." *Fisherman's Harvest, Inc. v. United States*, 74 Fed. Cl. 681, 690 (2006). "[I]t has been the practice of the . . . Court of Federal Claims to decline to grant a motion to strike, where the moving party is unable to show prejudice or confusion." *Waltner v. United States*, 98 Fed. Cl. 737, 766 (2011) (quotation omitted), *aff'd*, 679 F.3d 1329 (Fed. Cir. 2012).

10

**ARGUMENT**

The government's request to dismiss or strike Sublime's "damages theories"—without actually dismissing any claims—is procedurally improper. RCFC 12(b)(6) is not a basis to preemptively opine on whether certain types of damages will be available after liability is established. Nor is RCFC 12(f) a vehicle to litigate contested damages questions at this stage.

The Federal Circuit has in fact definitively rejected the government's approach. The Federal Circuit has held that a contractor need only allege "some economic injury" to state a breach of contract claim, *Oliva v. United States*, 961 F.3d 1359, 1364 (Fed. Cir. 2020) (quotation omitted), and that it is putting "the cart before the horse" for this Court to address the availability of specific damages theories before adjudicating liability, *San Juan City Coll., Inc. v. United States*, 391 F.3d 1357, 1362 (Fed. Cir. 2004); Sublime clearly alleges "some economic injury" from the termination of an $87 million award that was essential to Sublime's business. The government does not even contest several forms of damages alleged in the complaint.

The Court thus need not address the government's arguments that damages associated with future budget periods cannot be recovered, but if the Court does address the issue, the government's arguments fail. The agreement provided entirely *objective* criteria for continuing to the next budget period; it was not a discretionary policy decision as the government claims. Whether Sublime was reasonably certain to meet the objective criteria—and the amount of damages attributable to the failure to complete each budget period—are factual questions.

Sublime has also plausibly stated a claim for breach of contract under each count of the complaint. With respect to Count I, for breach of the contract's express terms, the government does not even dispute several of Sublime's theories of express breach: (a) that two of the three reasons DOE gave for the termination were not contractual grounds for termination; (b) that the

11

contract's provision allowing termination based on "programs goals and agency priorities" does not encompass goals and priorities that directly conflict with Congress's; and (c) that Sublime's project was consistent with DOE's new goals and priorities. Count I cannot be dismissed where the government does not even dispute these independent grounds upon which Sublime alleges breach. And on the theories that the government does dispute, multiple district courts have rejected the government's interpretation of the "program goals and agency priorities" provision.

Regarding Count II, for breach of the implied covenant of good faith and fair dealing, the government erroneously argues that Sublime must allege a breach of a specific contractual promise to state a claim. That theory would render a claim for breach of the covenant of good faith and fair dealing superfluous to claims for breach of a contract's express terms. Under settled precedent, Sublime states a claim for breach of the implied covenant if it plausibly alleges that DOE acted arbitrarily, capriciously, or contrary to the parties' reasonable expectations. Sublime plausibly alleges that DOE acted in each of these ways in racing to terminate Sublime's award as part of a mass termination, without any individualized assessment of Sublime's project, without affording Sublime an opportunity to be heard, and for stated reasons that were factually false.

With Count III, for abuse of discretion, the government mistakenly asserts that this claim rests on the same theory as Count I. This Court has repeatedly held that a contractor may claim that an agency abused discretion that it held under the terms of a contract, which is distinct from a claim that an agency breached the contract's express terms. The government has waived any argument that Count III fails to state a claim under the applicable legal standard for an abuse of discretion claim. In any event, Sublime plausibly alleges that DOE abused its discretion in terminating in the slapdash, arbitrary manner that it did.

12

Finally, Sublime has met its burden to allege a bad-faith termination. The allegations in the complaint support the inference that DOE terminated the award based on animus toward the group of awardees mass terminated in May 2025, based on the awardees' presumed goals, and because they received their awards from the prior administration after the 2024 election. Claims of bad faith are fact-intensive, and discovery is necessary to resolve Sublime's claim here.

## I.    The Court Should Not Dismiss or Strike Damages Theories

### A.    The Government's Arguments Are Procedurally Improper and Foreclosed at the Pleadings Stage

In requesting that the Court dismiss or strike Sublime's "damages theories" under RCFC 12(b)(6) or RCFC 12(f), Mot. 7, the government does not appear to be moving to actually dismiss any count of the complaint. Rather, the government wants the Court to preemptively opine on the availability of various forms of damages, which would not be relevant until summary judgment or trial, even though the Court's conclusions would not affect whether this case or any particular counts go forward. *See, e.g.*, *id.* at 10 (section heading that "The Court Should Dismiss or Otherwise Strike Sublime's Demand for Inflated Costs . . . .").

The government's request fails at the threshold because it is procedurally improper. RCFC 12(b)(6) is not a vehicle for the Court to dismiss theories on the measure of damages, since that rule is for dismissal of *claims* based on a "failure to state a claim upon which relief can be granted." And the government offers no explanation for how, under RCFC 12(f), Sublime's allegations regarding certain types of damages it has suffered are "redundant, immaterial, impertinent, or scandalous." The government does not cite *any* Federal Circuit or Court of Federal Claims case that has ever employed RCFC 12(f) to strike allegations regarding particular

13

types of damages, nor does the government cite any case dismissing "damages theories" under RCFC 12(b)(6) untethered from dismissing a complaint or counts therein.[2]

To the contrary, Federal Circuit precedent forecloses the government's request to dismiss or strike Sublime's damages theories. The Federal Circuit has held that it is "premature" for the Court of Federal Claims to address the availability of particular types of damages at the motion to dismiss stage; the relevant inquiry is only whether the plaintiff has plausibly alleged a "breach of contract." *San Juan*, 391 F.3d at 1362–63. A plaintiff need not even "allege details of the damages calculation in the complaint" for a breach of contract claim. *Oliva*, 961 F.3d at 1364 (quotations omitted). Rather, a plaintiff asserting breach of contract "only needs to allege facts 'that, if proven true, would permit a factfinder to determine that [plaintiff] suffered at least some economic injury.'" *Id.* (quoting *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278, 287 (3d Cir. 2018)). Only *after* "the Court of Federal Claims determines that the [agency] breached the Agreement, and after a full factual record on the damages question has been developed, the trial court then will be in a position to decide" the types and measure of damages the plaintiff may recover. *San Juan*, 391 F.3d at 1363.

The Federal Circuit's decisions in *San Juan* and *Oliva* are instructive. In *San Juan*, the Court of Federal Claims had dismissed a grantee's breach of contract claim on the ground that the grantee's lost profits were not available damages as a matter of law. 391 F.3d at 1359–60.

---

[2] In the only Federal Circuit decision the government cites for its damages argument, *Ortiz & Assocs. Consulting, LLC v. Vizio, Inc.*, No. 2024-1783, 2025 WL 3653227 (Fed. Cir. Dec. 17, 2025), the court affirmed a district court's award of attorneys' fees after it had dismissed a complaint for failure "to plead compliance with the patent marking statute, 35 U.S.C. § 287." *Id.* at *1. The district court had dismissed the case because compliance with that statute is a "prerequisite for recovering damages." *Id.* at *3. The district court did not dismiss damages theories or opine on the measure of damages separate from whether the plaintiff could establish liability.

The Federal Circuit reversed, holding that it was "premature to decide whether the College could recover lost profits unless and until the Court of Federal Claims decides the Department [of Education] breached the agreement." *Id.* at 1362. "[T]he issue of lost profits [arose] in this appeal only because the Court of Federal Claims put the cart before the horse when it held, as a matter of law, that the College could not recover any damages and therefore it was unnecessary to determine whether a breach of contract occurred." *Id.*

In *Oliva*, the Court of Federal Claims had dismissed a breach-of-contract claim because it believed the plaintiff had not plausibly pleaded entitlement to lost salary and relocation-incentive damages. In reversing, the Federal Circuit emphasized that courts must draw reasonable inferences in the plaintiff's favor and accept plausible factual allegations as true. 961 F.3d at 1362–64. With respect to relocation damages, the Federal Circuit held that the court below had improperly required the plaintiff to plead certain factual details that are legal prerequisites to relocation incentive damages, explaining that "such detailed allegations as to the damages calculation were not required" at the pleadings stage. *Id.* at 1365.

This Court has consistently held in accord. In *Balboa Insurance Co. v. United States*, 3 Cl. Ct. 543 (1983), the government argued at the motion-to-dismiss stage that the plaintiff could not recover certain consequential damages arising from an alleged breach of a takeover agreement. The Claims Court denied the motion to dismiss, explaining that "[t]he issue of damages is one of fact and law and is not now appropriately before the court on a motion to dismiss for failure to state a cause of action." *Id.* at 546. Similarly, in *Boston Edison Co. v. United States*, 152 Fed. Cl. 358 (2021), this Court rejected the government's arguments regarding the legal availability of particular damages, holding that plaintiffs are not required to

15

plead detailed damages calculations so long as they allege facts supporting "at least some economic injury," which the plaintiff had. *Id.* at 364 (quoting *Oliva*, 961 F.3d at 1364).

The government ignores all of the above precedent in its motion, including the binding holdings of *San Juan* and *Oliva*. Instead, the government cites a district court decision from New York that dismissed a prayer for relief seeking *punitive damages*, where New York state law categorically precluded the recovery of punitive damages in the action. *Doe v. Indyke*, 457 F. Supp. 3d 278, 283–84 (S.D.N.Y. 2020); *see* Mot. 9. That case has no bearing here. Sublime does not seek punitive damages precluded by statute, and the government does not seek to dismiss Sublime's prayer for relief. Indeed, like in *San Juan*, Sublime's prayer appropriately seeks general damages to be proven at trial. Compl. at  27; *see San Juan*, 391 F.3d at 1362.

The Court should reject the government's procedurally improper attempt to adjudicate the availability of specific theories of expectation damages at the pleadings stage.

### B.    Sublime Has Met Its Burden to Plead Economic Injury

Sublime has easily met its burden to plausibly allege that it has "suffered at least <u>some</u> economic injury" as a result of the alleged breach. *Johnson & Johnson*, 903 F.3d at 287 (quoted in *Oliva*, 961 F.3d at 1364). The cooperative agreement that DOE breached obligated $86.9 million to Sublime, including $12,792,364 that Sublime was set to receive in Budget Period 1. Compl. ¶¶ 31–32. The complaint details, among other things, how this award was "critical" to Sublime's business operations, Compl. ¶¶ 24–27, how Sublime invested millions in reliance on the award, *id.* ¶ 67, and how the termination has caused Sublime to incur substantial operational, personnel, and legal expenses, *id.* And as a direct result of the termination, Sublime's business is now in dire financial straits. *See* Compl. ¶ 68. It is self-evident—and certainly plausible—that Sublime has suffered "some economic injury" as a result of this termination. That is sufficient at

16

this stage; the Court need not delay resolution of this motion by parsing Sublime's damages theories and addressing the government's arguments as to each.

Even if Sublime's complaint did have to allege a specific form of damages that it may recover, Sublime has alleged multiple categories of damages that the government barely disputes are available if Sublime establishes a breach. The government does not contest that, if Sublime may seek expectation damages, Sublime could recover the undisbursed balance of the $12,792,364 in Budget Period 1 funds that Sublime would have received but for the breach. *See* Compl. ¶¶ 32, 64. The government also does not contest that, if Sublime may seek reliance damages, it could obtain the millions of dollars that Sublime alleges it invested in reliance on the Cooperative Agreement. Compl. ¶ 67. And the government does not contest at all that Sublime may recover the costs and expenses it has allegedly incurred due to the termination, including severance costs, legal fees, and delay costs. *Id.*

The government's only argument relevant to whether Sublime may recover the expectation and reliance damages described above is its contention that Sublime is limited to seeking "termination costs" or "closeout costs" for the breach of contract. Mot. 10–11. This argument would not proscribe the other costs described above (*i.e.*, severance costs and legal fees, which would fall under termination costs), and thus even under the government's mistaken view of the law, this case cannot be dismissed for lack of damages.[3] In any event, the government's theory that Sublime is limited to termination or closeout costs is flat wrong.

---

[3] The government asserts that Sublime "has never submitted or identified any such [termination or closeout] costs to DOE." Mot. 11-12. But the complaint does identify some of Sublime's termination and closeout costs. See Compl. ¶ 67. The reason Sublime has not submitted its complete inventory of closeout and termination costs that are allowable under 2 C.F.R. § 200.344(b), (c) is because Sublime filed an administrative appeal after the termination (for which DOE has been unresponsive), and DOE expressly told Sublime that the administrative appeal tolled the time for submitting closeout materials.

17

It is black-letter law that government contractors may recover expectation damages and reliance damages for a breach of contract by the government. *S. California Fed. Sav. & Loan Ass'n. v. U.S.*, 422 F.3d 1319, 1334 (Fed. Cir. 2005). "Expectation damages give the non-breaching party the benefit of his bargain by putting him in as good a position as he would have been in had the contract been performed." *Id.* "As reliance damages, the non-breaching party may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract." *Hansen Bancorp, Inc. v. U.S.*, 367 F.3d 1297, 1309 (Fed. Cir. 2004) (quotations omitted). The government does not contest that the cooperative agreement with Sublime was a valid and enforceable contract, and therefore it should be beyond dispute that Sublime may seek expectation or reliance damages for breach of the contract.

The government seems to suggest that grants and cooperative agreements should be treated differently from procurement contracts with respect to damages, pointing to the ability of grantees and cooperative agreement recipients to seek closeout and termination costs under financial assistance regulations. *See* Mot. 10–12 (citing 2 C.F.R. part 200). But the relevant regulations merely provide that such costs are "allowable," meaning awardees may seek reimbursement of them. *See* 2 C.F.R. § 200.472. The government identifies no language in 2 C.F.R. § 200.472 or other regulations saying termination and closeout costs are the exclusive remedies for breach of a grant or cooperative agreement. And no such language exists. Just as procurement contractors may seek damages for breach of contract in addition to the termination and closeout costs they may recover under the Federal Acquisition Regulation (FAR), *see, e.g.*, FAR 31.205-42, cooperative agreement recipients such as Sublime may seek damages for breach of contract in addition to the termination and closeout costs an agency must reimburse. *See Danziger v. United States*, No. 1:25-cv-01241-DAT, ECF No. 20 at 4 (Fed. Cl. Apr. 10, 2026)

18

(rejecting similar government argument that contractors were limited to termination costs, because "[w]hen the United States improperly terminates a contract and thereby breaches it, the contractor is entitled to termination costs *and* breach-of-contract damages").

The Federal Circuit has indeed squarely rejected any notion that financial assistance recipients cannot recover breach of contract damages. In *San Juan*, the Federal Circuit reversed a Court of Federal Claims decision holding that a grantee could not seek expectation damages (there, lost profits) for breach of the grant agreement. The Federal Circuit held that "the fact that this contract covers government financial grants does not warrant a different standard" for available damages. *San Juan*, 391 F.3d at 1361. "'[D]amages are always the default remedy for breach of contract,'" and "nothing in either the [grant] Agreement itself or in the governing statute or regulations" displaces that default remedy by specifying that damages would not be available in the event of breach. *Id.* at 1360–61 (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality op.)). Here, as in *San Juan*, nothing in Sublime's agreement or applicable regulations displaces the default contract remedy of damages for a breach.

Remarkably, the government cites the Supreme Court's decision in *Department of Education v. California*, 604 U.S. 650 (2025), for the proposition that "the available relief" for terminated grants and cooperative agreements "is the recovery of potentially appropriate termination costs." Mot. 11. The Supreme Court said no such thing, and its decisions in *California* and *National Institutes of Health (NIH) v. American Public Health Association*, 145 S. Ct. 2658 (2025), stand for the opposite proposition. In those cases, the Supreme Court held— at the government's urging—that the plaintiffs' challenges to grant terminations were tantamount to breach of contract actions, which must be heard in this Court. *See, e.g.*, *NIH*, 145 S. Ct. at 2665 (Kavanaugh, J., concurring in part and dissenting in part) ("The core of plaintiffs' suit

19

alleges that the Government unlawfully terminated their grants. That is a breach of contract claim."). The Court highlighted in *California* that, if the grantees ultimately prevailed, they could recover "wrongfully withheld funds" as damages in this Court. 604 U.S. at 652.

Having persuaded the Supreme Court that challenges to the termination of grants and cooperative agreements are properly brought as breach of contract actions in this Court, Sublime has every right to pursue the ordinary remedies for breach of contract.

**C.      The Government's Arguments Regarding Available Damages Are Erroneous**

For the reasons explained above, the Court need not address the government's arguments as to whether certain categories of damages are legally available. But if the Court does reach these issues, the government's arguments are wrong. They rest on mischaracterizations of the cooperative agreement and a failure to recognize the fact-bound nature of the relevant damages.

First, even if the government were correct that Sublime cannot recover damages expected from future budget years because DOE purportedly maintained wide discretion to not proceed to future budget years (which is not correct as a factual or legal matter), the government is wrong to assume that would foreclose all of Sublime's alleged damages for lost income, investments and tax credits, and diminution in business value. See Mot. 17. The government assumes without basis that such damages "could only accrue upon the successful completion and operation of a fully constructed cement manufacturing facility." *Id.* The extent to which these damages, or portions thereof, flow from the failure to complete Budget Period 1 is a factual question of causation. Sublime must show with "reasonable certainty" that its expectation damages resulted from the breach, and whether that causation standard is met is a "question of fact" that requires development of a record and potentially expert analysis. *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355–56 (Fed. Cir. 2001).

20

Regardless, the government is wrong that Sublime will be unable to recover damages associated with future budget periods. DOE did not have any discretion—let alone unfettered discretion as the government claims—regarding whether to continue the award into future budget periods.

Unlike the option-year contracts to which the government analogizes, Sublime's cooperative agreement provided for a period of performance that lasted through all the budget years—until April 1, 2028—and the government obligated the full amount of funds for all budget years at the agreement's outset. *See* Pl. Appx 1 Box 7 (period of performance), Box 13 (showing full award amount of $86,907,197 obligated to the award). That means that DOE legally committed the full $86.9 million to the cooperative agreement, and DOE had to take action to cut the agreement short and de-obligate the funds in order for Sublime not to receive them.

The cooperative agreement did provide for "Go/No Go" review points at which DOE could decide not to provide the next budget year's funding, but critically, the Go/No Go criteria were all *objective*. Compl. ¶ 35. Term 5 of the Award-Specific Terms and Conditions provided a list of objective Go/No Go Criteria, such as that "[Sublime] has a full list of all permits required for the project and has submitted National Environmental Policy Act (NEPA) documentation to DOE." Gov't Appx 34–37. Sublime was on track to meet all the Go/No Go criteria to proceed to Budget Period 2, Compl. ¶ 38, and the government does not dispute that allegation.

The other conditions in the cooperative agreement for continuing across budget years were objective as well. Term 19 of the Award-Specific Terms and Conditions provides seven objective criteria that had to be met, in addition to the Go/No Go criteria. *See* Gov't Appx 46–47. To support its notion that the continuation decision was "entirely discretionary," Mot. 18, the

21

government purports to quote the final condition, writing that it was that the "project continues to support DOE's programmatic goals[.]" Mot. 6. But the government's quotation is misleading, as it crops out key language specifying the objective nature of this condition. The full condition is: "The project continues to support DOE's programmatic goals and be economically viable, *in each case as addressed in the Award Project Vision and Objectives*." Gov't Appx 47 (emphasis added). The Award Project Vision and Objectives, which the government does not include in its attachments to the motion, provides objective programmatic goals for the award. *See* Pl. Appx 5–8. The government again does not dispute that Sublime was on track to meet all of these objective criteria at the end of Budget Period 1. And even if it did, whether Sublime would have met those objective criteria with reasonable certainty is a question for which "factual development . . . is necessary" and cannot be resolved "at this stage of the litigation." *Seneca Sawmill Co. v. United States*, 130 Fed. Cl. 774, 778–79 (2017) (Kaplan, J.).

The government accordingly misses the mark in analogizing to cases holding that a contractor could not recover damages for unexercised option years. For Sublime's cooperative agreement, DOE did not have "sole discretion" or a "unilateral right" to continue the award. *Contra* Mot. 16 (quoting *Mktg. & Mgmt. Info. v. United States*, 62 Fed. Cl. 126, 130 (2004)). Far from it: the cooperative agreement actually required DOE to make good-faith efforts to extend the award, providing that "DOE will negotiate in good faith with the Recipient regarding any award modifications necessary for the next Budget Period." Gov't Appx 47.

The government's suggestion that Sublime's technology was "novel and unproven" also is no basis for pre-judging the availability of damages. Mot. 15. The Federal Circuit has rejected the argument that expectation damages are unavailable when a plaintiff "was engaged in a new business that had never been performed." *Energy Cap. Corp. v. United States*, 302 F.3d 1314,

22

1325 (Fed. Cir. 2002). Yes, Sublime is the pioneer in ultra-low-carbon cement technology and manufacturing, but the groundbreaking nature of Sublime's technology does not change its ability to prove damages. In *Energy Capital*, the plaintiff was a "new venture" with "no evidence [] of historical performance of a type of business similar to AHELP," the plaintiff's "energy efficiency loan" service. *Id.* at 1317, 1326. But the Federal Circuit held that made no difference. "Whether or not one considers AHELP to have been a 'new venture' or merely an extension of Energy Capital's existing loan business, Energy Capital was required to demonstrate its entitlement to lost profits by showing the same elements that any business must show: (1) causation, (2) foreseeability, and (3) reasonable certainty." *Id.* at 1326.

Here, Sublime plausibly alleges these elements for each of the damages theories that the government now challenges. Sublime alleges that DOE knew that Sublime would use the award to unlock private investment, demonstrate the commercial scalability of its technology, and secure pre-orders from customers. Compl. ¶¶ 24–27, 34, 39–40. Sublime alleges that it would have met the objective criteria to move forward with the project, and that it had secured or was reasonably certain to secure specific investments, tax credits, and commercial commitments, most or all of which are now likely lost due to the termination. Compl. ¶¶ 38, 41–48, 50, 60–66.

In short, although this Court need not address the damages theories that the government prematurely seeks to adjudicate, if the Court does address them, Sublime has plausibly alleged these damages, and whether Sublime is entitled to them is a question of fact that cannot be resolved in response to Defendant's motion.

## II.    The Court Should Not Dismiss Any Counts for Failure to State a Claim

The government's arguments that Sublime fails to state a claim for breach under each count of the complaint lack merit. It is telling that the government saves these arguments for the

23

back of its brief, focusing instead on its Hail Mary arguments for stripping "damages theories" from the case. When the government gets around to addressing the breach allegations, it does not dispute several of Sublime's allegations of breach of the cooperative agreement's express terms, fails to apply the correct legal standards for the implied covenant of good faith and fair dealing and abuse of discretion, and ignores the fact-bound nature of a bad faith claim.

**A.      Sublime Plausibly Alleges Breach of the Express Contract Terms (Count I)**

Count I alleges that DOE breached the express terms of the cooperative agreement in six independent ways, any one of which would establish a breach of contract. Specifically, Sublime alleges that DOE breached the contract's express terms in that:

1.  Two of the three grounds that DOE provided for terminating the award were not contractual bases upon which DOE could terminate. Compl. ¶¶ 71–75.

2.  DOE could terminate the agreement because the award "no longer effectuates the program goals or agency priorities" only "to the extent authorized by law," and the termination was not authorized by law because it:

    (i) violated the APA's requirements for reasoned decisionmaking, and

    (ii) was done for the express purpose of not carrying out Congress's directive in IRA § 50161 to spend appropriated funds for advanced industrial technology to reduce greenhouse gas emissions. *Id.* ¶ 77.

3.  DOE could only terminate based on program goals and agency priorities that existed at the time that DOE issued the award, not changed goals and priorities. *Id.* ¶ 78.

4.  Even if DOE could terminate based on changed goals and priorities, DOE had to make an individualized determination of non-alignment with the new goals and priorities. *Id.* ¶ 81.

24

5. Even if DOE could terminate based on changed goals and priorities, DOE could not terminate based on goals and priorities that directly conflict with Congress's goals and priorities in requiring the agency to spend the relevant funds. *Id.* ¶ 82.

6. Regardless of whether DOE breached on any of the above grounds, it breached because Sublime's project did effectuate agency goals and priorities. *Id.* ¶ 83.

### 1) The Government Does Not Dispute Three Alleged Reasons DOE Breached

The government's motion to dismiss does not dispute three of the grounds upon which Sublime alleges a breach of the contract's express terms.

First, the government does not dispute that two of the three reasons provided by DOE for terminating the award were not contractually permissible grounds for termination. The cooperative agreement allowed DOE to unilaterally terminate only if Sublime failed to comply with the terms and conditions of the award, or "to the greatest extent authorized by law, if the award no longer effectuates the program goals or agency priorities." Compl. ¶ 37. The first ground for termination listed in DOE's termination letter—that Sublime allegedly "only considered the emissions reduction at the facility and did not consider emissions generation of electricity to power the project"—is factually false and not a contractually permitted ground for termination even if it were true. Compl. ¶ 74. The government does not dispute, or even mention, that it terminated on this basis in its motion. The second stated reason for the termination was that the award "fails to meet the goals or priorities of DOE and the Administration," but that also is not an enumerated ground for termination. It omits the key "to the extent authorized by law" language as well as the preface "no longer effectuates," and it speaks of "the goals" of the agency rather than the "program goals." *Id.* ¶ 75. The government does not dispute in its motion that this basis for termination was contractually impermissible. Because the government's

25

motion does not address at all Sublime's allegation that DOE breached by terminating for reasons not permitted under the contract, that allegation is uncontested for purposes of this motion, and the question whether this breach caused Sublime's damages is a factual one.

Second, DOE does not dispute that, even if it could terminate based on changed program goals and agency priorities, those goals and priorities cannot be ones that directly conflict with Congress's goals and priorities in requiring DOE to spend these funds for the program in question. *Id.* ¶ 82. Under the doctrine of constitutional avoidance, the regulation that is the source of this ground for termination, 2 C.F.R. § 200.340(a)(4), must be interpreted not to permit terminations where the administration simply does not agree with Congress's goals and priorities, to avoid rendering the regulation unconstitutional. *Consolidation Coal Co. v. United States*, 615 F.3d 1378, 1382 (Fed. Cir. 2010). DOE does not dispute this legal proposition, nor could it. Congress has the exclusive constitutional power of the purse, including to set the purposes of federal spending, and it violates the separation of powers for the Executive to refuse to carry out these spending commands based on policy disagreements with Congress. *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018). Sublime has plausibly alleged that DOE did so here, *see* Compl. ¶¶ 11-12, 54, 77, and this allegation is a question of fact. *Id.* ¶ 82.

Third, the government does not address Sublime's allegation that DOE breached the contract because Sublime's award *does* effectuate the Administration's program goals and agency priorities. *Id.* ¶ 83. DOE unquestionably breached the contract if that is the case, and the Court must undertake factfinding to answer that question. DOE does not contend otherwise.

Because the government's motion does not address Sublime's allegations that DOE breached the express terms of the contract on these three bases, Defendant has waived any

arguments against these theories of breach for purposes of its motion. *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002); *accord AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 360 (2023) ("Arguments not raised in an opening brief are waived"). Given this waiver, Count I cannot be dismissed, and the Court need not address at this time the other theories of breach of the contract's express terms.

      2)  *The Government's Arguments on the Other Breach Allegations Lack Merit*

If, however, the Court does address the other theories of breach alleged in Count I, these theories state a claim for relief as well.

With respect to Sublime's allegation that the termination was not "to the extent authorized by law" because DOE's intent was to avoid spending the funds that Congress required to be spent in IRA § 50161, the government's only argument is a tortured grammatical one. The relevant regulation provides that an award may be terminated "[b]y the Federal agency . . . pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The government contends that "the phrase 'to the extent authorized by law' in section 200.340(a)(4) does not modify or otherwise attach to an agency's discretion to terminate an award . . . that conflicts with program goals or agency priorities." Mot. 24. Rather, according to the government, "'to the extent authorized by law' follows and is applicable to 'the Federal agency or pass-through entity, such that a funding instrument cannot be terminated for a reason that violates substantive law unrelated to 'program goals or agency priorities.'" *Id.* "In other words, this Cooperative Agreement could not be terminated for an illegal purpose that is *unrelated* to program goals or agency priorities." *Id.* (emphasis added).

This interpretation makes no sense as a grammatical and legal matter. The phrase "to the extent authorized by law" obviously is in reference to when an agency may terminate "if an award no longer effectuates the program goals or agency priorities," the phrase that immediately follows. The government's argument that "to the extent authorized by law" applies to "the Federal agency or pass-through" is hard to follow; there is no question that the Department of Energy itself is authorized by law. What the government really seems to be arguing is that, if the reason the termination is illegal is "[]related" to the program goals and agency priorities, then the termination is contractually permissible. So, under the government's theory, if an agency's "goals" or "priorities" are to not have cooperative agreements with members of certain racial or religious groups, the regulation and corresponding contractual provision would permit the termination, even if it violates equal protection, because the reason the termination is illegal is not "unrelated to program goals or agency priorities." Mot. 24.

The regulation and associated contractual provision cannot be interpreted in such a manner. Rather, it is clear that the provision does not permit termination based on program goals or agency priorities whenever, for whatever reason, the termination would be unlawful. And the government does not dispute that terminating for the purpose of not carrying out Congress' spending commands would be unlawful. Sublime's theory of breach in Paragraph 77(b) of the complaint thus states a claim.

With respect to Sublime's argument that DOE could only terminate based on the agency's goals and priorities that existed at the time the award was issued, not changed goals and priorities, a district court recently adopted Sublime's position. *See New Jersey v. OMB*, No. 1:25-cv-11816, 2026 WL 2069832, at *11–17 (D. Mass. July 17, 2026). The court held that the

provision does not authorize agencies to terminate based on program goals or agency priorities first identified after the awards were made. *Id.* at *11, *17.

The court explained that the regulation refers to "the" program goals and agency priorities, indicating a discrete and identifiable set of goals, and uses the phrase "no longer effectuates," which presupposes goals or priorities that the award previously effectuated. *Id.* at *16. Thus, the clause concerns whether new evidence shows that the award can no longer achieve the objectives for which it was made. *Id.* at *15. The regulatory history supports this interpretation. In the preamble to the 2020 rulemaking that was the genesis of this provision, OMB explained that the "no longer effectuates" language was to allow termination of projects that could no longer meet "the intended objective of the award," or that had become "ineffective at achieving program goals." Compl. ¶ 78 (quoting 85 Fed. Reg. 49506, 49507–08 (Aug. 13, 2020)). These examples "support[] the conclusion" that the provision allows agencies "to terminate an award in instances where new information establishes that the original goals can no longer be met, either because the specific project cannot achieve those goals or because they are unachievable." *New Jersey*, 2026 WL 2069832, at *16. The government is wrong that Sublime's argument "finds no support in the contract, the regulations, or federal law." Mot. 26.

The government similarly does not engage with the relevant text and regulatory history in disputing another basis for the alleged breach: that DOE had to make an individualized assessment of whether Sublime's award was consistent with program goals and agency priorities. *See* Mot. 27–28. The relevant provision permits termination, to the extent authorized by law, "if *the* Award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). The provision thus requires an assessment of whether "the Award" continues to effectuate program goals or agency priorities. The regulatory history

29

described above confirms this understanding, as OMB intended the provision to be invoked in circumstances such as where an award had become "ineffective" at achieving goals, which necessarily is based on the project itself. More generally, an agency cannot possibly make a reasoned determination of whether an award effectuates certain programs goals or agency priorities without looking at the details of the award. That certainly is what "a reasonable and prudent contractor" would have thought in agreeing to this provision, which must guide its interpretation. *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998). No reasonable company in Sublime's position would have thought, as the government now suggests, that an agency could presume that a project does not align with programs goals and agency priorities without actually inquiring into the details of the project at issue. Because the contract required an individualized assessment and Sublime plausibly alleges that did not occur, Sublime states a claim for breach on this basis as well.

Finally, Sublime plausibly states a claim that the termination was not "authorized by law" because it violated the requirements of the Administrative Procedure Act and DOE regulations that the agency not engage in arbitrary and capricious action. Compl. ¶ 77; 5 U.S.C. § 706(2)(A); 10 C.F.R. § 1003.17(b). The government contends that Sublime cannot rely on these laws because the APA is not a source of "substantive law," Mot. 24, but the termination provision does not limit this constraint to "substantive law." The APA thus does not "authorize" agency action that is arbitrary and capricious, and so DOE cannot terminate an award based on programs goals or agency priorities arbitrarily or capriciously. Multiple district courts have agreed with Sublime's position that "to the extent authorized by law" in 2 C.F.R. § 200.340(a)(4) includes the APA's prohibition on arbitrary and capricious action. *See, e.g.*, *Green & Healthy Homes Initiative, Inc. v. EPA*, 788 F. Supp. 3d 676, 703 (D. Md. 2025); *Launch Alaska v. Dep't of the*

30

*Navy, Off. of Naval Rsch.*, No. 3:25-CV-00141-GMS, 2025 WL 2223744, at \*6 (D. Alaska Aug. 5, 2025). And for the same reasons, DOE's termination was not "authorized" under DOE regulations that mirror the APA's requirements. *See* 10 C.F.R. § 1003.17.

### B. Sublime Plausibly Alleges Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

Sublime has also stated a claim that DOE breached the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quotations omitted). The covenant "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* at 991 (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)). Where a contract confers discretion on a party, the covenant "limits the manner in which a party who is vested with discretion under the contract may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 638 (2020) (quoting *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 705–06 (1996)). The implied covenant prohibits "evasion of the spirit of the bargain" and "abuse of a power to specify terms." Restatement (Second) of Contracts § 205 cmt. d.

Good faith and fair dealing claims involve a "fact-intensive inquiry" that depends on the terms of the contract, "in combination with the nature of the bargain struck by [the parties] and their respective expectations." *Hamilton Square, LLC v. United States*, 160 Fed. Cl. 617, 629 (2022). Accordingly, such claims are "typically resolved at the summary judgment stage," not a motion to dismiss. *Sunrez Corp. v. United States*, 157 Fed. Cl. 640, 662 (2022) (denying motion

to dismiss because there were a "plethora of disputed facts that make dismissal . . . inappropriate"); *Hamilton Square*, 160 Fed. Cl. at 629 (similar); *Vanquish Worldwide, LLC*, 147 Fed. Cl. at 401–02 (2020) (similar); *ASI Constructors, Inc. v. United States*, 129 Fed. Cl. 707, 721 (2016) (Kaplan, J.) (similar). Indeed, the government cites no case where the court held at the motion-to-dismiss stage that a plaintiff failed to plausibly allege facts supporting a good faith and fair dealing claim. *See* Mot. 30–32.

In any event, Sublime plausibly states a claim that DOE terminated the award "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Hous. Auth. of Slidell*, 149 Fed. Cl. at 638. DOE's demonstrably false first reason for terminating the award—that Sublime did not consider emissions generation of electricity to power the project—alone renders the termination arbitrary, capricious, and unreasonable. Moreover, for DOE to terminate an award because it purportedly does not effectuate program goals or agency priorities, without considering whether the award *actually* effectuated program goals or agency priorities, is arbitrary and capricious in the literal sense of those terms. *See Arbitrary*, Merriam-Webster ("chosen, decided, etc. seemingly at random or on a whim rather than in a reasoned or methodical way"); *Capricious*, Merriam-Webster ("governed or characterized by sudden irrational and unpredictable impulses or whims").

Secretary Wright's announcement of the "review process" and subsequent press release regarding the mass termination belie any notion that it was reasonable and contemplated by the parties for DOE to terminate the awards without individualized assessments. Compl. ¶¶ 51–52. Just two weeks before Sublime's termination, Wright stated that DOE would review awards from the prior administration for potential termination on a "case-by-case basis." *Id.* ¶ 52. Then, in announcing the mass termination on May 30, 2025, Wright claimed that the terminations were

32

undertaken "after a thorough and individualized financial review of each award."[4] DOE knew then that terminating without individualized review would be unreasonable. The disconnect between DOE's public statements about the process and what actually occurred confirms that DOE did not "effectuate the object and purpose the parties had in mind in providing for the exercise of [] power" by DOE to terminate based on programs goals and agency priorities. *Orange Cove Irr. Dist. v. United States*, 28 Fed. Cl. 790, 800–01 (1993) (quotation omitted).

The harried and slapdash nature of Sublime's termination provided yet more evidence that the termination was arbitrary and capricious. DOE rushed to terminate Sublime's award just weeks after announcing its purported review process. Compl. ¶¶ 51–52. DOE arbitrarily did not afford Sublime the opportunity to meet with the agency and explain why the award should be retained, even though DOE afforded that opportunity to other awardees, and DOE offered no explanation for the differential treatment. Compl. ¶¶ 51–52. DOE then sent the termination letter to a junior accountant at Sublime, rather than Sublime's designated award contacts. *Id.* ¶¶ 51–53. Everything about the process was arbitrary, capricious, unreasonable, and contrary to the reasonable expectations any awardee would have held in entering the agreement.

Contrary to the government's contentions, those allegations are precisely the kinds of allegations that courts have found to support a claim of breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Hous. Auth. of Slidell*, 149 Fed. Cl. at 638, 646; *Orange Cove*, 28 Fed. Cl. at 800–01 (1993).

The government argues that Sublime's allegations are insufficient here because "DOE made no promise that the award would not be terminated," Mot. 31. But that argument attacks a

---

[4] *Secretary Wright Announces Termination of 24 Projects, Generating Over $3 Billion in Taxpayer Savings*, DOE.gov, (May 30, 2025), https://perma.cc/PQ35-XDC5. This press release is cited and incorporated by reference in Sublime's complaint. *See* Compl. ¶ 59 n.1.

straw man. Sublime is not contending that DOE breached the implied covenant simply by terminating the award. Sublime's claim is that DOE breached the implied covenant by terminating the award *in the manner that it did*.  *See* Compl. ¶¶ 90–91.

The government is likewise wrong that Sublime must "identify [a] specific contractual promise that" was violated. Mot. 31. "[A] breach of the implied duty does not necessitate a violation of an express provision." *Hamilton Square*, 160 Fed. Cl. at 629. While an alleged breach of the implied duty must be "connected . . . to the bargain struck in the contract," it is "not limited to" the express provisions of the contract. *Id.* at 628 (quoting *Metcalf*, 742 F.3d at 994). Were the government correct, there would never be a reason to assert a claim for breach of the implied covenant of good faith and fair dealing, because the contractor would directly allege breach of the contract's express terms.

Sublime's claim for breach of the implied covenant is not "duplicat[ive]" of its breach-of-contract claims. Mot. 32. As an initial matter, even if the claim were redundant of the breach-of-contract claim, "redundancy in a complaint's causes of action . . . is not ordinarily a basis of dismissal." *Aries Constr. Corp. v. United States*, 164 Fed. Cl. 290, 297 (2023). "This Court's Rules expressly permit 'alternative statements' of claims, or even inconsistent theories for relief." *Id.* (quoting RCFC 8(d)(2), (3)). The government cites *Aries* for the relevant legal standard, but then fails to note that the court in that case *denied* the government's motion to dismiss the good faith and fair dealing claim, holding that the plaintiff's allegations were sufficient to state a claim and that "redundan[cy]" was not an appropriate basis to dismiss an otherwise well-pleaded claim. *See* Mot. 30; *Aries*, 164 Fed. Cl. at 297.

Here, Sublime alleges in Count I that DOE breached the express terms of the award in terminating Sublime's award as part of a mass termination, without any individualized

34

assessment of whether Sublime's project was consistent with DOE's program goals and agency priorities. But if the Court concludes that does not constitute a breach of the agreement's express terms, Sublime's "allegations of arbitrary and capricious agency conduct, at a minimum, support [Sublime's] claim for breach of the implied duty of good faith and fair dealing." *Hous. Auth. of Slidell*, 149 Fed. Cl. at 638; *see also id.* at 646 & n.57 (allegations stated claim for breach of the implied covenant even though nothing expressly prohibited agency from "act[ing] with impunity to do whatever it wants regardless of reasonableness and arbitrariness" (quotation omitted)).

In any event, Sublime's good faith and fair dealing claim relies on "additional facts" beyond those relevant to the claim for breach of express terms. *Sunrez*, 157 Fed. Cl. at 663 (2022) (quoting *ASI Constructors, Inc.*, 129 Fed. Cl. at 721). Many of these additional facts are disputed, making "dismissal at this phase inappropriate." *Id.* Resolution of a good faith and fair dealing claim also requires examination of the terms of the agreement "in combination with the nature of the bargain struck," the parties' "respective expectations," and whether those expectations were "reasonable," which involves a "fact-intensive inquiry" that "warrants further exploration during discovery." *Hamilton Square*, 160 Fed. Cl. at 629. The Court cannot adjudicate such factual disputes on a motion to dismiss.

### C.    Sublime Plausibly Alleges Abuse of Discretion (Count III)

Sublime also states a claim for abuse of discretion. Count III does not, as the government contends, "plead the same legal theory as Count I." Mot. 23. While Count I alleges that DOE breached the contract's express terms, Count III alleges that even if the express terms of the contract gave the government discretion to terminate on the grounds that it invokes, the government abused that discretion in terminating the award. The Federal Circuit and this Court have repeatedly recognized that such a claim for abuse of discretion may arise in connection with

the termination of a contract. *See, e.g.*, *27-35 Jackson Ave LLC v. United States*, 127 F.4th 1314, 1319–20 (Fed. Cir. 2025); *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 347 (2013).

Under this doctrine, where a contract gives the government discretion to make a particular determination or take a particular action, including to terminate an award, there is a breach of contract where "the government's exercise of its discretion was unreasonable or arbitrary and capricious." *27-35 Jackson Ave*, 127 F.4th at 1319–20. "More specifically, in a case in which a contract gives the government unilateral authority to make a decision affecting its contracting partner, . . . the government's judgment should be exercised not capriciously or fraudulently, but reasonably, and with due regard to the rights of both the contracting parties." *Id.* (quotations omitted). Thus, in termination cases, a contractor may "prove an abuse of discretion" where it shows that the agency's "decision to terminate was arbitrary and capricious." *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 361 (2013); *see also id.* at 384 (finding breach of contract where the Army's termination of award was arbitrary and capricious); *TigerSwan, Inc. v. United States*, 118 Fed. Cl. 447, 453 (2014) (similar).

The government's motion does not address the applicable standards for an abuse-of-discretion breach claim, let alone argue that the complaint fails to plausibly allege the elements of such a claim. Instead, the government addresses Count III only insofar as it erroneously asserts that "Count III . . . pleads the same legal theory" as Count I. Mot. 23. That is wrong, and the government has waived any argument that Sublime has failed to state an abuse of discretion claim under the established standards for such claims. This Court should reject the government's motion to dismiss Count III on this basis alone.

In any event, Sublime has plausibly alleged abuse of discretion. For similar reasons to those explained above with respect to the implied duty of good faith and fair dealing, the

36

termination of Sublime's award was arbitrary, capricious, and irrational. Terminating Sublime's award because it purportedly did not perform a certain analysis (of the emissions generation of electricity to power the plant), when Sublime did perform that exact analysis, is intrinsically irrational. And it was wholly arbitrary and capricious for DOE to terminate the award because it purportedly does not effectuate program goals or agency priorities without conducting any actual "investigations into the facts" of the award to determine whether that was the case. *TigerSwan*, 118 Fed. Cl. at 453. Stated differently, DOE abused its discretion to terminate an award based on program goals and agency priorities where it did not undertake to determine how those criteria applied to Sublime's project.

DOE's failure to undertake any individualized review of Sublime's award, despite its public statements that such would occur and did occur, also renders the termination arbitrary, capricious, and unreasonable for the reasons previously explained. At a minimum, DOE's false claims regarding the process used raise serious doubts about whether its justifications for terminating were well grounded, making it necessary for "the court . . . to inquire into the objective facts to determine whether the justifications for the decision are supported." *Id.*

In short, the government's motion does not contest that Sublime plausibly states a claim for abuse of discretion under the well-worn standards for such a claim, and Sublime's complaint does plausibly allege that there was an abuse of discretion here in multiple ways.

### D.    Sublime Plausibly Alleges Termination in Bad Faith (Count IV)

The Court should deny the government's motion to dismiss Count IV, because Sublime has plausibly alleged that the Department acted with animus and a specific intent to injure when it terminated Sublime's award.

Sublime alleges far more than "disagreement" with DOE's decision to terminate. *Contra* Mot. 35. Sublime alleges that DOE terminated Sublime's award as part of a mass termination in

37

May 2025, not based on specific problems with Sublime's project, but rather based on animosity toward the awardees. That animosity was driven by disdain for the presumed goals of the recipients in performing their awards (e.g., reducing carbon emissions), when they received their awards, and for which statutory programs. DOE did not hide these motivations; the announcement of the terminations highlighted that "the previous administration" issued the awards, most were issued between Election Day and January 20th, and that the projects were to carry out specific "initiatives."[5] Those initiatives were prescribed by the IRA, which enacted programs that the Administration—including DOE—has consistently described as part of the "Green New Scam," including in congressional testimony from Secretary Wright just a week before the terminations. *Energy and Water Development Appropriations for Fiscal Year 2026: Hearings Before the Subcomm. on Energy & Water Development of the S. Comm. on Appropriations*, 119th Cong. 10, 57 (2025), available at https://www.govinfo.gov/content/pkg/CHRG-119shrg60258/pdf/CHRG-119shrg60258.pdf.

As further evidence of bad faith, DOE never requested information from Sublime or gave it an opportunity to be heard, never contacted Sublime, and abruptly terminated Sublime's award less than two weeks after the so-called review process began, effective immediately, by sending the notice to a junior accountant rather than Sublime's designated award contacts. Compl. ¶¶ 51–53. DOE provided no individualized explanation for why Sublime's project supposedly no longer effectuated agency priorities, and relied on a factual assertion—that Sublime's application did not account for emissions from the electricity consumed in producing cement—that was so demonstrably false as to suggest DOE was merely searching for pretextual reasons to give for its predetermined decision. Compl. ¶¶ 54–57.

---

[5] *See Secretary Wright Announces Termination of 24 Projects, supra* note 4.

Interpreting the allegations in the light most favorable to Sublime, these allegations more than plausibly support the claim that DOE acted with bad-faith intent. Sublime does not rest on a presumption of bad faith, *contra* Mot. 36, but has instead plausibly alleged bad faith based on reasonable inferences from the facts. The government's principal response is that Sublime must allege animus directed at Sublime specifically. Mot. 34–35. But Sublime alleges just that: DOE acted with intent to harm award recipients, including Sublime, that received awards from the Biden administration after the election, for work that DOE presumed without basis was wasteful and part of a "scam."

The government cites no case holding that, at the pleadings stage for a claim of bad faith, a plaintiff must plead that a government official cursed a plaintiff by name as part of a "personal vendetta." Mot. 36. It is sufficient that Sublime alleges that DOE acted with animus toward the group of award recipients terminated in May 2025, based on shared characteristics of that group. For instance, in *Danziger*, Judge Tapp held that former USAID contractors adequately alleged bad faith in pointing to repeated statements by senior officials denigrating the agency and its contractors as a group. *Danziger*, ECF No. 20 at 2. The court subsequently certified a class of the contractors on their bad faith claims, rejecting the government's arguments that a bad-faith claim must be entirely individualized. 181 Fed. Cl. 93, 98 (2026). To hold otherwise would immunize the government's bad faith actions so long as the action harms a class of disfavored recipients rather than individual award holders.

Count IV ultimately rests on disputed factual questions regarding DOE's intent and motivations that cannot be resolved at the pleadings stage.

## CONCLUSION

The Court should deny the government's motion to dismiss and to strike.

Dated: July 23, 2026

Respectfully submitted,

/s/ *Daniel F. Jacobson*
Daniel F. Jacobson
John Robinson
Brian C. Rosen-Shaud
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiff*